# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

PHILLIP RAMSEY,
    Plaintiff,

    vs.

RECEIVABLES PERFORMANCE
MANAGEMENT, LLC, et al.,
    Defendant.

Case No. 1:16-cv-1059
Dlott, J.
Litkovitz, M.J.

**ORDER**

This matter is before the Court following the January 24, 2019 telephone conference with the parties. (Doc. 60).

The background of this dispute is fully set forth in the submissions of the parties which are attached to this Order.

The Court set a deadline of May 17, 2017 for defendant Receivables Performance Management, LLC (RPM) to inform the Court whether it intended to file a motion to compel arbitration. *See* Docket Notation of April 20, 2017. The following month, defendant RPM notified the Court that "[a]fter attempting to obtain additional information, and after further investigation of the ability to pursue arbitration in this matter, Defendant Receivables Performance Management is unable to proceed with a motion to compel arbitration." (Pl's submission, Exhibit 3, May 17, 2017).[1] On December 27, 2018, over one and one-half years later, defendant RPM sent an email to counsel for plaintiff requesting that plaintiff dismiss this lawsuit and proceed with arbitration. Plaintiff objected, arguing there was no basis for defendant to move to compel arbitration. The parties requested a conference with the undersigned magistrate judge on whether defendant RPM is barred from seeking to compel

---

[1] The letter is dated April 14, 2017, which is an obvious typographical error. The letter was submitted to the Court via email dated May 17, 2017.

arbitration at this juncture of the lawsuit. For the reasons more particularly stated on the record and as set forth below, the Court finds RPM has waived its right to compel arbitration in this case.

The Sixth Circuit has determined that "a party may waive an agreement to arbitrate by engaging in two courses of conduct: (1) taking actions that are completely inconsistent with any reliance on an arbitration agreement; and (2) 'delaying its assertion to such an extent that the opposing party incurs actual prejudice.'" *Johnson Assocs. Corp. v. HL Operating Corp.*, 680 F.3d 713, 717 (6th Cir. 2012) (citations omitted).

Assuming the parties entered into an agreement to arbitrate this case, the actions taken by defendant RPM are inconsistent with any reliance on the right to arbitration. The length of time a party engages in active litigation is a factor to consider in this regard. *Johnson*, 680 F.3d at 718. In *Johnson*, the Sixth Circuit determined the defendant waived the right to arbitration where the request to compel arbitration was made 8 months into the case, the defendant failed to raise arbitration in its answer, and the defendant actively scheduled and requested discovery, including depositions, rather than moving to compel arbitration following the end of formal settlement discussions. 680 F.3d at 718-19.

While RPM, unlike the defendant in *Johnson*, did raise the arbitration defense in its answer (Doc. 7), RPM nevertheless explicitly notified the Court and plaintiff early in the litigation that it would not be pursuing arbitration. The original complaint in this matter was filed in November 2016. In May 2017, RPM notified the Court and plaintiff that RPM would not be filing a motion to compel arbitration (Pl's submission, Exhibit 3) and thereafter actively participated in the litigation for over one and one-half years. The affirmative notice to the

Court, coupled with the motion practice, conferences with the Court, and discovery proceedings throughout this case, evince an intent to litigate and not arbitrate.

This case has now been pending for over two years. The parties have actively litigated this case and engaged in motion practice and briefing, including the filing of two motions to dismiss by defendants. Plaintiff filed and the Court granted a motion for attorney fees, finding that "[t]his case has been rife with needless contention, and evasion of service is among the many disputes that have backlogged the docket of this case and cost the Court unnecessary judicial resources." (Doc. 45 at 12). The parties have participated in numerous conferences with the Court, including multiple discovery conferences with the magistrate judge who was previously assigned to the case. The parties have conducted discovery over the past two years, including the taking of plaintiff's deposition, defendant Howard George's deposition, and witness depositions. The course of this litigation and the length of time this case has been proceeding weigh heavily in favor of finding a waiver.

RPM states it has timely sought to compel arbitration in this case because it only recently obtained a copy of the service agreement between plaintiff and Windstream that contains the relevant arbitration clause. RPM alleges that it made informal attempts to obtain the operative service contract between plaintiff and Windstream for "years," but it was not until RPM subpoenaed Windstream in December 2018 that it received a copy of the agreement. RPM claims it then promptly notified plaintiff of its desire to arbitrate this matter. However, RPM could have subpoenaed this information from Windstream nearly two years ago in April of 2017 when it was deciding whether to file a motion to compel arbitration. To the extent RPM intended to rely on an arbitration defense, it was RPM's burden to obtain the service agreement

3

in a timely manner and not wait until more than two years into the litigation to do so. RPM has

not given a valid excuse for its unreasonable delay in obtaining the agreement.

RPM also seeks to place the blame on plaintiff for not producing the service agreement in

response to discovery requests. However, despite several discovery conferences with the Court,

RPM never raised this specific issue with the Court. In addition, plaintiff's counsel provided

defense counsel with the identical agreement in March 2017 when RPM indicated it might seek

to compel arbitration. (Pl's submission, Exh. 1). The circumstances leading up to RPM's

belated request to arbitrate this matter, more than two years after this litigation was filed, are

inconsistent with reliance on the right to arbitrate.

The second factor of prejudice also weighs heavily in favor of waiver. "Prejudice can

be substantive, such as when a party loses a motion on the merits and then attempts, in effect, to

relitigate the issue by invoking arbitration, or it can be found when a party too long postpones his

invocation of his contractual right to arbitration, and thereby causes his adversary to incur

unnecessary delay or expense." *Johnson*, 680 F.3d at 719 (citations omitted). In *Johnson*, the

Sixth Circuit substantially agreed with the district court's finding that the plaintiffs were

prejudiced by unnecessary delay and expense:

> "[T]he right to arbitrate was not asserted for eight months, during which motions
> were filed, requests for discovery materials were made and responses were
> prepared, and a judicial settlement conference was held." [The district court]
> emphasized that "[a] considerable amount of time and resources has been spent in
> pursuing this matter in court, and Plaintiffs assert that the fruits of their efforts will
> not be fully transferrable to an arbitration process abroad that may delay resolution
> of this case even further."

680 F.3d at 720 (internal citation omitted). The Sixth Circuit rejected the defendant's

contention that the district erred in its prejudice finding by relying on the time and resources

4

spent in litigation. While acknowledging that delay alone may not be sufficient to establish prejudice, the Sixth Circuit determined:

> [T]his is not a case involving delay alone, or even delay and the inherent pretrial expense. . . . This is a case where, in addition to an eight-month delay and expenses involved with numerous scheduling motions and court-supervised settlement discussions, plaintiffs also engaged in discovery. The combination of all of these factors caused plaintiffs to suffer "actual prejudice."

*Johnson*, 680 F.3d at 720 (citations omitted).

The circumstances of the instant case are even stronger than those in *Johnson* for a showing of prejudice. The delay involved is over two years, far in excess of the eight months in *Johnson*. In the instant case, numerous motions and related memoranda have been filed, including motions to amend the complaint, to dismiss, and for attorney fees, among others; the parties submitted and the Court approved a detailed protective order to govern confidential information exchanged during discovery; there have been multiple discovery and other conferences with the Court; the parties have engaged in discovery, including the taking of depositions, which required plaintiff's counsel to travel to Seattle, Washington to depose three separate witnesses of RPM, including defendant George; discovery will end in 24 days; and dispositive motions are due in one month. The totality of these circumstances have caused plaintiff to suffer actual prejudice.

This case has continued on a litigation track for over two years. Defendant RPM's actions have been inconsistent with any reliance on a right to arbitrate this case. RPM's belated assertion of that right, over two years after the filing of this case, has caused plaintiff actual prejudice due to unnecessary delay and expense. Assuming the parties entered into an agreement to arbitrate the dispute before the Court, the Court finds RPM has waived its right to

arbitration.

**IT IS SO ORDERED.**

Date: _1/25/19_

Karen L. Litkovitz
United States Magistrate Judge



THE LAW FIRM OF
# SADLOWSKI & BESSE L.L.C.


11427 Reed Hartman Hwy, Suite 217 • Blue Ash, Ohio 45241 • www.sb-lawyers.com

Adam V. Sadlowski
513-618-6595
asadlowski@sb-lawyers.com

January 23, 2019

**VIA ELECTRONIC MAIL**

Magistrate Judge Karen L. Litkovitz
litkovitz_chambers@ohsd.uscourts.gov

**Re:** ___Ramsey v. Receivables Performance Mgmt., LLC, et al.___, **No. 1:16-cv-1059 (S.D. Ohio)**

Dear Magistrate Judge Litkovitz:

Per the Court's January 23, 2019 docket notice, this letter is Plaintiff Phillip Ramsey's memorandum summarizing the current issues between Plaintiff and Defendants Receivables Performance Management, LLC's ("RPM") and Howard George.[1]

Plaintiff filed this lawsuit on November 8, 2016. After actively litigating this case for over 2 years, counsel for Defendants sent Plaintiff's counsel an email on December 28, 2018 requesting Plaintiff dismiss the lawsuit and proceed with arbitration. As outlined in position statement and the attached exhibits, there is no basis for Defendants to move to compel arbitration.

## I. BACKGROUND

Plaintiff filed this lawsuit in November 2016 alleging violations of federal and state law based on RPM's unlawful debt collection efforts taken on behalf of one of its clients, Windstream Communications ("Windstream"). In March 2017, counsel for RPM (Sean Flynn) informed Plaintiff's counsel and Judge Dlott that RPM was considering moving to compel arbitration of this dispute based on a purported arbitration provision contained in the Terms and Conditions Agreement with Windstream. On March 28, 2017, based Plaintiff's counsel's own independent online research, Plaintiff provided defense counsel with a copy of a Windstream Terms and Conditions dated Oct. 21, 2013 and explained Plaintiff's position as to why arbitration was not appropriate in this case (attached as Exhibit 1).

Pursuant the Court's April 20, 2017 Minute Entry (attached as Exhibit 2), Judge Dlott set May 17, 2017 as the deadline for RPM to inform the Court and Plaintiff whether it intended to compel

---

[1] RPM and Howard George will be referred to jointly as "Defendants."

arbitration in this case. On May 17, 2017, defense counsel emailed the parties' joint status letter (attached as Exhibit 3) to Judge Dlott, where RPM informed the Court it would not seek arbitration in this case:

> "After attempting to obtain additional information, and after further investigation of the ability to pursue Arbitration in this matter, Defendant Receivables Performance Management is unable to proceed with a motion to compel arbitration."

Since informing the Court on May 17, 2017 that RPM would not move to compel arbitration, the parties have actively litigated this case over the course of nearly two years, including (but not limited to) the follow:

1. Plaintiff amending his complaint;
2. Defendants filing two motions to dismiss;
3. The parties briefing the Court on Defendants' motions to dismiss (which Judge Dlott denied);
4. The parties briefing the Court on Plaintiff's motion for attorney's fees (which Judge Dlott granted);
5. Defendants filing answers;
6. The parties serving, objecting, and responding to written discovery requests;
7. The parties briefing the Court and holding hearings on multiple discovery disputes before Magistrate Judge Bowman;
8. Plaintiff's counsel traveling to Seattle, WA to depose three separate witnesses of RPM, including Co-Defendant Howard George;
9. Defense counsel taking Plaintiff Phillip Ramsey's deposition;
10. Counsel for the parties preparing and filing multiple case schedules;
11. Counsel for the parties preparing and filing motions to extend the case schedule, including a recent joint motion to extend the discovery and dispositive motion deadlines which the Court granted on December 18, 2018;
12. Defendants issuing subpoenas to various third parties; and
13. Counsel for the parties engaging in substantive and lengthy settlement discussions.

To date, Plaintiff and his counsel have expended hundreds of hours in time and tens of thousands of dollars in legal fees and costs litigating this lawsuit.

Around November 30, 2018 (over two years after the complaint was filed and nearly nineteen months after informing Judge Dlott that RPM would not compel arbitration), Defendants issued a subpoena to Windstream requesting documents relevant to Plaintiff's account (attached as Exhibit 4). In response to this subpoena, Windstream produced the same Windstream Terms and Conditions dated Oct. 21, 2013 which had previously been provided to defense counsel by Plaintiff's counsel on March 28, 2017. Subsequently, on December 27, 2018, defense counsel sent Plaintiff's counsel an email (attached as Exhibit 5) with the Windstream Terms and

Conditions dated Oct. 21, 2013 and requested if Plaintiff would dismiss this lawsuit and proceed with arbitration.

On January 2, 2019, Plaintiff's counsel emailed defense counsel to (1) explain yet again why arbitration was not appropriate, and (2) inform Defendants that Plaintiff would not dismiss the lawsuit after the parties have actively litigated the case for over two years (attached as Exhibit 6).

## II. THERE IS NO BASIS FOR DEFENDANTS TO MOVE TO COMPEL ARBITRATION

There is no basis for Defendants to move to compel arbitration for two separate and independent reasons.

First, under controlling Sixth Circuit authority, Defendants have waived any purported right to compel arbitration by (1) representing in May 2017 to Judge Dlott and Plaintiff that RPM would not seek to compel arbitration and submitting a joint case schedule, and thus explicitly waiving any purported right to arbitrate; (2) the Court and Plaintiff relying on this explicit representation and waiver causing them substantial prejudice by expending resources; and (3) Defendants actively litigating this case for more than two years after the lawsuit was filed and nearly nineteen months after explicitly representing to the Court and Plaintiff of the intention not to seek arbitration. *Johnson Associates Corp. v. HL Operating Corp.*, 680 F.3d 713, 717-21 (6th Cir. 2012) (affirming district court's decision holding defendant waived right to arbitrate where it sought to compel arbitration eight months after the case was filed and where defendant actively participated in litigation by filing an answer, filing a counterclaim, engaging in settlement talks, actively drafting case calendar, and requesting discovery) (attached as Exhibit 7).[2] In short, Defendants' conduct is a text book example of a party waiving any purported right to compel arbitration by making explicit representations to the Court and Plaintiff upon which they relied, and actively participating in litigation for <u>over a two year period</u> before attempting to compel arbitration.

Second, as outlined in Plaintiff's counsel's March 28, 2017 email (see Exhibit 1), the arbitration provision contained in the Windstream Terms and Conditions dated Oct. 21, 2013 specifically excludes claims relating to debt collection, which have been asserted in this case against Defendants. An illustrative case is *Loney v. State Collection Serv.*, where the United States District Court for the Eastern District of North Carolina refused to enforce the exact same Windstream arbitration provision because plaintiff asserted claims against one of Windstream's debt collectors based on its debt collection efforts. *Loney v. State Collection Serv.*, Case No.

---

[2] It is unclear what efforts (if any) were taken by Defendants in March 2017 to contact Windstream to determine whether the Windstream Terms and Conditions dated Oct. 21, 2013 was governed Plaintiff's account with Windstream. Presumably, either defense counsel or Defendants simply could have emailed or called Windstream in March 2017 to confirm this information. Moreover, it also is unclear why Defendants needed to wait until November 30, 2018 (two years after the lawsuit was filed and right before the discovery cut-off) to issue a subpoena to Windstream.

7:13-CV-247, 2014 U.S. Dist. LEXIS (E.D. N.C. Jan. 31, 2014) (denying motion to compel arbitration where claims were asserted against a debt collector working on behalf of Windstream; holding the Windstream Terms and Conditions dated Oct. 21, 2013 "provisions [that] apply to arbitration" specifically exempted debt collection from the arbitration provision: "[t]his section is intended to resolve outstanding disputes between us and not to collect a debt owed by you to Windstream."). Therefore, even if Defendants did not waive a purported right to compel arbitration (which they did), the claims asserted in this lawsuit are specifically exempted from arbitration.

III.     THE COURT SHOULD IMPOSE SANCTIONS AGAINST DEFENDANTS SHOULD THEY MOVE TO COMPEL ARBITRATION

Defendants have already exhibited a pattern of delay tactics throughout this litigation. The parties had multiple discovery hearings with Magistrate Judge Stephanie K. Bowman regarding the deficiencies in RPM's discovery responses. As a result of these discovery hearings, Magistrate Judge Bowman issued Orders on August 18, 2017, August 31, 2017, and November 14, 2017, compelling Defendants to produce discovery responses and documents. Indeed, Judge Dlott has already criticized Defendants' delay tactics in this case and awarded Plaintiff the resulting costs and attorney's fees. January 23, 2018 Order Denying Defendants' Motions to Dismiss and Granting Plaintiff's Motion for Costs and Attorney's Fees, pp. 12, 14 [Dkt. No. 45] ("This case has been rife with needless contention, and evasion of service is among the many disputes that have backlogged the docket of this case and cost the Court unnecessary judicial resources. . . . [D]efense counsel has demonstrated a pattern of dilatory tactics that have needlessly delayed this case from moving forward. Accordingly, the Court finds that under Rule 4(d)(2), Plaintiff is entitled to the fees and costs of service and reasonable attorney's fees for preparing and defending a motion to obtain such fees and costs.") (attached as Exhibit 8).

As illustrated in this position statement and the attached documents, there is no basis for Defendants to move to compel arbitration in this case and any motion to compel arbitration should be viewed as yet another effort by Defendants to delay this case from moving forward, to drive up costs needlessly on Plaintiff, and to waste precious judicial resources. To be clear, Plaintiff intends to move for his attorney's fees as sanctions should Defendants move to compel arbitration.

Respectfully submitted,

*Adam V. Sadlowski*

Adam V. Sadlowski

# EXHIBIT 1

# Adam V. Sadlowski

Sean,

Per our conversation today, attached is a screen shot for Mr. Ramsey's Windstream account that was produced by Windstream in response to a subpoena in another lawsuit. It appears to show Mr. Ramsey's dates of service for the account on which RPM was seeking to collect as being 6/5/2014 to 10/21/2014.

Also, as I indicated to your during our call, our firm researched the arbitration issue prior to filing the lawsuit, but my memory was a bit hazy on the details so we re-pulled the research that was performed before filing the lawsuit. Mr. Ramsey did not have a copy of his user agreement with Windstream. However, our research found a case from the Eastern District of North Carolina involving a Windstream user agreement dated October 21, 2013 which is around the same time period Mr. Ramsey was a customer of Windstream. The case is captioned as *Loney v. State Collection Serv.*, Case No. 7:13-CV-247, 2014 U.S. Dist. LEXIS (E.D. N.C. Jan. 31, 2014), and involved a consumer suing a debt collector regarding the collection of a Windstream debt. The *Loney* court denied the motion to compel arbitration, finding that the Windstream arbitration provision applied only to the customer and Windstream, and did not apply to Windstream's debt collector.

As a professional courtesy, attached are copies of the *Loney* case, and the Windstream user agreement and the complaint from the *Loney* case which we pulled from Pacer. As you will see, the arbitration provision in the Windstream user agreement was narrowly defined as applying to "you" and "Windstream." Further, the term "Windstream" was narrowly defined in section 1 as "the Windstream legal entities providing Services to you and as identified on your bill." The user agreement didn't have the sort of broad language you often see in other user or arbitration agreements (e.g. agents, representatives, etc.). Lastly, "Dispute" is defined as "any claim or controversy related in any way to Windstream's Services, including charges for Services, Equipment, Service Order(s) or our agreements pursuant to these Terms or any other agreements." Notably, the "provisions [that] apply to arbitration" specifically exempted debt collection from the arbitration procedures, stating that "[t]his section is intended to resolve outstanding disputes between us and not to collect a debt owed by you to Windstream."

I will be sending you a separate email regarding what documents we need from your client on the automated dialing issue.


Adam V. Sadlowski
**THE LAW FIRM OF**
**SADLOWSKI & BESSE L.L.C.**
11427 Reed Hartman Highway, Suite 217
Blue Ash, Ohio 45241
P: (513) 618-6595
F: (513) 618-6442
E: asadlowski@sb-lawyers.com
www.sb-lawyers.com
www.blueashlawfirm.com

# Loney v. State Collection Serv.

United States District Court for the Eastern District of North Carolina, Southern Division

January 31, 2014, Decided; January 31, 2014, Filed

No: 7:13-CV-247-BR

**Reporter**
2014 U.S. Dist. LEXIS 13821 *; 2014 WL 349380

JOYCE LONEY, Plaintiff, v. STATE COLLECTION SERVICE, DOES 1-10, inclusive, Defendant.

**Subsequent History:** Dismissed by Loney v. State Collection Servs., 2014 U.S. Dist. LEXIS 39389 (E.D.N.C., Mar. 25, 2014)
Related proceeding at Loney v. HSBC Card Servs., 2014 U.S. Dist. LEXIS 175483 (E.D.N.C., Dec. 18, 2014)

**Counsel:** [*1] Joyce Loney, Plaintiff, Pro se, Oak Island, NC.

For State Collection Services, Inc., Defendant: Samuel David Fleder, Smith Debnam Narron Drake Saintsing & Myers, L.L.P., Raleigh, NC.

**Judges:** WILLIAM A. WEBB, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** WILLIAM A. WEBB

# Opinion

## ORDER

This matter is before the Court upon Defendant SCS's motion to stay discovery and pretrial deadlines (DE-11), and Plaintiff's motion to compel arbitration (DE-13). Defendant has responded to Plaintiff's motion, and the time for Plaintiff to respond to Defendant's motion has expired. Accordingly, the matter is now ripe for adjudication. For the reasons discussed below, Defendant's motion is GRANTED, and Plaintiff's motion is DENIED.

## I. Plaintiff's Motion to Compel Arbitration (DE-13)

Plaintiff seeks to compel arbitration with SCS. She asserts that "[t]he parties are bound" by the contract ("Agreement") attached to her motion, which includes an arbitration provision.[1] DE-13 at 1. Defendant contends that, as a non-party, it is not bound by the Agreement. DE-14. Under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.,* a court must compel arbitration if it finds: (1) that a valid arbitration agreement exists between the parties, and (2) [*2] that the dispute before it falls within the scope of the agreement. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 US. 614, 626-28, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985); *Glass v. Kidder Peabody & Co.,* 114 F.3d 446, 453 (4th Cir. 1997). Plaintiff must thus, as a threshold, establish that she and SCS are bound by the agreement that she has provided. *Adkins v Labor Ready Inc.,* 303 F.3d 496, 500-01 (4th Cir. 2002) ("In the Fourth Circuit, a litigant can compel arbitration under the FAA if he can demonstrate," *inter alia,* that an agreement to arbitrate covers the dispute between the parties); *In re Mercury Constr. Corp.,* 656 F.2d 933, 939 (4th Cir. 1981) ("It is obvious from [the FAA] that in a case such as this, there are but two facts which a plaintiff seeking arbitration must establish: (1) The making of the agreement and (2) the breach of the agreement to arbitrate.").

Plaintiff's motion must be denied because she has not made even an initial showing that a valid arbitration agreement exists between her *and SCS.* In fact, several aspects of the Agreement attached to her motion undercut her claim. The Agreement sets forth the "Terms and Conditions for Services and/or Equipment Provided by Windstream" to Plaintiff. DE-13-1 at 1.

---

[1] The posture of this request is unusual: most frequently, it is the commercial party who seeks to compel an individual to arbitrate, and the individual who resists, rather than vice versa. *See, e.g.,* DE-14 at 5 (citing cases in which debt collection companies sought to compel a debtor to arbitrate pursuant to a clause in the debtor's agreement [*3] with the creditor). Indeed, these consumer agreement arbitration clauses have been routinely decried as unfair to consumers. *See, e.g.,* Katherine Van Wezel Stone, *Rustic Justice: Community and Coercion Under the Federal Arbitration Act,* 77 N.C. L. Rev. 931 (1999).

Windstream is defined as "the Windstream legal entities providing Services to you and as identified on your bill." *Id.* The Agreement provides for certain resolution procedures, including arbitration, in the event of any "dispute with Windstream." *Id.* at 5. "Dispute" is defined as "any claim or controversy related in any way to Windstream's Services, including charges for Services, Equipment, Service Order(s) or our agreements pursuant to these Terms or any other agreements." *Id.* at 5. Notably, the "provisions [that] apply to arbitration" specifically exempt debt collection [*4] from the arbitration procedures, stating that "[t]his section is intended to resolve outstanding disputes between us and not to collect a debt owed by you to Windstream." *Id.* at 6; *cf. Garrett v. Margolis, Pritzker, Epstein & Blatt, P.A.,* 861 F. Supp. 2d 724, 728 (E.D.Va. 2012) (debt collection attorneys could enforce arbitration provision of creditor-debtor agreement where agreement broadly stated that claims "made by or against anyone connected with us or you or claiming through us or you, such as ... an employee, agent, representative, affiliated company, predecessor or successor...." were subject to arbitration). In addition, paragraph 25 provides that Windstream may not assign the agreement to another entity without consent of the customer. *Id.* at 9.

"A party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *American Recovery Sys. v. Computerized Thermal Imaging, Inc.,* 96 F.3d 88, 92 (4th Cir. 1996) (quoting *United Steelworkers of America v. Warrior & Gulf Navig. Co.,* 363 U.S. 574, 582, 80 S. Ct. 1347, 4 L. Ed. 2d 1409 (1960)). Here, Plaintiff has not sued Windstream, the party to the agreement; Plaintiff has sued SCS. Plaintiff has made no showing or specific assertion [*5] that Windstream's rights under the Agreement were assigned to SCS, that SCS is an intended third party beneficiary of the Agreement, or that the Agreement is otherwise enforceable against SCS. *See, e.g., Rota-McLarty v. Santander Consumer USA, Inc.,* 700 F.3d 690, 700 (2012) (enforcing arbitration where defendant seeking to compel arbitration was an assignee of the entire agreement between plaintiff and original contractor). Indeed, the Agreement expressly provides that Windstream *cannot* assign its rights without the consumer's-*i.e.*, Plaintiff's-consent. DE-13-1 at 9. And though Windstream is defined as "the Windstream legal entities providing services to you," there is no indication that SCS is a Windstream entity or that it has ever provided services *to Plaintiff.*

Given this thin record and Plaintiff's failure to make any factual showing other than a bald assertion that SCS is

bound by the Windstream contract, the undersigned declines to compel arbitration. *See Arrants v. Buck,* 130 F.3d 636, 640 (4th Cir. 1997) ("[E]ven though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate"). [*6] Accordingly, Plaintiff's motion (DE-13) is DENIED.

## II. Defendant's Motion to Stay (DE-11)

In its motion, Defendant requests that discovery be stayed during the pendency of its motion to dismiss. Rule 26(c) authorizes a court to issue orders limiting or staying discovery. Specifically:

> A court may properly exercise its discretion under Rule 26(c) to stay discovery pending resolution of dispositive motions. *Tilley v. United States,* 270 F. Supp. 2d 731, 734 (M.D.N.C. 2003), *aff'd,* 85 F. App'x 333 (4th Cir. Jan. 15, 2004), *cert. denied,* 543 U.S. 819, 125 S. Ct. 64, 160 L. Ed. 2d 27 (2004). Factors favoring a stay include the potential for the dispositive motion to terminate all the claims in the case or all the claims against particular defendants, strong support for the dispositive motion on the merits, and irrelevancy of the discovery at issue to the dispositive motions. *See id.* at 735; *Simpson v. Specialty Retail Concepts, Inc.,* 121 F.R.D. 261, 263 (M.D.N.C. 1998). Conversely, discovery ordinarily should not be stayed when it is necessary to gather facts in defense of the motion. *Tilley,* 270 F. Supp. 2d at 734; *Simpson,* 121 F.R.D. at 263.

*Yongo v. Nationwide Affinity Ins. Co. of America,* No. 5:07-cv-94, 2008 U.S. Dist. LEXIS 14684, 2008 WL 516744, at *2 (E.D.N.C. Feb. 25, 2008) [*7] (footnote omitted). Moreover, a stay of discovery "is an eminently logical means to prevent wasting the time and effort of all concerned, and to make the most efficient use of judicial resources." *United States v. A.T. Massey Coal Co.,* No. 2:07-cv-299, 2007 U.S. Dist. LEXIS 77501, 2007 WL 3051449, at *2 (S.D. W.Va. 2007) (*quoting Coastal States Gas Corp. v. Department of Energy,* 84 F.R.D. 278, 282 (D. Del. 1979)).

Defendant alleges that Plaintiff's Complaint fails to state a claim for relief. (DE-6, 7). As mentioned above, Plaintiff has not responded in objection to a stay of discovery. Because the motion to dismiss challenges the sufficiency of the Complaint on its face, it is not necessary for Plaintiff to gather facts in defense of the motion, and discovery is irrelevant to the motion. Defendant's motion to dismiss likewise could terminate all claims in this case. For these reasons, the

undersigned finds that Defendant has demonstrated good cause for its request, and therefore the instant motion to stay discovery (DE-11) is GRANTED. All discovery-including, *inter alia*, the requirements of Rules 26(a) & (f) of the Federal Rules of Civil Procedure-in this matter is stayed until Defendant's motion to dismiss (DE-6) [*8] is ruled upon.[2] If Defendant's motion is denied, the parties shall, within 15 days thereafter, confer regarding a discovery plan pursuant to Rule 26(f). The parties shall further file a proposed discovery plan and exchange mandatory initial disclosures within 15 days after this conference.

DONE AND ORDERED in Chambers at Raleigh, North Carolina on Friday, January 31, 2014.

/s/ William A. Webb

WILLIAM A. WEBB

UNITED STATES MAGISTRATE JUDGE

---

End of Document

---

[2] Although the parties have not yet conferred to create a discovery plan, Plaintiff has served several discovery requests upon Defendant. DE-11 at 1; *see also* DE-12. "A party may not seek discovery from any source before the parties have conferred as required by Rule 26(f)" unless otherwise authorized by rule, stipulation, or order. FED. R. CIV. P. 26(d)(1). Due to the stay and the improper timing of Plaintiff's discovery requests, Defendant has no obligation to respond to these requests at this time. Plaintiff is further reminded that, pursuant to E.D.N.C. Local Rule 26.1(a), discovery materials are not to be filed with the clerk unless by order of the court.

Received Business

RECEIVED

JAN 1 4 2014

JULIE A. RICHARDS, CLERK
US DISTRICT COURT, EDNC

*Exhibit A*

High-Speed Internet    Digital TV    Home Phone    Electronics    Support

# Terms and Conditions

TERMS AND CONDITIONS FOR SERVICES AND/OREQUIPMENT PROVIDED BY WINDSTREAM

**PLEASE READ THESE TERMS AND CONDITIONS CAREFULLY. IT IS ESPECIALLY IMPORTANT FOR YOU TO READ SECTION 10 (DISPUTE RESOLUTION) CAREFULLY. AS SECTION 10 PROVIDES FOR RESOLUTION OF DISPUTES THROUGH FINAL AND BINDING ARBITRATION BEFORE A NEUTRAL ARBITRATOR INSTEAD OF IN A COURT BY A JUDGE OR JURY OR THROUGH A CLASS ACTION. YOU WILL CONTINUE TO HAVE CERTAIN RIGHTS TO OBTAIN RELIEF FROM FEDERAL OR STATE AGENCIES.**

## 1. Definitions

"You" or "Customer" means the person or entity that subscribes to Services or purchases or leases Equipment and anyone who accesses the Services and Equipment provided to you.

"We", "us", "our", "Company" and "Windstream" refer to the Windstream legal entities providing Services to you and as identified on your bill.

"Service(s)" refer to any services you have agreed to obtain from us.

"Equipment" means any equipment or accessories you purchase or lease from us or those provided by us for use in any manner in connection with your Services. For ease of reference, Services and Equipment provided by Windstream shall be referred to in this document collectively as "Services."

"Promotional Terms" mean terms that apply to special offers from time to time. Promotional terms will be specified in your first bill message. Promotional terms may include a term commitment and an early termination fee in the event the service is not installed or maintained, or in the event you disconnect service prior to the end of the term.

"Service Order" means the form (whether paper or electronic, including on-line order forms), if any, in which you apply for or make changes to Services and may include the lease of itterscost describe the arrangements the possible changes, fees, laxes and surcharges, choice of

long distance carrier, and the Equipment you have selected.

2. **Agreement and Acceptance.** This Agreement incorporates by reference and you agree to be bound by the following, in this order of priority AND INCLUDING ANY CHANGES (SEE SECTION 23 BELOW): 1) any applicable tariffs filed with the Federal Communications Commission ("FCC") or the relevant state public service commission; 2) The FCC or state web-posted price lists or terms and conditions (either, "price lists") posted at http://windstream.com/uploadedFiles/Content/General Content/detariffedservices.pdf; 3) the product (bundle)-specific terms and conditions, including any Promotional Terms (see Section 27 herein and Your Bill Messages) and any additional agreements associated with such products; 4) the Service Order, if any; 5) any relevant click-through agreement for the Services you received; 6) these Terms and Conditions ("Terms"); 7) the Acceptable Use Policy posted at http://www2.windstream.net/customersupport/usersguide/accept.html; and 8) the Privacy Policy posted at http://windstream.com/About-Us/Privacy-Policy-page/.

You accept this Agreement when you do any of the following: (a) give us your written or electronic signature, (b) tell us orally or electronically that you accept (i.e., by clicking the "I Accept" button for on-line purchases or account changes), or (c) use any Services. If you have never used the Services before and do not wish to be bound by this Agreement, do not begin using them and notify us immediately. By accepting this Agreement, you acknowledge that you are 18 years of age or older, are competent to enter into a contract with us, and are authorized to obtain Services or make changes to an existing account. You may obtain a copy of these Terms and any product-specific Terms and Conditions by visiting www.windstream.com or by calling a service representative at 877-807-9463. This Agreement supersedes any and all statements or promises made to you by any of our employees or agents. If you are a business customer with an existing contract, those contract terms will control.

3. **Charges for Services and Taxes, Fees and Surcharges.** You are responsible for paying all charges applicable to Services provided to you including, but not limited to, monthly recurring charges ("MRCs"), access charges, features, charges and moves to Services, Service directory assistance, and any other usage-based charges at our current rates when used. In addition to the monthly recurring and usage-based changes, taxes, fees, surcharges, assessments and other charges apply to all Services and Equipment, including how those may change in the future. In certain service areas paper bills are available for a monthly charge.

To determine whether certain taxes, fees and surcharges are applicable to Services provided to you, we are required by federal law to obtain your street address, which must be within our service area. You represent and warrant that the address you provide us to obtain Service is correct, and you acknowledge that we are relying on this information to determine which taxes, fees or surcharges are applicable to your Service. You agree to notify us if your address changes. In the event you do not provide us with a valid address or address change, you may be responsible for additional taxes, fees or surcharges and penalties associated with failure to pay taxes based on the proper address, and we may terminate your Services.

As a convenience to you, Company may include charges for third party services on your monthly bill. You should always review your bill carefully and contact the Company if you are unsure about a charge on your bill. Company also offers the ability to block third party charges from your monthly bill. This service is optional and free of charge, and if you are interested in adding a third party block to your account, call a Company representative at the number found at the top right hand corner of your statement to determine if your account is eligible. The block does not apply to Services provided by Windstream or its affiliates to which you subscribe.

4. **Billing and Payment; Rate Increases.** We will bill you the recurring and installation rates you were quoted for Services or those associated with the Services you use or ordered, with increases on notice. All recurring charges are billed one month in advance. Billing at a location will begin upon the earlier of (i) the Installation Date (which may be the date administrative access to certain software-based Services is granted to Customer); or (ii) 30 days after delivery of the applicable facility and/or equipment to the Customer premises (if the delay in

connection of the facility and/or equipment is due to Customer or its agent); however, Company may choose to bill in full monthly increments with no proration for partial service periods when service either starts or ends in the middle of a billing cycle. We reserve the right to back-bill you for Services actually used but not previously billed.

Payment in full is due no later than the due date indicated on your bill and we may apply a late fee and interest and other charges (including, but not limited to, collection fees) up to the maximum amount permitted by law. Returned checks, payment by phone, paper bills and other fees due to your choice of payment method or billing receipt may also be subject to fees. You agree to pay costs and fees, including but not limited to attorney fees, we incur to collect an unpaid balance from you. Company may require you to authorize payment for Services by credit card or by debiting a bank account, and no additional notice or consent is required before we invoice the credit card or debit the bank account for all amounts due to us for any reason.

**5. Credits, Deposits and Advanced Payments.** Our agreement to provide you Services is subject to credit approval and, as such, you authorize us to ask credit-reporting agencies for credit information about you. We may, in our discretion, require you to submit a deposit as security for payment or charges or an advanced payment before we establish any Services on your behalf. In the future, an additional deposit may be required if either the amount or number of Services is increased or your credit rating changes. Simple interest will be paid on the cash deposit for the period it is held by us and will be refunded if satisfactory credit has been established or upon termination of service (if no balance is due). We reserve the right to apply the deposit to any amount due and unpaid but the payment of a deposit in no way relieves you of paying your bills in a timely manner. Regarding advanced payments, any advanced payment will appear as a credit to your first month's bill. In the future, an additional advanced payment, that will be applied to your bill, may be required if you increase your Services with us. If you cancel Services before installation or we cannot install your Services for some reason, we may refund the advanced payment. We will not refund any advanced payment made after installation of Services..

**6. Termination by You**

**Pre-Installation.** If you are a business customer and you terminate your order prior to the installation of Services, you will be required to pay a pre-installation cancellation charge equal to the greater of (i) three (3) months of MRCs ; or (ii) our costs to other providers. You agree that this charge is a reasonable measure of the administrative costs and other fees incurred by us to prepare for installation.

**After Installation.** If you cancel your Services or a portion thereof after installation, you remain liable for payment of all outstanding charges for all Services you used and Equipment you purchased from us prior to termination and you will be charged for the full last month of Service with no proration or credit if you terminate Services prior to the last day of your billing cycle.

**Fixed-Term Agreements.** When you purchased your Service(s), you may have been required to commit to a term or a minimum purchase. EITHER YOU OR WE MAY ELECT NOT TO RENEW YOUR SERVICE BY PROVIDING NOTICE TO THE OTHER NO LATER THAN THIRTY (30) DAYS PRIOR TO EXPIRATION OF THE FIXED TERM. IF NEITHER YOU NOR WE DELIVER A TIMELY NOTICE NOT TO RENEW, THE SERVICES WILL RENEW ON A MONTH-TO-MONTH BASIS. IF YOU TERMINATE SERVICES AFTER INSTALLATION DURING THE INITIAL OR RENEWAL TERM FOR ANY REASON OTHER THAN FOR CAUSE, OR WE TERMINATE FOR CAUSE PURSUANT TO SECTION 7 BELOW, YOU WILL BE REQUIRED TO PAY TO US AS LIQUIDATED DAMAGES AN AMOUNT EQUAL TO 100% OF THE MONTHLY RECURRING CHARGES ("MRCS") MULTIPLIED BY THE NUMBER OF MONTHS REMAINING IN THE THEN CURRENT TERM, OR IF YOU TERMINATE OR DISCONNECT LESS THAN THE ENTIRETY OF YOUR SERVICES SUCH THAT YOUR ACTUAL USAGE AT A LOCATION FALLS BELOW ANY MINIMUM MONTHLY CHARGE ("MMC") OR MINIMUM MONTHLY FEE ("MMF") FOR THAT LOCATION, YOU AGREE TO PAY AN AMOUNT EQUAL TO THE MMC OR MMF FOR EVERY MONTH REMAINING IN THE THEN CURRENT TERM ("LIQUIDATED DAMAGES").

YOU AGREE THAT IN THE EVENT OF TERMINATION BY YOU, THE ACTUAL DAMAGE TO WINDSTREAM IS DIFFICULT TO ASCERTAIN AND THAT THE EARLY TERMINATION FEE REPRESENTS LIQUIDATED DAMAGES AND NOT A PENALTY AND IS A REASONABLE ESTIMATE OF

THE ACTUAL REDUCTION IN THE VALUE OF THIS AGREEMENT THAT WE WILL SUSTAIN.

**Month-to-Month Agreements.** If no length of time is identified on the Service Order or you were not otherwise required to commit to a term, then the term is month-to-month and you or we may terminate at any time by providing notice at least thirty (30) days prior to the effective date of termination. You remain liable for payment of all outstanding charges for all Services you used and Equipment you purchased from us prior to termination and you will be charged for the full last month of Service with no proration or credit if you terminate Service prior to the last day of your billing cycle.

**Bundled Services.** Some plans may offer a discount if you sign up for bundled services and may require a term commitment. If you sign up for bundled services, you agree to maintain the bundled services for the applicable term. If you receive bundled services and you subsequently unbundle, terminate, or disconnect any of these Services, or we disconnect any of the Services, we may adjust the rates for the remaining Service(s) to the then current price.

**Change in Location.** A change in your service address or the location to which any Service is provided to you may constitute, at our sole discretion, termination of the Services or result in an increase in the prices you must pay for the Services.

**Change to Another Carrier.** We may deem a request by you to port your numbers as a request by you to terminate your Agreement. If you choose to port less than all of your numbers, or you leave any Services connected, we will continue to bill you for the numbers and/or Services still connected.

**7. Termination by Us.** Provisioning of the Service is subject to the availability of the requisite equipment and facilities. We may limit, interrupt, terminate or refuse to provide a Service if: (a) you do not honor any provision of this Agreement; (b) you use a Service in a manner that adversely affects other customers or harasses them, our employees, or others; (c) you use Service to engage in fraud or unlawful conduct or are suspected of doing so; (d) you modify your phone or any software residing thereon from the original manufacturer specifications, including for the purpose of accessing non-Windstream services; (e) you use Service in a manner that is excessive or unreasonable when compared to the predominant usage patterns of other customers on a similar service plan in your geographic area (and we may also implement charges or change you to the appropriate rate plan consistent with such use); (f) resell any Service; (g) for any other reason set forth in the relevant tariffs and price lists or terms and conditions; (h) you do not pay any amount to us or billed by us on behalf of others, including disputed amounts that Windstream determines are valid charges on your bills; (i) facilities or property associated with providing the Services have been condemned or use has been prohibited by the government in any manner; (j) you fail to acquire and maintain the rights of way or property access necessary for installation or maintenance of Services; (k) you are insolvent, have made an assignment for the benefit of credits or you have filed or had filed against you a petition for bankruptcy; or (l) we determine in our sole discretion that facilities are not technically or economically feasible. We may restore interrupted or terminated Service, in our sole discretion, following your correction of the violation and payment of any amounts due, including any restoration charge we assess for restoring your Service.

**8. Personal Identifiers.** We assign telephone numbers, e-mail addresses, IP addresses, and other personal identifiers in connection with the Services. You have no proprietary right to any such identifiers, and we reserve the right to change them upon notice to you. In the event that we allow you to transfer a personal identifier to another party to obtain any Services we provide you, we reserve the right, prior to honoring the request for transfer, to charge a fee for the transfer and to collect any money owed for Services.

**9. Disputed Bills.** You must review bills in a timely manner. To dispute a bill, you must comply with the dispute resolution provisions in Section 10 and submit your dispute, in writing, within 60 days after the date on the bill. You must pay any undisputed portion while your dispute is investigated. You accept all charges on your bill not disputed within 60 days and must pay those charges.

10. **Dispute Resolution.** By utilizing Windstream's Services and agreeing to these Terms, you agree to the following dispute resolution procedures. **You and Windstream agree to waive any right to a trial by jury in a court of general jurisdiction and any right to participate in a class action or consolidated action regarding a dispute as defined below. Specifically, you and Windstream agree to waive any right to pursue a dispute by joining a disputed claim with the disputed claim of any other person or entity or to assert a disputed claim in a representative capacity on behalf of anyone else in any lawsuit, arbitration or other proceeding.** If you have a dispute with Windstream, you should notify Windstream's Customer Care department at the number listed on your invoice. If the Customer Care department is unable to resolve your dispute, you must submit your dispute to us in writing at the following address: Windstream Communications, Inc., 1720 Galleria Boulevard, Charlotte, NC 28270, Attn: Executive Customer Relations. You must describe your dispute and provide enough detail to allow us to understand it. You must provide any supporting documentation with your written dispute. Click here http://windstream.com/Legal-Notices/ for a form that you may, but are not required, to use to submit your written dispute to us. If we have a dispute with you, we will send you a written notice to your billing address to attempt to resolve the dispute. You and Windstream agree that a dispute is any claim or controversy related in any way to Windstream's Services, including charges for Services, Equipment, Service Order(s) or our agreements pursuant to these Terms or any other agreements, whether the dispute arises in tort, contract, by statute or any other legal theory and whether the dispute arises under this or any prior agreement with us or arises after your Services with Windstream are terminated.

If you and Windstream are unable to resolve the dispute after 60 days from the date of receipt of the written dispute, you agree that either you or Windstream shall resolve the dispute in only one of two possible ways: (1) by seeking relief in small claims court, if appropriate under the applicable court's rules, in the city or county of the billing address reflected on your bill; or (2) by arbitration. **This Section does not prohibit you from submitting any issue you have with Windstream to any federal, state or local governmental agency or public service commission which may be able to seek relief from Windstream on your behalf.** If the dispute is regarding the charges for Services, you agree that if you do not seek relief in small claims court or by arbitration following the 60 day dispute period, then you will immediately begin paying the disputed amount that Windstream determines is valid, plus any charges that were not paid during the 60 day dispute period, or Windstream may terminate the Services.

Regarding arbitration, you and Windstream specifically agree to finally resolve all disputes not filed in small claims court by arbitration that will be final and binding on both you and Windstream, subject to any exceptions required by applicable law. **The following provisions shall apply to arbitration:**

1. **Notice:** If you want to arbitrate a dispute with Windstream after expiration of the 60 day dispute period noted above, you must file a claim with the American Arbitration Association ("AAA"). Click here http://windstream.com/Legal-Notices/ for a form that you may, but are not required, to use. The claim must include a description of the dispute, a brief outline of previous efforts to resolve the dispute, all supporting documentation and a proposed resolution. A copy of the claim and proof of payment of the filing fee, such as a copy of the check or money order, should be sent to Windstream at: 4001 Rodney Parham, Little Rock, Arkansas 72212, Mailstop B1F03-71A, Attn: Legal Department ("Arbitration Notice Address"). Windstream will reimburse you for the filing fee if your claim does not exceed $75,000. If Windstream wants to arbitrate a dispute with you after expiration of the 60 day dispute period noted above, Windstream will send a copy of its claim to your billing address.

2. **Applicable Law.** The interpretation and enforceability of the arbitration provisions, and whether a dispute is subject to arbitration, is subject to the Federal Arbitration Act ("FAA") only and not state law.

3. **Applicable Rules:** Windstream and you agree that the arbitration will be conducted by the AAA. The rules governing the arbitration proceeding will be the current Commercial Arbitration Rules and the Supplementary Procedures for Consumer Related Disputes ("AAA Rules") from the American Arbitration Association. The AAA rules are at www.adr.org or can be obtained by calling 1.800.778.7879.

4. **Method of Arbitration:** If your claim is for $10,000 or less, Windstream agrees that you may choose whether the arbitration will be conducted solely on the written documents submitted, by telephone or in person in the city or county of the billing address reflected on your bill. If your claim exceeds $10,000, the right to a hearing will be determined by the AAA rules. The written documents can be the notice to arbitrate that either of us send to the other, the supporting documentation and the proposed resolution.

5. **Arbitration Costs and Attorney Fees:** If you properly file a claim with AAA pursuant to these arbitration provisions, and the amount of your dispute does not exceed $10,000, Windstream agrees to pay for all AAA filing, administrative and arbitrator fees ("Arbitration Costs"). For disputes of $75,000 or more, the AAA rules regarding Arbitration Costs will apply. However, Windstream agrees to pay 50% of the Arbitration Costs, and each party will pay its own Attorney Fees incurred for disputes of $75,000 or more. Notwithstanding the foregoing, if your claim is found to be frivolous or improper (as set forth in the Federal Rules of Civil Procedure Rule 11) by the arbitrator, Windstream will have no obligation to pay any of your Attorney Fees. If Windstream his/her decision regarding Attorney Fees will be binding on both you and Windstream. In no event shall Windstream be entitled to an award of its Attorney Fees.

6. **Awards:** If the arbitrator's award is in your favor and is greater than the value of Windstream's last settlement offer made to you prior to selection of the arbitrator, Windstream will pay you the amount of the arbitrator's award or $3,000, whichever amount is greater. Windstream also will pay your attorney's reasonable fees, including expenses, or $2,500, whichever amount is greater.

7. **Injunctive relief:** If you seek declaratory or injunctive relief in the arbitration, the arbitrator may award such relief only to the extent necessary to provide relief warranted by your individual claim.

8. **Consolidation:** The arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding.

9. **Confidentiality:** Any arbitration shall remain confidential. During the arbitration, the amount of any settlement offer made by Windstream or you shall not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which you or Windstream is entitled. Neither you nor Windstream may disclose the existence, content or result of any arbitration or award, except as may be required by law, or to confirm and enforce an award.

10. **Exceptions:** Nothing in this Section shall prevent Windstream from issuing notices, including take-down notices for alleged trademark or copyright infringement pursuant to the Digital Millennium Copyright Act, or termination of Service pursuant to Windstream's Acceptable Use Policy for your abuse of your internet access Services. Nothing in this Section shall prohibit Windstream from filing a lawsuit in a court of general jurisdiction to collect outstanding balances for unpaid Services or Equipment, or any other type of charge owed on your account, or for the theft of any Services or Equipment by you. This Section is intended to resolve outstanding disputes between us and not to collect a debt owed by you to Windstream.

11. **Limitation of Liability:** This Section is subject to the Limitation of Liability Section in these Terms and Conditions.

12. **Limitations Period:** Any dispute must be brought by you or Windstream within two years after the date the basis for the claim or dispute first arises.

Notwithstanding any provision in these Terms and Conditions to the contrary, you and Windstream agree that if Windstream makes any future change to this arbitration provision (other than a change to the notice addresses), you may reject any such change by sending Windstream written notice within 30 days of the change to the Arbitration Notice Address provided above. By rejecting any such change, you are agreeing that you will arbitrate any dispute between us in accordance with the language of this provision.

If the provisions concerning the waiver of the class or consolidated actions, or the provisions regarding mandatory arbitration, are deemed unenforceable or void as a matter of law, you and Windstream agree that all claims will be brought in a court of general jurisdiction and not resolved through arbitration. YOU AND WINDSTREAM WAIVE THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT FOR THE SERVICES PROVIDED BY US.

11. **Services Provided by Third Parties.** The Services will be provided either by us or by our third party vendors or contractors. We reserve the right to change or modify the source of any Services provided to you without notice.

12. **Company Provided and Owned Equipment.** Any Equipment installed by us on your premises that is not the subject of a sale or lease to Customer (such as the CSU/DSU interface cards, Channel Bank and router, if applicable) shall remain at all times our property. It shall remain in good condition, less normal wear and tear. If we do not have access to your premises within 30 days after Services are terminated, you shall reimburse us for the full purchase price of the equipment as well as any attorney's fees and costs. You are responsible for all security measures over the Services, including but not limited to access to authorization codes or encryption you deem necessary or required. Once Equipment is delivered to you, you bear the risk of loss.

13. **Disconnection of Current Provider; Special Construction; Third Party Charges.** You are solely responsible for disconnecting Services with your current service provider and we are not responsible for any charges assessed against you by such provider. You shall pay all charges if we or a third party provider is required to extend the demarcation point or undertake special construction or non-routine installation for you. Unless we specifically agree in writing to undertake equipment installation and maintenance work, you are responsible for all charges assessed by your phone system vendor and other third parties in connection with the Services and we shall have no responsibility for maintenance or repair of same.

14. **Access to Third Party Services.** You agree that the telephone line on which your Services are activated may not be used to access any third-party services equivalent to Services we provide or can make available, even if you declined to purchase such Services from us. Your telephone line contains programming designed to enable access to our Services only. You may not use any manual or electronic means to circumvent any restrictions placed on your telephone line to modify without authorization any programming supplied by us.

15. **Access and Installation, Repair and Maintenance.** You agree that you are responsible for acquiring and maintaining the right of way necessary to allow installation and maintenance of Services. Failure to acquire and maintain necessary right of way may result in delay of installation or termination of Services by Windstream. Upon notice, we may make tests and inspections to determine you are complying with the requirements of these terms or for routine and emergency maintenance of the equipment and facilities. We may take action to protect our facilities and equipment. We may substitute, change or rearrange any Equipment or facility at any time and we may limit or allocate use of existing facilities when necessary due to lack of facilities or due to a cause beyond our reasonable control.

16. **Privacy and Customer Proprietary Network Information.** You authorize us to monitor and record communications to us regarding your account or the Services for purposes of quality assurance. For on-line orders, we may implement reasonable procedures including, but not limited to, validating information provided by you or restricting the amount of Services purchases online. We reserve the right to cancel or reject on-line orders at any time for security or privacy reasons.

To provide Services to you, we maintain certain customer proprietary network information ("CPNI"). CPNI includes information that relates to the quantity, technical configuration, type destination, location and amount of use of any telecommunications service we provide to you, and which we obtain because of the carrier-customer relationship between us. CPNI also includes information contained in your bill. We may use and share your CPNI without your permission for the following purposes:

- To protect the rights or property of us or other customers or carriers from fraudulent, abusive, or unlawful use of or subscription to the Services you get from us;

- To initiate, render, bill and collect for your Services;

- To provide information telemarketing, referral, or administrative services to you when you call us if you give us permission to do so;

- To provide call location information regarding the user of a wireless mobile service to certain other parties in an emergency situation;

- To provide information requested by law enforcement or a third party pursuant to a subpoena or other method of requesting information. We will not give you notice of any subpoena or court or administrative orders related to your account, IP address, contact information or use of Services unless required to do so by law.

If you do not want us to provide your information to other Windstream entities, please notify us by calling Residential Support at 866-347-1991 or Business Support at 800-843-9214.

When you view your account information or shop for Services on-line, you agree that we may display your CPNI on-line after proper verification by you to fill orders or allow you to make account changes.

**17. Theft and Fraud.** You agree to keep all passwords, Member ID's, IP addresses, and computer names confidential. If your Services are lost or stolen or fraudulently used, then you are responsible for all usage incurred before we receive notice from you of such loss or theft. If we choose to pursue investigation or prosecution of the loss or theft, you agree to cooperate in the investigation of fraud or theft and to provide us with such information and documentation as we may request (including affidavits and police reports).

**18. LIMITATION OF LIABILITY. FOR PURPOSES OF THIS SECTION, DISCLAIMER OF WARRANTIES AND EMERGENCY/CRITICAL LINES SECTIONS, "OUR" OR "WE" INCLUDES WINDSTREAM'S OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES, AGENTS, SUBCONTRACTORS, VENDORS AND ANY ENTITY ON WHOSE BEHALF THE COMPANY RESELLS SERVICES. UNDER NO CIRCUMSTANCES WILL WE BE LIABLE FOR ANY ACCIDENT OR INJURY CAUSED BY SERVICES OR ANY DAMAGE OR LOSS RESULTING FROM THE INSTALLATION, MAINTENANCE OR REMOVAL OF THE SERVICES, ANY INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES (SUCH AS LOST PROFITS, LOST BUSINESS OPPORTUNITIES, BUSINESS INTERRUPTION, LOSS OF BUSINESS DATA), ANY PUNITIVE OR EXEMPLARY DAMAGES, THE COST OF ALTERNATIVE SERVICE OR FOR ANY SERVICE INTERRUPTIONS, DELAY OR FAILURE TO PERFORM UNDER THIS AGREEMENT DUE TO CAUSES BEYOND OUR REASONABLE CONTROL, INCLUDING BUT NOT LIMITED TO, STRIKES, LOCKOUTS, OTHER LABOR UNREST, NATURAL DISASTERS, ACTS OF GOD, CABLE CUTS OR COMMON CARRIER DELAYS. YOU AGREE THAT THE PRICING OF SERVICES REFLECTS THE INTENT OF BOTH YOU AND US TO LIMIT OUR LIABILITY AS PROVIDED HEREIN.**

**19. DATA SERVICES. YOU ACKNOWLEDGE THAT THE INTERNET IS A VOLATILE ENVIRONMENT AND WE ARE NOT LIABLE FOR CONFIDENTIAL INFORMATION STORED ON OR TRAVERSING OUR NETWORK. YOU MUST TAKE ALL APPROPRIATE PRECAUTIONS TO SECURE CONFIDENTIAL INFORMATION INCLUDING ENCRYPTING IF YOU DEEM NECESSARY.**

**20. DISCLAIMER OF WARRANTIES. SERVICES ARE PROVIDED ON AN "AS IS" AND "AS-AVAILABLE" BASIS WITHOUT WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF TITLE OR NON-INFRINGEMENT OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WARRANTY ARISING BY COURSE OF TRADE, COURSE OF DEALING OR COURSE OF PERFORMANCE, ANY WARRANTY THAT THE SERVICES WILL MEET CUSTOMER'S REQUIREMENTS OR ANY WARRANTY REGARDING THE QUALITY, CONTENT, ACCURACY OR VALIDITY OF THE INFORMATION OR DATA RESIDING ON OR PASSING THROUGH OR OVER THE NETWORK. ALL SUCH WARRANTIES ARE HEREBY DISCLAIMED. WITHOUT LIMITING THE FOREGOING, BROADBAND SPEEDS, TRANSMISSION QUALITY, NETWORK SECURITY OR RELIABILITY, AND ACCURACY OF ANY DIRECTORY LISTINGS ARE NOT GUARANTEED. NO ORAL OR WRITTEN ADVICE OR INFORMATION BY COMPANY'S EMPLOYEES, AGENTS OR CONTRACTORS SHALL CREATE A WARRANTY, AND CUSTOMER MAY NOT RELY ON ANY SUCH INFORMATION. WINDSTREAM DOES NOT GUARANTEE YOUR SERVICE CAN OR WILL BE INSTALLED BY A PARTICULAR DATE. ANY INSTALLATION DATE PROVIDED IS ONLY AN ESTIMATE.**

**21. Indemnification.** You agree to indemnify and hold Windstream and its subsidiaries, affiliates, officers, agents, co-branders, licensors or other partners and employees harmless from any claim or demand, including reasonable attorneys' fees, made by any third party due to or arising out of content you submit, post, transmit or otherwise make available through the Service, your use of the Service, your connection to the Service, your violation of this Agreement, including, without limitation the Acceptable Use Policy, or your violation of any rights of another. You acknowledge that you are responsible for all use of the Service using your account, including use by subaccounts, and that this Agreement, including, without limitation, the Acceptable Use Policy and Privacy Policies, as amended from time to time, apply to any and all usage of your account, including use by subaccounts. You agree to abide by these terms and you agree to defend, hold harmless and indemnify Windstream from and against any and all claims stemming from usage of this account and any subaccounts, whether or not such usage is expressly authorized by you.

**22. Emergency/Critical Lines. CUSTOMER ACKNOWLEDGES THAT CERTAIN SERVICES MAY NOT PROVIDE ACCESS TO 911 OR TRANSMIT THE LOCATION OR EXTENSION IF CUSTOMER ATTEMPTS TO ACCESS 911 IN AN EMERGENCY.** Examples include voice over Internet protocol (VoIP), Centrex, and private branch exchange. Additionally, because T1s and VoIP can cease operating during a power outage, you should have a basic business or copper line for elevator, alarm, E911 and other critical functions. By proceeding with use of Services, you assume all responsibility and risk of harm, loss, or damage in the event that 911 access fails, is not possible, or does not provide the address, correct address, extension or other information to emergency authorities.

**23. Changes to these Terms and Conditions.** We may change these Terms, including any change in any charge or fee, or the imposition of a new charge or fee, at any time if we give you notice of the change. If we make a change to these Terms and Conditions that is material and you do not wish to accept such material change, you may terminate the affected Service by giving us 30 days notice, in which case you will not be subject to an early cancellation fee. You will, however, still be responsible for all charges for Services provided before you terminated your Agreement. A material change is ONLY a change that (a) terminates or substantially reduces the availability of a Service for you or (b) NOT include the increase in, or imposition of: (1) any charge required to be collected by any governmental authority, such as taxes or surcharges, or (2) any charge not prohibited by any governmental authority to recoup our expense incurred to comply with a governmental requirement.*

As noted in Section 10, if Windstream makes future changes to the arbitration provision in that Section (other than a change to the notice addresses), you may reject this change by sending Windstream written notice within 30 days of the change to the Arbitration Notice Address. By rejecting the change, you agree that you will arbitrate any dispute between us in accordance with the language in Section 10 existing prior to the change.

**24. Applicable Law.** Your Agreement and our provision of Services to you are subject to (a) the laws of the state identified in the billing address that you have provided us and (b) any applicable federal laws including, but not limited to, the Federal Arbitration Act, 9 U.S.C. § 1 et seq. In the event of an inconsistency between any governmental requirement and these Terms regarding the provision of a Service that is subject to the governmental requirement, the provisions of the governmental requirement will apply to the extent necessary to avoid the inconsistency.

**25. Assignment.** We may assign this Agreement to another entity without any advance consent from or notice to you. You may not assign this Agreement without our consent.

**26. No Waiver, Severability.** If we do not enforce any right or remedy available under this Agreement, that failure is not a waiver. If any part of this Agreement is held invalid or unenforceable, the remainder of this Agreement will remain in force.

**27. Product Bundle - Specific Terms and Conditions (alphabetically)**

Product Descriptions generally can be found at www.windstream.com. Some Services have certain system requirements (i.e., Online Backup, Security Suite and TechHelp). Please see the relevant product description for details.

**Broadband Protection Plus.** Includes the wiring coverage of Protection Plus (see below) and professional installation of Broadband. NIC (network interface card) if needed and Broadband-specific software provided by us for one computer at initial installation and only includes specific types of equipment. For installation and NIC replacement, the system must be Windows 2000 SP-4 or higher. With other operating systems, such as Mac and Linux, we will only cover replacement Customer Premise Equipment (CPE) and wiring/cabling but will not cover installation or software or NIC. The Broadband modem (if provided by us) will be replaced if damages by an electrical surge or natural act (i.e., lightning, floods, etc). This Product does NOT include: a) home networks (even if Equipment is purchased from us); b) LAN software; c) bandwidth/throughput guarantees; d) damage to PCs from: viruses; e) non-standard wiring; f) PC Hardware (other than NIC); g) Cisco 827H and 827-HI modems; h) operating systems and software maintenance; or i) integrated NIC cards and internal NIC laptop cards.

**Cable TV.** Channels available to customer as part of any select packages of programming through Windstream Cable TV are subject to change and customer is not guaranteed any particular channel or number of channels. All prices, packages and programming are subject to availability based on location and Windstream's agreements with content providers and credit approval. A Cable TV service activation fee may apply. Taxes and fees, including applicable franchise and FCC regulatory fees may apply. Some promotions may require minimum programming. Certain promotions have an optional or mandatory term commitment period, and if the customer cancels services prior to the optional or mandatory term commitment period, certain termination or cancellation fees may apply. In some packages hardware and programming are sold separately. Other restrictions may apply.

**Centrex.** Within 30 days of subscribing, you and Windstream will agree on the specific feature, functions and minimum lines and groups to be provisioned. We will base charges on the agreed minimum lines. We will have the right to bill you at hourly rates for all programming, installation or other labor associated with any adjustments to features and functions at initial installation and when changes are made later.

**Conference Calling.** All per minute conferencing has a minimum per call. Flat Rate Audio and Web Conferencing is limited to 5,000 minutes per month, is only available to you if you have 10 lines or less, is limited to 5 participants on a call simultaneously and you must use Reservationless-Plus®. Flat Rate Web Conferencing requires user licensing at varying rates.

**Credit Card Acceptance.** Credit card processing services are NOT provided by us and are instead provided by a third party vendor, with which you may be required to enter an agreement. We do not in any way provide credit card processing services, and we are not liable for, nor do we make any representation or warranty regarding the vendor's services. You are solely responsible for any applicable Payment Card Industry security and other standards applicable to accepting credit cards.

**DISH Network Services.** All prices, packages and programming are subject to change without notice including, without limitation, any term

commitment to which you have agreed. All DISH Network programming and any other services that are provided by DISH Network are subject to the terms and conditions of the Promotional Agreement and Residential Customer Agreement, which are available online at www.dishnetwork.com or upon request. Some promotions may require minimum programming. Certain promotions have an optional or mandatory term commitment period, and if you cancel your Services prior to the optional or mandatory term commitment period, certain termination or cancellation fees may apply. Hardware and programming are sold separately.

**Domain Renewals.** New registrations with Windstream are free for 1 year and then renewals are billed to the customer in 1 year, 3 year or 5 year increments.

**Fax to Email.** You must have an email address to Send/Receive faxes via this Service but email is not included with the Service. If you exceed your page limit per month, a minimum per page charge will apply. Overages are billed at $0.10/per page.

**Google.** IF YOU SUBSCRIBE TO GOOGLE THROUGH US YOU WILL BE REQUIRED TO COMPLETE A CLICK-THROUGH AGREEMENT FOR THE GOOGLE LICENSE. We may cancel Google Services at any time on 30 days' notice and, at our option, may either terminate such Google Services altogether or move you to a similar platform. In the event that we or you terminate the Google Services or downgrade or cancel Google Services, you are solely responsible for downloading all your information to your computer within 30 days.

**High-Speed Internet.** High Speed Internet service is subject to the the Broadband Network Statement. Customers must agree to all terms of service prior to installing and using service. Speeds are distance-sensitive and availability by address varies. We strive to provision the line up to the maximum speed required to support the qualified and subscribed Service but actual speed will vary based on factors such as the condition of wiring inside a specific location; computer configuration; network or internet congestion; and the server speed of the websites accessed. We cannot guarantee speeds or uninterrupted, error-free service.

**Hulu Plus Services.** All Hulu Plus Services and any other services provided by Hulu are subject to the Hulu Terms of Use, which are available online at: www.hulu.com. Certain promotions have an optional or mandatory term commitment period, and if you cancel your Services prior to cancelled at the end of the promotional period, certain termination or cancellation fees may apply. If the Hulu Plus membership is not you cancel the membership.

**Identity Protection.** Windstream partners with a third party vendor to provide service. As a result of this, you may be required to accept certain terms and conditions of the service as required by the third party. Windstream reserves the right to alter the service in any way including, but not limited to changing the third party provider of the service or discontinuing this service at any time.

**Internet Access.** Internet Access service is subject to the Broadband Network Statement Service will be provisioned for a maximum download speed of 1 Mbps. Due to the nature of this service, it is an "AS IS" service and may be intermittent, specifically during peak usage times of the day. This Service is not suitable for streaming video, gaming, or large downloads or uploads. Credits or adjustments for slow and/or varying speed, or not being able to access the Internet, will not be issued. Windstream cannot guarantee speeds or uninterrupted, error-free service.

**Lifetime Price Guarantee.** Certain Services are subject to a Lifetime Price Guarantee ("Guarantee"), as advertised by us; however, in addition to the Agreement set forth herein, the following conditions apply to this Guarantee:

- The Guarantee only applies to select Services that are part of a bundle, and not a stand-alone service. You must subscribe to at least one new bundle service that includes select High Speed Internet, or other select Internet services, select Phone services, select Cable TV programming, or select DISH programming.

- Any package that includes DISH is subject to our continuing relationship with DISH. If such relationship ends for any reason, Guarantee bundles that include DISH may be terminated at our discretion. Additionally, channels available to you as part of DISH programming are subject to change without notice. You are not guaranteed any particular channel or number of channels.

- A DISH activation fee may apply.

- If DISH service is terminated by you before the end of any commitment, a cancellation fee based on the number of months remaining in the commitment will apply.

- Channels available to customer as part of any select packages of programming through Windstream Cable TV are subject to change without notice and customer is not guaranteed any particular channel or number of channels. A Cable TV service activation fee may apply.

- The Guarantee is void if you move, make any changes to your Services, disconnect. If you are disconnected by us, or if any portion of your account balance becomes past due.

- If you order additional services and equipment including, but not limited to HD or DVR receivers, additional charges apply.

- The Guarantee covers only the advertised price and does not include current or future taxes, fees or other charges.

**Long Distance (Business).** Domestic calls are billed in six-second increments with a eighteen-second minimum. A sixty-second minute is broken down into ten six-second blocks and any calls with talk-times of eighteen seconds or less will be billed for eighteen seconds. Usage may be monitored for compliance/abnormal usage and you may be required to demonstrate compliance with these restrictions where monitoring indicates non-compliance. If usage is inconsistent with these restrictions and typical voice usage, Windstream may: (1) charge an additional amount per minute for each call that violates this policy; (2) restrict use or convert you to another plan; and/or (3) void any applicable price guarantee. Additional charges apply for directory assistance, calling cards, collect calls, operator services, International calling and/or toll-free calling services. International dialing and access to 900/976 telephone numbers are blocked unless otherwise specified by the customer.

**Managed Network Security CPE.** Requires a minimum commitment and subscription to Windstream Data services. Security gateway equipment must be returned upon service termination.

**Online Backup.** Windstream partners with a third party vendor to provide service. As a result of this, you may be required to accept certain terms and conditions of the service as required by the third party. The purchase and use of service requires you to be an active Windstream residential or small business High-Speed Internet customer. Service is intended for the backup of laptops or PCs and does not support stand-alone or network servers. Minimum system requirements: Windows XP SP3or higher, Windows Vista SP1 or higher and Internet Explorer 6.0 or later. This service is activated through the Windstream Service Agent. Windstream reserves the right to alter the service in any way including but not limited to changing the third party provider of the service or discontinuing this service at any time.

**PC Protect Plan.** Windstream partners with a third party vendor to provide service. As a result of this, you may be required to accept certain terms and conditions of the service as required by the third party. Windstream reserves the right to alter the service in any way including but

not limited to changing the third party provider of the service or discontinuing this service at any time. The purchase and use of service requires you to be an active Windstream residential or small business High-Speed Internet customer. A full service agreement will be presented to you when you register your laptop or PC for coverage. For devices to be supported, they must contain supported Windows Operations System (currently Windows XP or newer) and a processor that is a Pentium 4 or newer or equivalent.

**Personal Computer Offers.** Windstream resells personal computers that are manufactured and warranted by a third party. All support and warranties are provided by the manufacturer.

**Phones at Home Protection Plan.** This plan provides for repair or replacement of residential phones. You must sign up and agree to additional terms applicable specifically to this Plan via the Windstream Phones at Home Protection Plan Registration Form in order to obtain Phones at Home Protection from us.

**Price Lock.** Price Lock applies to select bundle products. This plan is in addition to the monthly recurring rate for your bundled services, any services and equipment you may purchase, and current and future taxes, fees and other charges. The Price Lock is void and current monthly rates will apply if any portion of the bundled service or feature is disconnected or changed or if any portion of your account balance becomes past due. Price Lock may be void if you move, even if the move is within Windstream service locations.

**Professional Bundle Website Services.** Windstream requires the customer to agree to a EULA.

**Professional Installation (Business).** Provided for only one computer per business or home and you must sign a waiver/disclaimer prior to our technicians working at your premises. This service includes: a) setting up the initial DSL connection; b) installing the NIC, if necessary; c) installing the necessary filter on the telephone line; d) DNS entries, configuring DHCP/Static IP address, gateway, etc.; and e) performing various network connectivity tests to ensure each network element has proper connectivity; it does NOT include: f) software installation other than what is included with the router; u) PC installation (the computer must be installed before we can do a DSL installation); v) station cabling or CAT 5 patch cables; w) new or additional jacks for the DSL service; x) removing any applications unless the application must be removed to make the TCP/IP connection to the Internet work; y) CPE charges; or z) resolving LAN issues including, but not limited to, shared network drives, driver issues or other hardware issues.

**Professional Installation (Residential).** Provided for the connection of up to three computers per home to the internet when computers are being connected via Windstream provided equipment. This service includes: a) setting up the initial High-Speed Internet connection; b) installing the NIC, if necessary; c) installing the Windstream wireless gateway and/or performing the initial wireless setup of up to four peripheral devices, including the Windstream wireless gateway (customer may be required to provide user guides for peripheral devices); e) DNS entries, configuring DHCP/Static IP address, gateway, etc.; f) performing various network connectivity tests to ensure each network element has proper connectivity; g) installation and setup of one PC if purchased through Windstream; h) installation of one jack if needed for the High-Speed Internet service. It does NOT include: t) software installation other than what is included with the modem or provided by Windstream; u) PC installation for computers not purchased through Windstream; v) station cabling or CAT 5 patch cables; w) removing any applications unless the application must be removed to make the TCP/IP connection to the Internet work; x) CPE charges; or y) resolving LAN issues including, but not limited to, shared network drives, driver issues or other hardware issues. We reserve the right to not provide this service if the requirements are beyond the standard scope of work.

**Protection Plus.** This Service is a wire maintenance plan that includes repair or replacement of existing jacks/outlets (not including the addition or move of existing jacks) that meet out installation standards. This Service provides coverage for one access line. Wiring and jacks damaged as a result of faulty, non-earthquakes are excluded. This Service does not cover Key, Centrex and PBX systems.

**Secure Broadband** requires a minimum term commitment and includes Internet and one static IP address for Managed Network Security. Additional static IP addresses may be available for an additional charge.

**Security Suite.** Windstream partners with a third party vendor to provide service. As a result of this, you may be required to accept certain terms and conditions of the service as required by the third party. Windstream reserves the right to alter the service in any way including but not limited to changing the third party provider of the service or discontinuing this service at any time. The purchase and use of service requires you to be an active Windstream residential or small business High-Speed Internet customer. System requirements include: Microsoft® Windows 2000 (32-bit) with Service Pack 4 (SP4) or higher. Windows XP (32-bit) with Service Pack 1 (SP1) or higher, Windows Vista (32- or 64-bit) and Windows Vista Service Pack 1 (SP1) or higher, 800 X 600 or higher resolution, 256 MB RAM, 75 MB of available free disk space, Internet connection, Microsoft® Internet Explorer 6.0 or later, and (optional) Mozilla Firefox 1.5 or later. This service is activated through the Windstream Service Agent.

**Small Business Bundles with Peace of Mind Guarantee.** The Windstream Small Business Bundle includes a business access line or a business VoIP line, long-distance calling, and a feature package of Caller ID, Call Forward, Repeat Dial, 3-Way Calling, Speed Call 30, Call Return, Call Waiting, and Caller ID on Call Waiting and may or may not include High-Speed Internet, High-Speed Internet with Static IP, Premium Tech Support, Online Backup, PC Protect, SaaS Endpoint Security and Broadband Protection Plus, Voice Mail and Rotary Hunt are included with certain bundles. The price for the bundle shall be set forth in Customer's first bill, and such price shall be specifically incorporated as a term of this Agreement.

This Lowest Price Guarantee offer is subject to availability and is a limited time offer for new customers or existing customers with business line only. If Customer switches to a lower price point for their bundle during the term of this Agreement, this Agreement will restart for another term on the effective date of the new pricing. If Customer terminates service prior to the end of the Agreement, customer may be responsible for an early termination charge equal to 50% of the monthly recurring revenue multiplied by the number of remaining months.

The **Peace of Mind Guarantee** offer allows a Customer to avoid an early termination charge in the event the Customer terminates service prior to the end of the Agreement if the termination is due to either Customer closing the service location or Customer moving outside of Company's service area. In order to avoid an early termination charge, Customer must provide thirty (30) days' written notice of its intent to terminate service to Company. Only Customers that have a two-year Agreement are covered by the Peace of Mind Guarantee.

**Price Guarantees for Small Business Bundle Customers.** Covers the advertised price only rate (payable on a monthly basis). Does not include current or future taxes, fees or other charges. Guarantee is void and tariff or price list rates as applicable will apply if any bundled service or feature is disconnected or changed at any time. Guarantee may be void if Customer moves, even if move is within Company service locations. Offer is non-transferable. Customer's failure to remit the total due for the Small Business Bundle may result in disconnection of Customer's bundle. Customer can revert to basic local service only by payment of past due amounts for basic local service. The Peace of Mind Guarantee does not apply if Customer is disconnected involuntarily from its Small Business Bundle for any violation of the Terms and Conditions contained herein and wants to reconnect. The Lowest Price Guarantee does not apply if Customer voluntarily disconnects from its Business Bundle and wants to re-establish the service.

**Tech Help.** Windstream partners with a third party vendor to provide service. As a result of this, you may be required to accept certain terms and conditions of the service as required by the third party. Windstream reserves the right to alter the service in any way including but not limited to changing the third party provider of the service or discontinuing this service at any time. The purchase and use of service requires you to be an active Windstream residential or small business High-Speed Internet customer. This Service requires a minimum term commitment unless bundled with other value added services in a Windstream Security Package. Service is provided via agents remoting into customers' computer and therefore requires that computer must be capable of connecting to the Internet in order to utilize service. Minimum System requirements including Windows XP or Vista, Intel Pentium or Pentium II Processor with 500 MHz or faster for Windows XP, 256 MB or higher. Macintosh, UNIX, LINUX or older Windows operating systems are not supported. It includes: a) PC Security and Protection (viruses, spyware, etc.); b) PC Optimization; c) setting up new PCs and transferring files and data from the old machines; d) setting up and encrypting wireless networks; e) handling Windows issues; f) connecting and setting up printers and other peripherals such as

scanners, printers and PDAs/Smartphones; and g) software installation, tutorials and tips. Does NOT include the following, among other items that cannot be solved remotely: u) site visits, if needed; v) failed/broken hard drives; w) adding more RAM; x) cracked motherboards; y) bad USB ports or connectors; or z) replacing broken hardware. This service is activated through the Windstream Service Agent.

**Travel Safety Plus.** Windstream partners with a third party vendor to provide service. As a result of this, you may be required to accept certain terms and conditions of the service as required by the third party. Windstream reserves the right to alter the service in any way including but not limited to changing the third party provider of the service or discontinuing this service at any time. Windstream assume no responsibility for loss or damage resulting from services provided by the vendor or its subcontractors. Windstream residential home phone services, long distance or High-Speed Internet is required in order to subscribe to Travel Safety Plus.

**Unlimited Long Distance (Business).** Intended for direct-dialed, one-plus voice use only and cannot be used for auto-dialing (including automatic outbound dialing systems or call distribution systems); broadcast fax, long distance internet or intranet access, fax machines, softphones or data devices, transcript services, telemarketing, multi-party conferencing calling (excluding 3-way calls), party lines, chat lines, adult entertainment lines, calls to 900 and 976 numbers, or call center and certain switching applications. In addition, for residential users, unlimited long distance may not be used for business use.

**Unlimited Long Distance (Residential).** Intended for personal, residential voice calls within the U.S. Calling restrictions include but are not limited to business use, Internet services, telemarketing, auto-dialing, multi-party conferences, party or chat lines, adult entertainment lines, and voicemail/information policy; (2) restrict use or convert plan to Windstream 10; and/or (3) void price guarantee and convert rates to then current monthly rates. Windstream may (1) charge 10 cents per minute for each call that violates this services access. If usage is inconsistent with residential voice calling, Windstream may (1) charge 10 cents per minute for each call that violates this

**Voice Over Internet Protocol (VoIP)-Based Services.** In order to access or use any VoIP Services, you must sign the 911 Disclosure form, which warns of and has you acknowledge certain 911 limitations for VoIP Services.

**Web Hosting.** See policy for Web Hosting at http://www.windstreambusiness.com/media/788/hosting_policy.pdf.

**Windstream Service Agent.** Windstream partners with a third party vendor to provide service. As a result of this, you may be required to accept certain terms and conditions of the service as required by the third party. Windstream reserves the right to alter the service in any way including but not limited to changing the third party provider of the service or discontinuing this service at any time. The use of service requires you to be an active Windstream residential or small business High-Speed Internet customer. Service is free to all Windstream High-Speed Internet subscribers. Service is available for use only via laptop or PC and requires software download.

**Wireless Data Backup** is for backup purposes only. Maximum bandwidth is 2MG regardless of the amount of bandwidth a customer has; Customer may not remove the wireless card from the service address. Real time quality of service is not available. Availability and speeds are not guaranteed and are affected by wireless strength.

**October 21, 2013**

High-Speed Internet | Digital TV | Phone | Electronics | Support | Store Finder | Windstream Overview | Careers | Investor Relations | News | Windstream.net | Website Track Blog

Windstream is one of the largest providers of telecommunications services in rural communities in the United States, and we are a customer-focused telecommunications company that

Case 7:13-cv-00247-BR   Document 13-1   Filed 01/14/14   Page 15 of 16

provides phone, high-speed Internet and digital television services. We also offer a wide range of IP-based voice and data services and advanced phone systems and equipment to businesses and government agencies.

Copyright © 2014 Windstream Communications. All rights reserved   Privacy Policy | Terms & Conditions | Legal Notices | Broadband Network Statement | Suppliers | Site Map

FIND US ON    Twitter    Facebook

**Target Name:**      Phillip Ramsey
**Target Phone:**      606-561-8850
**Account Number:**    162418057, 162472801

**Customer:**      Phillip Ramsey

**Status:**      Disconnected 10/21/2014
**Creation Date:**    6/5/2014

**Site Address:**      54 Beech Dr
**Site City/State/Zip:**    Burnside, KY 42519

**Billing Address:**     7919 Colette Ln
**Billing City/State/Zip:**   Cincinnati, OH 45224

# EXHIBIT 2

**Adam V. Sadlowski**

| | |
|---|---|
| **From:** | cmecfhelpdesk@ohsd.uscourts.gov |
| **Sent:** | Thursday, April 20, 2017 11:09 AM |
| **To:** | ecf.notification@ohsd.uscourts.gov |
| **Subject:** | Activity in Case 1:16-cv-01059-SJD Ramsey v. Receivables Performance Management, LLC Pretrial Conference - Initial |

This is an automatic e-mail message generated by the CM/ECF system. Please **DO NOT RESPOND** to this e-mail because the mail box is unattended.

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### U.S. District Court

### Southern District of Ohio

## Notice of Electronic Filing

The following transaction was entered on 4/20/2017 at 11:08 AM EDT and filed on 4/20/2017
| | |
|---|---|
| **Case Name:** | Ramsey v. Receivables Performance Management, LLC |
| **Case Number:** | 1:16-cv-01059-SJD |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
**Minute EntryThe PPTC was conducted by the Law Clerk; participating were Adam Sadlowski on behalf of plaintiff and Sean Flynn on behalf of Defendant; Status conference by telephone is set for May 24, 2017 at 2:00 PM; Five business days prior to the status conference, the parties will submit a joint letter (to dlott_chambers@ohsd.ucourts.ogv) addressing whether and when defendant will file a motion to compel arbitration and proposing dates for disclosure/reports of experts and discovery cutoff; IT IS SO ORDERED. (vp)**

**1:16-cv-01059-SJD Notice has been electronically mailed to:**

Brant T Miller  btmiller@gordonrees.com

Adam V Sadlowski  asadlowski@sb-lawyers.com, cbesse@sb-lawyers.com

Cori R Besse  cbesse@sb-lawyers.com, asadlowski@sb-lawyers.com

Sean P. Flynn  sflynn@gordonrees.com

**1:16-cv-01059-SJD Notice has been delivered by other means to:**

# EXHIBIT 3

**Adam V. Sadlowski**

| | |
|---|---|
| **From:** | Leslie Handy <lhandy@gordonrees.com> |
| **Sent:** | Wednesday, May 17, 2017 6:12 PM |
| **To:** | dlott_chambers@ohsd.uscourts.gov |
| **Cc:** | Adam V. Sadlowski; Sean Flynn; Cameron Hitson; RPMT_1130547 _ Ramsey v_ Receivables Performance Mgmt _Correspondence _ E_Mail |
| **Subject:** | Ramsey v. RPM; Case No. 1:16-cv-1059 |
| **Attachments:** | 2017 05 17 Ramsey Status Letter to Court.pdf |

Your Honor

Attached please find the Joint Status Letter relating to the May 24, 2017 telephonic status conference in this matter.

**LESLIE M. HANDY** | Legal Secretary to Sean P. Flynn
**GORDON & REES**
**SCULLY MANSUKHANI**

2211 Michelson Drive, Suite 400
Irvine, CA 92612
D: 949-255-6999
lhandy@gordonrees.com

Alabama | Arizona | California | Colorado | Connecticut | Florida
Georgia | Illinois | Maryland | Massachusetts | Missouri | Nevada
New Jersey | New York | North Carolina | Ohio | Oklahoma | Oregon
Pennsylvania | South Carolina | South Dakota | Texas | Utah | Virginia
Washington | Washington, D.C. | West Virginia | Wisconsin

www.gordonrees.com

Alabama * Arizona * California * Colorado * Connecticut * Florida * Georgia * Illinois * Maryland * Massachusetts * Missouri * Nevada * New Jersey * New York * Pennsylvania * Ohio * Oregon * Pennsylvania * South Carolina * South Dakota * Texas * Virginia * Washington * Washington, DC * West Virginia

This e-mail transmission may contain CONFIDENTIAL INFORMATION WHICH IS ALSO MAY BE LEGALLY PRIVILEGED and is intended only for the use of the individual or entities named above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, disclosure, distribution, downloading, or copying of this communication is strictly prohibited. If you have received this communication and have received the communication in error, please immediately notify us by reply e-mail and delete this communication and destroy all copies.

**GORDON & REES LLP**
http://www.gordonrees.com

1

SEAN P. FLYNN
SFLYNN@GORDONREES.COM
DIRECT DIAL: (949) 255-6958



GORDON&REES
SCULLY MANSUKHANI

2211 MICHELSON DRIVE, SUITE 400
IRVINE, CALIFORNIA 92612
PHONE: (949) 255-6958
WWW.GORDONREES.COM

April 14, 2017

**VIA EMAIL**

Hon. Susan J. Dlott
Potter Stewart U.S. Courthouse, Room 227
100 East Fifth Street
Cincinnati, OH 45202
Email: dlott_chambers@ohsd.uscourts.gov

    Re:    *Ramsey v. Receivables Performance Management, LLC*
           Case No.: 1:16-cv-1059

Judge Dlott:

      Pursuant to Your Honor's April 20, 2017 Order, the Parties are submitting their Joint Status Letter.[1]

      After attempting to obtain additional information, and after further investigation of the ability to pursue Arbitration in this matter, Defendant Receivables Performance Management is unable to proceed with a motion to compel arbitration. Thus, the Parties are submitting the following proposed discovery schedule:

| **Deadline** | **Plaintiff's Proposal** | **Defendant's Proposal** |
|---|---|---|
| Initial Disclosures | Served April 11, 2017 | Served April 14, 2017 |
| Fact Discovery Cutoff[2] | Agreed | September 29, 2017 |
| Plaintiff's Expert Disclosure | Agreed | October 6, 2017 |
| Defendant's Expert Disclosure | Agreed | November 6, 2017 |
| Expert Discovery Cutoff[3] | Agreed | December 8, 2017 |

---

[1] Plaintiff's Counsel participated in the drafting of this Joint Status Letter, and has consented to its submission by Defense Counsel.
[2] Including hearings on any fact discovery related motions.

ALABAMA ♦ ARIZONA ♦ CALIFORNIA ♦ COLORADO ♦ CONNECTICUT ♦ FLORIDA ♦ GEORGIA ♦ ILLINOIS ♦ MARYLAND ♦
MASSACHUSETTS ♦ MISSOURI ♦ NEVADA ♦ NEW JERSEY ♦ NEW YORK ♦ NORTH CAROLINA ♦ OHIO ♦ OREGON ♦ PENNSYLVANIA ♦
SOUTH CAROLINA ♦ SOUTH DAKOTA ♦ TEXAS ♦ VIRGINIA ♦ WASHINGTON ♦ WASHINGTON, DC ♦ WEST VIRGINIA

| Mediation/Settlement Conference Deadline | Agreed | January 26, 2018 |
| --- | --- | --- |

   The Parties are very appreciative of Your Honor's assistance and attention to these matters.

Very truly yours,

*s/ Sean P. Flynn*

Sean P. Flynn

---

[1] Including hearings on any expert discovery related motions.

# EXHIBIT 4

Civil Action No. 09-cv-410-L (POR)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:


American LegalNet, Inc.
www.FormsWorkFlow.com

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction – which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information;

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

**(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

CG/105296-1/2993686-1 **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).



American LegalNet, Inc.
www.FormsWorkFlow.com

## Exhibit A

## DEFINITIONS

1.     **"DOCUMENTS"** as used herein is intended to have the broadest possible meaning and encompasses, without limitation:

a.     The definitions of "writing" set forth in Section 1001 of the Federal Rules of Evidence, and Federal Rule of Civil Procedure 34, respectively, and include the original or copy, and both sides thereof, of handwriting, typewriting, printing, photocopying, photographing, and every other means of recording upon any tangible thing, any form of communication and representation, including letters, words, pictures, sounds, and symbols, or combinations of them.

b.     It also includes non-paper information storage such as tapes, films, disks and computer memory devices and electronic mail.

i.     "Electronic mail" means all original and any non-identical copies of documents sent or received as electronic mail (including all attachments), whether in printed or electronic form of any kind, including, without limitation, data stored on hard disks, floppy discs, servers, magnetic tape, personal or handheld computers or devices (such as Palm or BlackBerry devices), in random access memory or in read-only memory. For purposes of this definition, the electronic version of any electronic mail is deemed to be an original, irrespective of the existence or creation of a hard copy print-out of that electronic mail, and you are required to produce all responsive documents stored in electronic format. Electronic mail includes all electronic mail in your possession, and is not limited to electronic mail in the senders' or recipients' files or computers, and includes any electronic mail that has been deleted from the senders' or recipients' computers.

c.     Electronically stored information shall be produced in its native format, searchable and with linked attachments as they were sent or received in the regular course of business.

2.     **"RELATING TO"** means referring to, discussing, mentioning, evidencing, criticizing, explaining, describing, illustrating, disparaging, addressing, demonstrating, assessing, alluding to, elaborating upon, remarking upon, probing, examining, debating the merits of, illuminating, disputing the benefits of, expanding upon, commenting upon, interpreting, reassessing, revealing, scrutinizing, studying, critiquing, or characterizing the subject matter or topic inquired about in that particular request.

## REQUESTS

1.     Any and all **DOCUMENTS RELATING TO** Account # 162418057, including but not limited to: all account opening **DOCUMENTS**; all monthly invoices/bills; all payments received; all account closing **DOCUMENTS**; and any and all documents which make up or comprise the contract(s) **RELATING TO** Account # 162418057.

2.      Any and all **DOCUMENTS RELATING TO** debt collection efforts for Account # 162418057 while the account was placed with International Computer Systems, Inc., D.B.A. First Collection Services - 10925 Otter Creek E. Blvd., P.O. Box 3564 Mabelvale, AR 72103.

3.      Any and all **DOCUMENTS RELATING TO** debt collection efforts for Account # 162418057 while the account was placed with Southwest Credit Systems Group - 4120 International Pkwy #1100, Carrollton, TX 75007.

4.      Any and all **DOCUMENTS RELATING TO** the lawsuit: *Phillip Ramsey v. International Computer Systems, Inc. (D/B/A First Collection Services), and Southwest Credit Systems, L.P.*, case number 1:16-cv-00745-TSB, originally filed on July 9, 2016.

# EXHIBIT 5

**From:** Sean Flynn <sflynn@grsm.com>
**Sent:** Thursday, December 27, 2018 6:30 PM
**To:** Adam V. Sadlowski <ASadlowski@sb-lawyers.com>
**Cc:** Cori R. Besse <CBesse@sb-lawyers.com>; Gregory Brunton <gbrunton@grsm.com>; Tyler Tarney <ttarney@grsm.com>; Carrie Thiem <cthiem@grsm.com>; Leslie Handy <lhandy@grsm.com>
**Subject:** Ramsey v. RPM - Documents produced by Windstream

Adam,

Attached are the transmittal e-mails from Windstream regarding their document production. We already sent you the two "No Documents" responses from Dish and Verizon. We have not received anything from SWC or FSC yet.

Regarding the attached documents, Dish is asking RPM for copies of any documents produced by Windstream. I didn't see any Confidential stamps on the documents, and even though there is PII on some documents, since Plaintiff was a customer I don't think there is a problem with sending them to Dish, but I wanted to give you an opportunity to weigh in first before RPM sends copies to Dish.

As you look through the documents, you will see in the second transmittal email that a copy of the operative agreement for Plaintiff's account is attached and there is a class action waiver and arbitration agreement. I have two questions: 1) ██████████████████████████████████████████ and 2) will Plaintiff stipulate to dismissing this matter and proceeding in Arbitration?

We look forward to your response(s).

**SEAN P. FLYNN** | Partner
**GORDON & REES**
SCULLY MANSUKHANI

2211 Michelson Drive, Suite 400
Irvine, CA 92612
D: 949-255-6958
sflynn@grsm.com

vCard

Alabama | Arizona | California | Colorado | Connecticut | Delaware | District of Columbia
Florida | Georgia | Illinois | Kentucky | Louisiana | Maryland | Massachusetts | Michigan
Missouri | Montana | Nebraska | Nevada | New Jersey | New York | North Carolina | Ohio
Oklahoma | Oregon | Pennsylvania | Rhode Island | South Carolina | South Dakota
Tennessee | Texas | Utah | Virginia | Washington | West Virginia | Wisconsin

www.grsm.com

Please consider the environment before printing this email.

1

| | |
|---|---|
| **From:** | Anderson, Paula C <Paula.C.Anderson@windstream.com> |
| **Sent:** | Wednesday, December 26, 2018 10:20 AM |
| **To:** | Gaston, Sara; Sean Flynn |
| **Subject:** | RE: Subpoena Response - Case Number 1:16-cv-1059 | Windstream Communications Tracking ID: 79381 |
| **Attachments:** | form_online_terms_and_conditions_10_21_13.pdf |

Sean – attached are the online terms and conditions that would have been in effect during the time Mr. Ramsey had service.

*Paula C. Anderson*

Litigation Paralegal | Windstream Services, LLC.
4001 N. Rodney Parham | Mailstop: 1170-B1F03-531A | Little Rock, AR 72212
paula.c.anderson@windstream.com
o: 501.748.4676

**windstream**

Data | Voice | Network | Cloud

**From:** Gaston, Sara
**Sent:** Friday, December 21, 2018 10:56 AM
**To:** sflynn@grsm.com
**Cc:** Gaston, Sara <Sara.Gaston@windstream.com>; Anderson, Paula C <Paula.C.Anderson@windstream.com>
**Subject:** Subpoena Response - Case Number 1:16-cv-1059 | Windstream Communications Tracking ID: 79381

Attached you will find the requested information.  If you have any questions feel free to contact me.

Sara M. Gaston
Network Analyst II - Network SOC | Windstream
o: 501-748-0756 | f: 330-486-3131

Sara.Gaston@windstream.com | windstreambusiness.com

## TERMS AND CONDITIONS FOR SERVICES AND/OR
## EQUIPMENT PROVIDED BY WINDSTREAM

**PLEASE READ THESE TERMS AND CONDITIONS CAREFULLY. IT IS ESPECIALLY IMPORTANT FOR YOU TO READ SECTION 10 (DISPUTE RESOLUTION) CAREFULLY, AS SECTION 10 PROVIDES FOR RESOLUTION OF DISPUTES THROUGH FINAL AND BINDING ARBITRATION BEFORE A NEUTRAL ARBITRATOR INSTEAD OF IN A COURT BY A JUDGE OR JURY OR THROUGH A CLASS ACTION. YOU WILL CONTINUE TO HAVE CERTAIN RIGHTS TO OBTAIN RELIEF FROM FEDERAL OR STATE AGENCIES.**

1. **Definitions**
   "**You**" or "**Customer**" means the person or entity that subscribes to Services or purchases or leases Equipment and anyone who accesses the Services and Equipment provided to you.
   "**We**", "**us**", "**our**", "**Company**" and "**Windstream**" refer to the Windstream legal entities providing Services to you and as identified on your bill.
   "**Service(s)**" refer to any services you have agreed to obtain from us.
   "**Equipment**" means any equipment or accessories you purchase or lease from us or those provided by us for use in any manner in connection with your Services. For ease of reference, Services and Equipment provided by Windstream shall be referred to in this document collectively as "Services."
   "**Promotional Terms**" mean terms that apply to special offers from time to time. Promotional terms will be specified in your first bill message. Promotional terms may include a term commitment and an early termination fee in the event the service is not installed or maintained, or in the event you disconnect service prior to the end of the term.
   "**Service Order**" means the form (whether paper or electronic, including on-line order forms), if any, in which you apply for or make changes to Services and may include the length of time you will subscribe to a Service, rate plans, access charges, fees, taxes and surcharges, choice of long distance carrier, and the Equipment you have selected.

2. **Agreement and Acceptance.** This Agreement incorporates by reference and you agree to be bound by the following, in this order of priority **AND INCLUDING ANY CHANGES (SEE SECTION 23 BELOW):** 1) any applicable tariffs filed with the Federal Communications Commission ("FCC") or the relevant state public service commission; 2) The FCC or state web-posted price lists or terms and conditions (either, "price lists") posted at http://ww.windstream.com/documents/detariffedservices.pdf; 3) the product (bundle)-specific terms and conditions, including any Promotional Terms (see Section 27 herein and Your Bill Messages) and any additional agreements associated with such products; 4) the Service Order, if any; 5) any relevant click-through agreement for the Services you received; 6) these Terms and Conditions ("Terms"); 7) the Acceptable Use Policy posted at http://www2.windstream.net/customersupport/usersguide/accept/accept.html; and 8) the Privacy Policy posted at http://www.windstream.com/privacy.aspx.

   You accept this Agreement when you do any of the following: (a) give us your written or electronic signature, (b) tell us orally or electronically that you accept (i.e., by clicking the "I Accept" button for on-line purchases or account changes), or (c) use any Services. If you have never used the Services before and do not wish to be bound by this Agreement, do not begin using them and notify us immediately. By accepting this Agreement, you acknowledge that you are 18 years of age or older, are competent to enter into a contract with us, and are authorized to obtain Services or make changes to an existing account. You may obtain a copy of these Terms and any product-specific Terms and Conditions by visiting www.windstream.com or by calling a service representative at 877-807-9463. This Agreement supersedes any and all statements or promises made to you by any of our employees or agents. If you are a business customer with an existing contract, those contract terms will control.

3. **Charges for Services and Taxes, Fees and Surcharges.** You are responsible for paying all charges applicable to Services provided to you including, but not limited to, monthly recurring charges ("MRCs"), access charges, features, changes and moves to Services, Service repair visits and no-show charges, installation charges, IP address charges, billing charges, credit card surcharges, toll, long distance, and directory assistance, and any other usage-based charges at our current rates when used. In addition to the monthly recurring and usage-based charges, taxes, fees, surcharges, assessments and other charges apply to all Services and Equipment, including how those may change in the future. In certain service areas paper bills are available for a monthly charge.

   To determine whether certain taxes, fees and surcharges are applicable to Services provided to you, we are required by federal law to obtain your street address, which must be within our service area. You represent and warrant that the address you provide us to obtain Service is correct, and you acknowledge that we are relying on this information to determine which taxes, fees or surcharges are applicable to your Service. You agree to notify us if your address

changes. In the event you do not provide us with a valid address or address change, you may be responsible for additional taxes, fees or surcharges and penalties associated with failure to pay taxes based on the proper address, and we may terminate your Services.

As a convenience to you, Company may include charges for third party services on your monthly bill. You should always review your bill carefully and contact the Company if you are unsure about a charge on your bill. Company also offers the ability to block third party charges from your monthly bill. This service is optional and free of charge, and if you are interested in adding a third party block to your account, call a Company representative at the number found at the top right hand corner of your statement to determine if your account is eligible. The block does not apply to Services provided by Windstream or its affiliates to which you subscribe.

4. **Billing and Payment; Rate Increases.** We will bill you the recurring and installation rates you were quoted for Services or those associated with the Services you use or ordered, with increases on notice. All recurring charges are billed one month in advance. Billing at a location will begin upon the earlier of (i) the Installation Date (which may be the date administrative access to certain software-based Services is granted to Customer); or (ii) 30 days after delivery of the applicable facility and/or equipment to the Customer premises (if the delay in connection of the facility and/or equipment is due to Customer or its agent); however, Company may choose to bill in full monthly increments with no proration for partial service periods when service either starts or ends in the middle of a billing cycle.

We reserve the right to back-bill you for Services actually used but not previously billed.

Payment in full is due no later than the due date indicated on your bill and we may apply a late fee and interest and other charges (including, but not limited to, collection fees) up to the maximum amount permitted by law. Returned checks, payment by phone, paper bills and other fees due to your choice of payment method or billing receipt may also be subject to fees. You agree to pay costs and fees, including but not limited to attorney fees, we incur to collect an unpaid balance from you.

Company may require you to authorize payment for Services by credit card or by debiting a bank account, and no additional notice or consent is required before we invoice the credit card or debit the bank account for all amounts due to us for any reason.

5. **Credits, Deposits and Advanced Payments.** Our agreement to provide you Services is subject to credit approval and, as such, you authorize us to ask credit-reporting agencies for credit information about you. We may, in our discretion, require you to submit a deposit as security for payment of charges or an advanced payment before we establish any Services on your behalf. In the future, an additional deposit may be required if either the amount or number of Services is increased or your credit rating changes. Simple interest will be paid on the cash deposit for the period it is held by us and will be refunded if satisfactory credit has been established or upon termination of service (if no balance is due). We reserve the right to apply the deposit to any amount due and unpaid but the payment of a deposit in no way relieves you of paying your bills in a timely manner. Regarding advanced payments, any advanced payment will appear as a credit to your first month's bill. In the future, an additional advanced payment, that will be applied to your bill, may be required if you increase your Services with us. If you cancel Services before installation or we cannot install your Services for some reason, we may refund the advanced payment. We will not refund any advanced payment made after installation of Services.

6. **Termination by You**
**Pre-Installation.** If you are a business customer and you terminate your order prior to the installation of Services, you will be required to pay a pre-installation cancellation charge equal to the greater of (i) three (3) months of MRCs ; or (ii) our costs to other providers. You agree that this charge is a reasonable measure of the administrative costs and other fees incurred by us to prepare for installation.

**After Installation.** If you cancel your Services or a portion thereof after installation, you remain liable for payment of all outstanding charges for all Services you used and Equipment you purchased from us prior to termination and you will be charged for the full last month of Service with no proration or credit if you terminate Services prior to the last day of your billing cycle.

**Fixed-Term Agreements.** When you purchased your Service(s), you may have been required to commit to a term or a minimum purchase. EITHER YOU OR WE MAY ELECT NOT TO RENEW YOUR SERVICE BY PROVIDING NOTICE TO THE OTHER NO LATER THAN THIRTY (30) DAYS PRIOR TO EXPIRATION OF THE FIXED TERM.

IF NEITHER YOU NOR WE DELIVER A TIMELY NOTICE NOT TO RENEW, THE SERVICES WILL RENEW ON A MONTH-TO-MONTH BASIS. IF YOU TERMINATE SERVICES AFTER INSTALLATION DURING THE INITIAL OR RENEWAL TERM FOR ANY REASON OTHER THAN FOR CAUSE, OR WE TERMINATE FOR CAUSE PURSUANT TO SECTION 7 BELOW, YOU WILL BE REQUIRED TO PAY TO US AS LIQUIDATED DAMAGES AN AMOUNT EQUAL TO 100% OF THE MONTHLY RECURRING CHARGES ("MRCS") MULTIPLIED BY THE NUMBER OF MONTHS REMAINING IN THE THEN CURRENT TERM. OR IF YOU TERMINATE OR DISCONNECT LESS THAN THE ENTIRETY OF YOUR SERVICES SUCH THAT YOUR ACTUAL USAGE AT A LOCATION FALLS BELOW ANY MINIMUM MONTHLY CHARGE ("MMC") OR MINIMUM MONTHLY FEE ("MMF") FOR THAT LOCATION, YOU AGREE TO PAY AN AMOUNT EQUAL TO THE MMC OR MMF FOR EVERY MONTH REMAINING IN THE THEN CURRENT TERM ("LIQUIDATED DAMAGES").

YOU AGREE THAT IN THE EVENT OF TERMINATION BY YOU, THE ACTUAL DAMAGE TO WINDSTREAM IS DIFFICULT TO ASCERTAIN AND THAT THE EARLY TERMINATION FEE REPRESENTS LIQUIDATED DAMAGES AND NOT A PENALTY AND IS A REASONABLE ESTIMATE OF THE ACTUAL REDUCTION IN THE VALUE OF THIS AGREEMENT THAT WE WILL SUSTAIN.

**Month-to-Month Agreements.** If no length of time is identified on the Service Order or you were not otherwise required to commit to a term, then the term is month-to-month and you or we may terminate at any time by providing notice at least thirty (30) days prior to the effective date of termination. You remain liable for payment of all outstanding charges for all Services you used and Equipment you purchased from us prior to termination and you will be charged for the full last month of Service with no proration or credit if you terminate Service prior to the last day of your billing cycle.

**Bundled Services.** Some plans may offer a discount if you sign up for bundled services and may require a term commitment. If you sign up for bundled services, you agree to maintain the bundled services for the applicable term. If you receive bundled services and you subsequently unbundle, terminate, or disconnect any of these Services, or we disconnect any of the Services, we may adjust the rates for the remaining Service(s) to the then current price.

**Change in Location.** A change in your service address or the location to which any Service is provided to you may constitute, at our sole discretion, termination of the Services or result in an increase in the prices you must pay for the Services.

**Change to Another Carrier.** We may deem a request by you to port your numbers as a request by you to terminate your Agreement. If you choose to port less than all of your numbers, or you leave any Services connected, we will continue to bill you for the numbers and/or Services still connected.

7. **Termination by Us.** Provisioning of the Service is subject to the availability of the requisite equipment and facilities. We may limit, interrupt, terminate or refuse to provide a Service if: (a) you do not honor any provision of this Agreement; (b) you use a Service in a manner that adversely affects other customers or harasses them, our employees, or others; (c) you use Service to engage in fraud or unlawful conduct or are suspected of doing so; (d) you modify your phone or any software residing thereon from the original manufacturer specifications, including for the purpose of accessing non-Windstream services; (e) you use Service in a manner that is excessive or unreasonable when compared to the predominant usage patterns of other customers on a similar service plan in your geographic area (and we may also implement charges or change you to the appropriate rate plan consistent with such use); (f) resell any Service; (g) for any other reason set forth in the relevant tariffs and price lists or terms and conditions; (h) you do not pay any amount to us or billed by us on behalf of others, including disputed amounts that Windstream determines are valid charges on your bills; (i) facilities or property associated with providing the Services have been condemned or use has been prohibited by the government in any manner; (j) you fail to acquire and maintain the rights of way or property access necessary for installation or maintenance of Services; (k) you are insolvent, have made an assignment for the benefit of credits or you have filed or had filed against you a petition for bankruptcy; or (l) we determine in our sole discretion that facilities are not technically or economically feasible. We may restore such interrupted or terminated Service, in our sole discretion, following your correction of the violation and payment of any amounts due, including any restoration charge we assess for restoring your Service.

8. **Personal Identifiers.** We assign telephone numbers, e-mail addresses, IP addresses, and other personal identifiers in connection with the Services. You have no proprietary right to any such identifiers, and we reserve the right to change them upon notice to you. In the event that we allow you to transfer a personal identifier to another party to obtain any Services we provide you, we reserve the right, prior to honoring the request for transfer, to charge a fee for

the transfer and to collect any money owed for Services.

9. **Disputed Bills.** You must review bills in a timely manner. To dispute a bill, you must comply with the dispute resolution provisions in Section 10 and submit your dispute, in writing, within 60 days after the date on the bill. You must pay any undisputed portion while your dispute is investigated. You accept all charges on your bill not disputed within 60 days and must pay those charges.

10. **Dispute Resolution.** By utilizing Windstream's Services and agreeing to these Terms, you agree to the following dispute resolution procedures. *You and Windstream agree to waive any right to a trial by jury in a court of general jurisdiction and any right to participate in a class action or consolidated action regarding a dispute as defined below. Specifically, you and Windstream agree to waive any right to pursue a dispute by joining a disputed claim with the disputed claim of any other person or entity or to assert a disputed claim in a representative capacity on behalf of anyone else in any lawsuit, arbitration or other proceeding.*

If you have a dispute with Windstream, you should notify Windstream's Customer Care department at the number listed on your invoice. If the Customer Care department is unable to resolve your dispute, you must submit your dispute to us in writing at the following address: Windstream Communications, Inc., 1720 Galleria Boulevard, Charlotte, NC 28270, Attn: Executive Customer Relations. You must describe your dispute and provide enough detail to allow us to understand it. You must provide any supporting documentation with your written dispute. Click here http://www.windstream.com/legal.aspx for a form that you may, but are not required, to use to submit your written dispute to us. If we have a dispute with you, we will send you a written notice to your billing address to attempt to resolve the dispute. You and Windstream agree that a dispute is any claim or controversy related in any way to Windstream's Services, including charges for Services, Equipment, Service Order(s) or our agreements pursuant to these Terms or any other agreements, whether the dispute arises in tort, contract, by statute or any other legal theory and whether the dispute arises under this or any prior agreement with us or arises after your Services with Windstream are terminated.

If you and Windstream are unable to resolve the dispute after 60 days from the date of receipt of the written dispute, you agree that either you or Windstream shall resolve the dispute in only one of two possible ways: (1) by seeking relief in small claims court, if appropriate under the applicable court's rules, in the city or county of the billing address reflected on your bill; or (2) by arbitration. **This Section does not prohibit you from submitting any issue you have with Windstream to any federal, state or local governmental agency or public service commission which may be able to seek relief from Windstream on your behalf.** If the dispute is regarding the charges for Services, you agree that if you do not seek relief in small claims court or by arbitration following the 60 day dispute period, then you will immediately begin paying the disputed amount that Windstream determines is valid, plus any charges that were not paid during the 60 day dispute period, or Windstream may terminate the Services.

Regarding arbitration, you and Windstream specifically agree to finally resolve all disputes not filed in small claims court by arbitration that will be final and binding on both you and Windstream, subject to any exceptions required by applicable law. *The following provisions shall apply to arbitration:*

a. **Notice:** If you want to arbitrate a dispute with Windstream after expiration of the 60 day dispute period noted above, you must file a claim with the American Arbitration Association ("AAA"). Click here http://www.windstream.com/legal.aspx for a form that you may, but are not required, to use. The claim must include a description of the dispute, a brief outline of previous efforts to resolve the dispute, all supporting documentation and a proposed resolution. A copy of the claim and proof of payment of the filing fee, such as a copy of the check or money order, should be sent to Windstream at: 4001 Rodney Parham, Little Rock, Arkansas 72212, Mailstop B1F03-71A, Attn: Legal Department ("Arbitration Notice Address"). Windstream will reimburse you for the filing fee if your claim does not exceed $75,000. If Windstream wants to arbitrate a dispute with you after expiration of the 60 day dispute period noted above, Windstream will send a copy of its claim to your billing address.

b. **Applicable Law:** The interpretation and enforceability of the arbitration provisions, and whether a dispute is subject to arbitration, is subject to the Federal Arbitration Act ("FAA") only and not state law.

c. **Applicable Rules:** Windstream and you agree that the arbitration will be conducted by the AAA. The rules governing the arbitration proceeding will be the current Commercial Arbitration Rules and the

Supplementary Procedures for Consumer Related Disputes ("AAA Rules") from the American Arbitration Association. The AAA rules are at www.adr.org or can be obtained by calling 1.800.778.7879.

d. **Method of Arbitration:** If your claim is for $10,000 or less, Windstream agrees that you may choose whether the arbitration will be conducted solely on the written documents submitted, by telephone or in person in the city or county of the billing address reflected on your bill. If your claim exceeds $10,000, the right to a hearing will be determined by the AAA rules. The written documents can be the notice to arbitrate that either of us send to the other regarding arbitration and referenced above.

e. **Arbitration Costs and Attorney Fees:** If you properly file a claim with AAA pursuant to these arbitration provisions, and the amount of your dispute does not exceed $10,000, Windstream agrees to pay for all AAA filing, administrative and arbitrator fees ("Arbitration Costs") and your reasonable attorney's fees (with reasonable hourly rates and expenses to be determined by the location of the arbitration) ("Attorney Fees") incurred by you regardless of the decision of the arbitrator, unless your claim is found to be frivolous or improper (as set forth in the Federal Rules of Civil Procedure Rule 11) by the arbitrator. A portion of the payment of Arbitration Costs may be in the form of reimbursement, as you may be required to place a deposit when your notice of arbitration is filed. If the claim is found to be frivolous or improper, the AAA Rules will apply regarding payment of Arbitration Costs. If your dispute exceeds $10,000 but not $75,000, Windstream agrees to pay all the Arbitration Costs and 50% of your Attorney Fees. For disputes of $75,000 or more, the AAA rules regarding Arbitration Costs will apply. However, Windstream agrees to pay 50% of the Arbitration Costs, and each party will pay its own Attorney Fees incurred for disputes of $75,000 or more. Notwithstanding the foregoing, if your claim is found to be frivolous or improper (as set forth in the Federal Rules of Civil Procedure Rule 11) by the arbitrator, Windstream will have no obligation to pay any of your Attorney Fees. If Windstream disputes the reasonableness of any Attorney Fees, you agree that the presiding arbitrator shall determine what is a reasonable fee and his/her decision regarding Attorney Fees will be binding on both you and Windstream. In no event shall Windstream be entitled to an award of its Attorney Fees.

f. **Awards:** If the arbitrator's award is in your favor and is greater than the value of Windstream's last settlement offer made to you prior to selection of the arbitrator, Windstream will pay you the amount of the arbitrator's award or $3,000, whichever amount is greater. Windstream also will pay your attorney's reasonable fees, including expenses, or $2,500, whichever amount is greater.

g. **Injunctive relief:** If you seek declaratory or injunctive relief in the arbitration, the arbitrator may award such relief only to the extent necessary to provide relief warranted by your individual claim.

h. **Consolidation:** The arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding.

i. **Confidentiality:** Any arbitration shall remain confidential. During the arbitration, the amount of any settlement offer made by Windstream or you shall not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which you or Windstream is entitled. Neither you nor Windstream may disclose the existence, content or result of any arbitration or award, except as may be required by law, or to confirm and enforce an award.

j. **Exceptions:** Nothing in this Section shall prevent Windstream from issuing notices, including take-down notices for alleged trademark or copyright infringement pursuant to the Digital Millennium Copyright Act, or termination of Service pursuant to Windstream's Acceptable Use Policy for your abuse of your internet access Services. Nothing in this Section shall prohibit Windstream from filing a lawsuit in a court of general jurisdiction to collect outstanding balances for unpaid Services or Equipment, or any other type of charge owed on your account, or for the theft of any Services or Equipment by you. This Section is intended to resolve outstanding disputes between us and not to collect a debt owed by you to Windstream.

k. **Limitation of Liability:** This Section is subject to the Limitation of Liability Section in these Terms and Conditions.

I. **Limitations Period:** Any dispute must be brought by you or Windstream within two years after the date the basis for the claim or dispute first arises.

Notwithstanding any provision in these Terms and Conditions to the contrary, you and Windstream agree that if Windstream makes any future change to this arbitration provision (other than a change to the notice addresses), you may reject any such change by sending Windstream written notice within 30 days of the change to the Arbitration Notice Address provided above. By rejecting any such change, you are agreeing that you will arbitrate any dispute between us in accordance with the language of this provision.

If the provisions concerning the waiver of the class or consolidated actions, or the provisions regarding mandatory arbitration, are deemed unenforceable or void as a matter of law, you and Windstream agree that all claims will be brought in a court of general jurisdiction and not resolved through arbitration. YOU AND WINDSTREAM WAIVE, THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT FOR THE SERVICES PROVIDED BY US.

11. **Services Provided by Third Parties.** The Services will be provided either by us or by our third party vendors or contractors. We reserve the right to change or modify the source of any Services provided to you without notice.

12. **Company Provided and Owned Equipment.** Any Equipment installed by us on your premises that is not the subject of a sale or lease to Customer (such as the CSU/DSU interface cards, Channel Bank and router, if applicable) shall remain at all times our property. It shall remain in good condition, less normal wear and tear. If we do not have access to your premises within 30 days after Services are terminated, you shall reimburse us for the full purchase price of the equipment as well as any attorney's fees and costs. You are responsible for all security measures over the Services, including but not limited to access to authorization codes or encryption you deem necessary or required. Once Equipment is delivered to you, you bear the risk of loss.

13. **Disconnection of Current Provider; Special Construction; Third Party Charges.** You are solely responsible for disconnecting Services with your current service provider and we are not responsible for any charges assessed against you by such provider. You shall pay all charges if we or a third party provider is required to extend the demarcation point or undertake special construction or non-routine installation for you. Unless we specifically agree in writing to undertake equipment installation and maintenance work, you are responsible for all charges assessed by your phone system vendor and other third parties in connection with the Services and we shall have no responsibility for maintenance or repair of same.

14. **Access to Third Party Services.** You agree that the telephone line on which your Services are activated may not be used to access any third-party services equivalent to Services we provide or can make available, even if you declined to purchase such Services from us. Your telephone line contains programming designed to enable access to our Services only. You may not use any manual or electronic means to circumvent any restrictions placed on your telephone line to modify without authorization any programming supplied by us.

15. **Access and Installation, Repair and Maintenance.** You agree that you are responsible for acquiring and maintaining the right of way necessary to allow installation and maintenance of Services. Failure to acquire and maintain necessary right of way may result in delay of installation or termination of Services by Windstream. Upon notice, we may make tests and inspections to determine you are complying with the requirements of these terms or for routine and emergency maintenance of the equipment and facilities. We may take action to protect our facilities and equipment. We may substitute, change or rearrange any Equipment or facility at any time and we may limit or allocate use of existing facilities when necessary due to lack of facilities or due to a cause beyond our reasonable control.

16. **Privacy and Customer Proprietary Network Information.** You authorize us to monitor and record communications to us regarding your account or the Services for purposes of quality assurance. For on-line orders, we may implement reasonable procedures including, but not limited to, validating information provided by you or restricting the amount of Services purchases online. We reserve the right to cancel or reject on-line orders at any time for security or privacy reasons.

To provide Services to you, we maintain certain customer proprietary network information ("CPNI"). CPNI includes information that relates to the quantity, technical configuration, type destination, location and amount of use of any

telecommunications service we provide to you, and which we obtain because of the carrier-customer relationship between us. CPNI also includes information contained in your bill. We may use and share your CPNI without your permission for the following purposes:

- To protect the rights or property of us or other customers or carriers from fraudulent, abusive, or unlawful use of or subscription to the Services you get from us;
- To initiate, render, bill and collect for your Services;
- To provide information telemarketing, referral, or administrative services to you when you call us if you give us permission to do so;
- To provide call location information regarding the user of a wireless mobile service to certain other parties in an emergency situation;
- To provide information requested by law enforcement or a third party pursuant to a subpoena or other method of requesting information. We will not give you notice of any subpoena or court or administrative orders related to your account, IP address, contact information or use of Services unless required to do so by law.

If you do not want us to provide your information to other Windstream entities, please notify us by calling Residential Support at 866-347-1991 or Business Support at 800-843-9214.

When you view your account information or shop for Services on-line, you agree that we may display your CPNI on-line after proper verification by you to fill orders or allow you to make account changes.

17. **Theft and Fraud.** You agree to keep all passwords, Member ID's, IP addresses, and computer names confidential. If your Services are lost or stolen or fraudulently used, then you are responsible for all usage incurred before we receive notice from you of such loss or theft. If we choose to pursue investigation or prosecution of the loss or theft, you agree to cooperate in the investigation of fraud or theft and to provide us with such information and documentation as we may request (including affidavits and police reports).

18. **LIMITATION OF LIABILITY.** FOR PURPOSES OF THIS SECTION, DISCLAIMER OF WARRANTIES AND EMERGENCY/CRITICAL LINES SECTIONS, "OUR" OR "WE" INCLUDES WINDSTREAM'S OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES, AGENTS, SUBCONTRACTORS, VENDORS AND ANY ENTITY ON WHOSE BEHALF THE COMPANY RESELLS SERVICES. UNDER NO CIRCUMSTANCES WILL WE BE LIABLE FOR ANY ACCIDENT OR INJURY CAUSED BY SERVICES OR ANY DAMAGE OR LOSS RESULTING FROM THE INSTALLATION, MAINTENANCE OR REMOVAL OF THE SERVICES, ANY INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES (SUCH AS LOST PROFITS, LOST BUSINESS OPPORTUNITIES, BUSINESS INTERRUPTION, LOSS OF BUSINESS DATA), ANY PUNITIVE OR EXEMPLARY DAMAGES, THE COST OF ALTERNATIVE SERVICE OR FOR ANY SERVICE INTERRUPTIONS, DELAY OR FAILURE TO PERFORM UNDER THIS AGREEMENT DUE TO CAUSES BEYOND OUR REASONABLE CONTROL, INCLUDING BUT NOT LIMITED TO, STRIKES, LOCKOUTS, OTHER LABOR UNREST, NATURAL DISASTERS, ACTS OF GOD, CABLE CUTS OR COMMON CARRIER DELAYS. YOU AGREE THAT THE PRICING OF SERVICES REFLECTS THE INTENT OF BOTH YOU AND US TO LIMIT OUR LIABILITY AS PROVIDED HEREIN.

19. **DATA SERVICES.** YOU ACKNOWLEDGE THAT THE INTERNET IS A VOLATILE ENVIRONMENT AND WE ARE NOT LIABLE FOR CONFIDENTIAL INFORMATION STORED ON OR TRAVERSING OUR NETWORK. YOU MUST TAKE ALL APPROPRIATE PRECAUTIONS TO SECURE CONFIDENTIAL INFORMATION INCLUDING ENCRYPTING IF YOU DEEM NECESSARY.

20. **DISCLAIMER OF WARRANTIES.** SERVICES ARE PROVIDED ON AN "AS IS" AND "AS-AVAILABLE" BASIS WITHOUT WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF TITLE OR NON-INFRINGEMENT OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WARRANTY ARISING BY COURSE OF TRADE, COURSE OF DEALING OR COURSE OF PERFORMANCE, ANY WARRANTY THAT THE SERVICES WILL MEET CUSTOMER'S REQUIREMENTS OR ANY WARRANTY REGARDING THE QUALITY, CONTENT, ACCURACY OR VALIDITY OF THE INFORMATION OR DATA RESIDING ON OR PASSING THROUGH OR OVER THE NETWORK. ALL SUCH WARRANTIES ARE HEREBY DISCLAIMED. WITHOUT LIMITING THE FOREGOING, BROADBAND SPEEDS, TRANSMISSION QUALITY, NETWORK SECURITY OR RELIABILITY, AND ACCURACY OF ANY DIRECTORY LISTINGS ARE NOT GUARANTEED. NO ORAL OR WRITTEN ADVICE OR INFORMATION BY COMPANY'S EMPLOYEES, AGENTS OR CONTRACTORS SHALL CREATE A WARRANTY, AND CUSTOMER MAY NOT RELY ON ANY SUCH INFORMATION. WINDSTREAM DOES NOT

**GUARANTEE YOUR SERVICE CAN OR WILL BE INSTALLED BY A PARTICULAR DATE. ANY INSTALLATION DATE PROVIDED IS ONLY AN ESTIMATE.**

21. **Indemnification.** You agree to indemnify and hold Windstream and its subsidiaries, affiliates, officers, agents, co-branders, licensors or other partners and employees harmless from any claim or demand, including reasonable attorneys' fees, made by any third party due to or arising out of content you submit, post, transmit or otherwise make available through the Service, your use of the Service, your connection to the Service, your violation of this Agreement, including, without limitation the Acceptable Use Policy, or your violation of any rights of another.

You acknowledge that you are responsible for all use of the Service using your account, including use by subaccounts, and that this Agreement, including, without limitation, the Acceptable Use Policy and Privacy Policies, as amended from time to time, apply to any and all usage of your account, including use by subaccounts. You agree to abide by these terms and you agree to defend, hold harmless and indemnify Windstream from and against any and all claims stemming from usage of this account and any subaccounts, whether or not such usage is expressly authorized by you.

22. **Emergency/Critical Lines. CUSTOMER ACKNOWLEDGES THAT CERTAIN SERVICES MAY NOT PROVIDE ACCESS TO 911 OR TRANSMIT THE LOCATION OR EXTENSION IF CUSTOMER ATTEMPTS TO ACCESS 911 IN AN EMERGENCY.** Examples include voice over Internet protocol (VoIP), Centrex, and private branch exchange. Additionally, because T1s and VoIP can cease operating during a power outage, you should have a basic business or copper line for elevator, alarm, E911 and other critical functions. By proceeding with use of Services, you assume all responsibility and risk of harm, loss, or damage in the event that 911 access fails, is not possible, or does not provide the address, correct address, extension or other information to emergency authorities.

23. **Changes to these Terms and Conditions.** We may change these Terms, including any change in any charge or fee, or the imposition of a new charge or fee, at any time if we give you notice of the change. If we make a change to these Terms and Conditions that is material and you do not wish to accept such material change, you may terminate the affected Service by giving us 30 days notice, in which case you will not be subject to an early cancellation fee. You will, however, still be responsible for all charges for Services provided before you terminated your Agreement. A material change is ONLY a change that (a) terminates or substantially reduces the availability of a Service for you or (b) results in the increase of any charge by more than 10% of the monthly access charge for that Service. Material changes in your Service DO NOT include the imposition in, or imposition of: (1) any charge required to be collected by any governmental authority, such as taxes or surcharges, or (2) any charge not prohibited by any governmental authority to recoup our expense incurred to comply with a governmental requirement.

As noted in Section 10, if Windstream makes future changes to the arbitration provision in that Section (other than a change to the notice addresses), you may reject this change by sending Windstream written notice within 30 days of the change to the Arbitration Notice Address. By rejecting the change, you agree that you will arbitrate any dispute between us in accordance with the language in Section 10 existing prior to the change.

24. **Applicable Law.** Your Agreement and our provision of Services to you are subject to (a) the laws of the state identified in the billing address that you have provided us and (b) any applicable federal laws including, but not limited to, the Federal Arbitration Act, 9 U.S.C. § 1 et seq. In the event of an inconsistency between any governmental requirement and these Terms regarding the provision of a Service that is subject to the governmental requirement, the provisions of the governmental requirement will apply to the extent necessary to avoid the inconsistency.

25. **Assignment.** We may assign this Agreement to another entity without any advance consent from or notice to you. You may not assign this Agreement without our consent.

26. **No Waiver, Severability.** If we do not enforce any right or remedy available under this Agreement, that failure is not a waiver. If any part of this Agreement is held invalid or unenforceable, the remainder of this Agreement will remain in force.

27. **Product Bundle - Specific Terms and Conditions (alphabetically)**
Product Descriptions generally can be found at www.windstream.com. Some Services have certain system requirements (i.e., Online Backup, Security Suite and TechHelp). Please see the relevant product description for details.

- **Broadband Protection Plus.** Includes the wiring coverage of Protection Plus (see below) and professional installation of Broadband, NIC (network interface card) if needed and Broadband-specific software provided by us for one computer at initial installation and only includes specific types of equipment. For installation and NIC replacement, the system must be Windows 2000 SP-4 or higher. With other operating systems, such as Mac and Linux, we will only cover replacement Customer Premise Equipment (CPE) and wiring/cabling but will not cover installation or software or NIC. The Broadband modem (if provided by us) will be replaced if damages by an electrical surge or natural act (i.e., lightning, floods, etc). This Product does NOT include: a) home networks (even if Equipment is purchased from us); b) LAN software; c) bandwidth/throughput guarantees; d) damage to PCs from viruses; e) non-standard wiring; f) PC Hardware (other than NIC); g) Cisco 827H and 827HI modems; h)operating systems and software maintenance; or i) integrated NIC cards and internal NIC laptop cards.

- **Cable TV.** Channels available to customer as part of any select packages of programming through Windstream Cable TV are subject to change and customer is not guaranteed any particular channel or number of channels. All prices, packages and programming are subject to availability based on location and Windstream's agreements with content providers and credit approval. A Cable TV service activation fee may apply. Taxes and fees, including applicable franchise and FCC regulatory fees may apply. Some promotions may require minimum programming. Certain promotions have an optional or mandatory term commitment period, and if the customer cancels services prior to the optional or mandatory term commitment period, certain termination or cancellation fees may apply. In some packages hardware and programming are sold separately. Other restrictions may apply.

- **Centrex.** Within 30 days of subscribing, you and Windstream will agree on the specific feature, functions and minimum lines and groups to be provisioned. We will base charges on the agreed minimum lines. We will have the right to bill you at hourly rates for all programming, installation or other labor associated with any adjustments to features and functions at initial installation and when changes are made later.

- **Conference Calling.** All per minute conferencing has a minimum per call. Flat Rate Audio and Web Conferencing is limited to 5,000 minutes per month, is only available to you if you have 10 lines or less, is limited to 5 participants on a call simultaneously and you must use Reservationless-Plus®. Flat Rate Web Conferencing requires user licensing at varying rates.

- **Credit Card Acceptance.** Credit card processing services are NOT provided by us and are instead provided by a third party vendor, with which you may be required to enter an agreement. We do not in any way provide credit card processing services, and we are not liable for, nor do we make any representation or warranty regarding the vendor's services. You are solely responsible for any applicable Payment Card Industry security and other standards applicable to accepting credit cards.

- **DISH Network Services.** All prices, packages and programming are subject to change without notice including, without limitation, any term commitment to which you have agreed. All DISH Network programming and any other services that are provided by DISH Network are subject to the terms and conditions of the Promotional Agreement and Residential Customer Agreement, which are available online at www.dishnetwork.com or upon request. Some promotions may require minimum programming. Certain promotions have an optional or mandatory term commitment period, and if you cancel your Services prior to the optional or mandatory term commitment period, certain termination or cancellation fees may apply. Hardware and programming are sold separately.

- **Domain Renewals.** New registrations with Windstream are free for 1 year and then renewals are billed to the customer in 1 year, 3 year or 5 year increments.

- **Fax to Email.** You must have an email address to Send/Receive faxes via this Service but email is not included with the Service. If you exceed your page limit per month, a minimum per page charge will apply. Overages are billed at $0.10/per page.

- **Google.** IF YOU SUBSCRIBE TO GOOGLE THROUGH US YOU WILL BE REQUIRED TO COMPLETE A CLICK-THROUGH AGREEMENT FOR THE GOOGLE LICENSE. We may cancel Google Services at any time on 30 days' notice and, at our option, may either terminate such Google Services altogether or move you to a similar platform. In the event that we or you terminate the Google Services or downgrade or cancel Google Services, you are solely

responsible for downloading all your information to your computer within 30 days.

- **High-Speed Internet.** High Speed Internet service is subject to the the Broadband Network Statement. Customers must agree to all terms of service prior to installing and using service. Speeds are distance-sensitive and availability by address varies. We strive to provision the line up to the maximum speed required to support the qualified and subscribed Service but actual speed will vary based on factors such as the condition of wiring inside a specific location; computer configuration; network or Internet congestion; and the server speed of the websites accessed. We cannot guarantee speeds or uninterrupted, error-free service.

- **Hulu Plus Services.** All Hulu Plus Services and any other services provided by Hulu are subject to the Hulu Terms of Use, which are available online at: www.hulu.com. Certain promotions have an optional or mandatory term commitment period, and if you cancel your Services prior to the optional or mandatory term commitment period, certain termination or cancellation fees may apply. If the Hulu Plus membership is not cancelled at the end of the promotional period, you authorize Hulu Plus to charge you each month for the membership fees, plus taxes, until you cancel the membership.

- **Identity Protection.** Windstream partners with a third party vendor to provide service. As a result of this, you may be required to accept certain terms and conditions of the service as required by the third party. Windstream reserves the right to alter the service in any way including, but not limited to changing the third party provider of the service or discontinuing this service at any time.

- **Internet Access.** Internet Access service is subject to the Broadband Network Statement Service will be provisioned for a maximum download speed of 1 Mbps. Due to the nature of this service, it is an "AS IS" service and may be intermittent, specifically during peak usage times of the day. This Service is not suitable for streaming video, gaming, or large downloads or uploads. Credits or adjustments for slow and/or varying speed, or not being able to access the Internet, will not be issued. Windstream cannot guarantee speeds or uninterrupted, error-free service.

- **Lifetime Price Guarantee.** Certain Services are subject to a Lifetime Price Guarantee ("Guarantee"), as advertised by us; however, in addition to the Agreement set forth herein, the following conditions apply to this Guarantee:

  - The Guarantee only applies to select Services that are part of a bundle, and not a stand-alone service. You must subscribe to at least one new bundle service that includes select High Speed Internet, or other select Internet services, select Phone services, select Cable TV programming, or select DISH programming.
  - Any package that includes DISH is subject to our continuing relationship with DISH. If such relationship ends for any reason, Guarantee bundles that include DISH may be terminated at our discretion. Additionally, channels available to you as part of DISH programming are subject to change without notice. You are not guaranteed any particular channel or number of channels.
  - A DISH activation fee may apply.
  - If DISH service is terminated by you before the end of any commitment, a cancellation fee based on the number of months remaining in the commitment will apply.
  - Channels available to customer as part of any select packages of programming through Windstream Cable TV are subject to change without notice and customer is not guaranteed any particular channel or number of channels. A Cable TV service activation fee may apply.
  - The Guarantee is void if you move, make any changes to your Services, disconnect, if you are disconnected by us, or if any portion of your account balance becomes past due.
  - If you order additional services and equipment including, but not limited to HD or DVR receivers, additional charges apply.
  - The Guarantee covers only the advertised price and does not include current or future taxes, fees or other charges.

- **Long Distance (Business).** Domestic calls are billed in six-second increments with a eighteen-second minimum. A sixty-second minute is broken down into ten six-second blocks and any calls with talk-times of eighteen seconds or less will be billed for eighteen seconds. Usage may be monitored for compliance/abnormal usage and you may be required to demonstrate compliance with these restrictions where monitoring indicates non-compliance. If usage is inconsistent with these restrictions and typical voice usage, Windstream may: (1) charge an additional amount per minute for each call that violates this policy; (2) restrict use or convert you to another plan; and/or (3) void any

applicable price guarantee. Additional charges apply for directory assistance, calling cards, collect calls, operator services, international calling and/or toll-free calling services. International dialing and access to 900/976 telephone numbers are blocked unless otherwise specified by the customer.

- **Managed Network Security CPE.** Requires a minimum commitment and subscription to Windstream Data services. Security gateway equipment must be returned upon service termination.

- **Online Backup.** Windstream partners with a third party vendor to provide service. As a result of this, you may be required to accept certain terms and conditions of the service as required by the third party. The purchase and use of service requires you to be an active Windstream residential or small business High-Speed Internet customer. Service is intended for the backup of laptops or PCs and does not support stand-alone or network servers. Minimum system requirements: Windows XP SP3or higher, Windows Vista SP1 or higher and Internet Explorer 6.0 or later. This service is activated through the Windstream Service Agent. Windstream reserves the right to alter the service in any way including but not limited to changing the third party provider of the service or discontinuing this service at any time.

- **PC Protect Plan.** Windstream partners with a third party vendor to provide service. As a result of this, you may be required to accept certain terms and conditions of the service as required by the third party. Windstream reserves the right to alter the service in any way including but not limited to changing the third party provider of the service or discontinuing this service at any time. The purchase and use of service requires you to be an active Windstream residential or small business High-Speed Internet customer. A full service agreement will be presented to you when you register your laptop or PC for coverage. For devices to be supported, they must contain supported Windows Operations System (currently Windows XP or newer) and a processor that is a Pentium 4 or newer or equivalent.

- **Personal Computer Offers.** Windstream resells personal computers that are manufactured and warranted by a third party. All support and warranties are provided by the manufacturer.

- **Phones at Home Protection Plan.** This plan provides for repair or replacement of residential phones. You must sign up and agree to additional terms applicable specifically to this Plan via the Windstream Phones at Home Protection Plan Registration Form in order to obtain Phones at Home Protection from us.

- **Price Lock.** Price Lock applies to select bundle products. This plan is in addition to the monthly recurring rate for your bundled services, any services and equipment you may purchase, and current and future taxes, fees and other charges. The Price Lock is void and current monthly rates will apply if any portion of the bundled service or feature is disconnected or changed or if any portion of your account balance becomes past due. Price Lock may be void if you move, even if the move is within Windstream service locations.

- **Professional Bundle Website Services.** Windstream requires the customer to agree to a EULA.

- **Professional Installation (Business).** Provided for only one computer per business or home and you must sign a waiver/disclaimer prior to our technicians working at your premises. This service includes: a) setting up the initial DSL connection; b) installing the NIC, if necessary; c) installing the necessary filter on the telephone line; d) DNS entries, configuring DHCP/Static IP address, gateway, etc.; and e) performing various network connectivity tests to ensure each network element has proper connectivity; it does NOT include: t) software installation other than what is included with the router; u) PC Installation (the computer must be installed before we can do a DSL installation); v) station cabling or CAT 5 patch cables; w) new or additional jacks for the DSL service; x) removing any applications unless the application must be removed to make the TCP/IP connection to the Internet work; y) CPE charges; or z) resolving LAN issues including, but not limited to, shared network drives, driver issues or other hardware issues.

- **Professional Installation (Residential).** Provided for the connection of up to three computers per home to the internet when computers are being connected via Windstream provided equipment. This service includes: a) setting up the initial High-Speed Internet connection; b) installing the NIC, if necessary; c) installing the necessary filter on the telephone line; d) performing the initial wireless setup of up to four peripheral devices, including the Windstream wireless gateway (customer may be required to provide user guides for peripheral devices); e) DNS entries, configuring DHCP/Static IP address, gateway, etc.; f) performing various network connectivity tests to ensure each network element has proper connectivity; g) installation and setup of one PC if purchased through Windstream; h) installation of one jack if needed for the High-Speed Internet service. It does NOT include: t) software installation other than what is included with the modem or provided by Windstream; u) PC installation for computers not

purchased through Windstream; v) station cabling or CAT 5 patch cables; w) removing any applications unless the application must be removed to make the TCP/IP connection to the Internet work; x) CPE charges; or y) resolving LAN issues including, but not limited to, shared network drives, driver issues or other hardware issues. We reserve the right to not provide this service if the requirements are beyond the standard scope of work.

- **Protection Plus.** This Service is a wire maintenance plan that includes repair or replacement of existing jacks/outlets (not including the addition or move of existing jacks) that meet our installation standards. This Service provides coverage for one access line. Wiring and jacks damaged as a result of faulty, non-Windstream installation, the negligence or willful acts of you or your agent, vandalism, casualties such as fire or water damages, lightning, floods or earthquakes are excluded. This Service does not cover Key, Centrex and PBX systems.

- **Secure Broadband** requires a minimum term commitment and includes Internet and one static IP address for Managed Network Security. Additional static IP addresses may be available for an additional charge.

- **Security Suite.** Windstream partners with a third party vendor to provide service. As a result of this, you may be required to accept certain terms and conditions of the service as required by the third party. Windstream reserves the right to alter the service in any way including but not limited to changing the third party provider of the service or discontinuing this service at any time. The purchase and use of service requires you to be an active Windstream residential or small business High-Speed Internet customer. System requirements include: Microsoft® Windows 2000 (32-bit) with Service Pack 4 (SP4) or higher , Windows XP (32-bit) with Service Pack 1 (SP1) or higher, Windows Vista (32- or 64-bit) and Windows Vista Service Pack 1 (SP1) or higher, 800 X 600 or higher resolution, 256 MB RAM, 75 MB of available free drive space, Internet connection, Microsoft® Internet Explorer 6.0 or later, and (optional) Mozilla Firefox 1.5 or later. This service is activated through the Windstream Service Agent.

- **Small Business Bundles with Peace of Mind Guarantee.** The Windstream Small Business Bundle includes a business access line or a business VoIP line, long-distance calling, and a feature package of Caller ID, Call Forward, Repeat Dial, 3-Way Calling, Speed Call 30, Call Return, Call Waiting, and Caller ID on Call Waiting and may or may not include High-Speed Internet, High-Speed Internet with Static IP, Premium Tech Support, Online Backup, PC Protect, SaaS Endpoint Security and Broadband Protection Plus. Voice Mail and Rotary Hunt are included with certain bundles. The price for the bundle shall be set forth in Customer's first bill, and such price shall be specifically incorporated as a term of this Agreement.

  This Lowest Price Guarantee offer is subject to availability and is a limited time offer for new customers or existing customers with business line only. If Customer switches to a lower price point for their bundle during the term of this Agreement, this Agreement will restart for another term on the effective date of the new pricing. If Customer terminates service prior to the end of the Agreement, customer may be responsible for an early termination charge equal to 50% of the monthly recurring revenue multiplied by the number of remaining months.

  The Peace of Mind Guarantee offer allows a Customer to avoid an early termination charge in the event the Customer terminates service prior to the end of the Agreement if the termination is due to either Customer closing the service location or Customer moving outside of Company's service area. In order to avoid an early termination charge, Customer must provide thirty (30) days' written notice of its intent to terminate service to Company. Only Customers that have a two-year Agreement are covered by the Peace of Mind Guarantee.

- **Price Guarantees for Small Business Bundle Customers.** Covers the advertised price only rate (payable on a monthly basis). Does not include current or future taxes, fees or other charges. Guarantee is void and tariff or price list rates as applicable will apply if any bundled service or feature is disconnected or changed at any time. Guarantee may be void if Customer moves, even if move is within Company service locations. Offer is non-transferable. Customer's failure to remit the total due for the Small Business Bundle may result in disconnection of Customer's bundle. Customer can revert to basic local service only by payment of past due amounts for basic local service. The Peace of Mind Guarantee does not apply if Customer is disconnected involuntarily from its Small Business Bundle for any violation of the Terms and Conditions contained herein and wants to reconnect. The Lowest Price Guarantee does not apply if Customer voluntarily disconnects from its Business Bundle and wants to re-establish the service.

- **Tech Help.** Windstream partners with a third party vendor to provide service. As a result of this, you may be required to accept certain terms and conditions of the service as required by the third party. Windstream reserves the right to alter the service in any way including but not limited to changing the third party provider of the service or discontinuing

this service at any time. The purchase and use of service requires you to be an active Windstream residential or small business High-Speed Internet customer. This Service requires a minimum term commitment unless bundled with other value added services in a Windstream Security Package. Service is provided via agents remoting into customers' computer and therefore requires that computer must be capable of connecting to the internet in order to utilize service. Minimum System requirements including Windows XP or Vista, Intel Pentium or Pentium II Processor with 500 MHz or faster for Windows XP, 256 MB or higher . Macintosh, UNIX, LINUX or older Windows operating systems are not supported. It includes: a) PC Security and Protection (viruses, spyware, etc.); b) PC Optimization; c) setting up new PCs and transferring files and data from the old machines; d) setting up and encrypting wireless networks; e) handling Windows issues; f) connecting and setting up printers and other peripherals such as scanners, printers and PDAs/Smartphones; and g) software installation, tutorials and tips. Does NOT include the following, among other items that cannot be solved remotely: u) site visits, if needed; v) failed/broken hard drives; w) adding more RAM; x) cracked motherboards; y) bad USB ports or connectors; or z) replacing broken hardware. This service is activated through the Windstream Service Agent.

- **Travel Safety Plus** .Windstream partners with a third party vendor to provide service. As a result of this, you may be required to accept certain terms and conditions of the service as required by the third party. Windstream reserves the right to alter the service in any way including but not limited to changing the third party provider of the service or discontinuing this service at any time. Windstream assume no responsibility for loss or damage resulting from services provided by the vendor or its subcontractors. Windstream residential home phone services, long distance or High-Speed Internet is required in order to subscribe to Travel Safety Plus.

- **Unlimited Long Distance (Business).** Intended for direct-dialed, one-plus voice use only and cannot be used for auto-dialing (including automatic outbound dialing systems or call distribution systems), broadcast fax, long distance internet or intranet access, fax machines, softphones or data devices, transcript services, telemarketing, multi-party conferencing calling (excluding 3-way calls), party lines, chat lines, adult entertainment lines, calls to 900 and 976 numbers, or call center and certain switching applications. In addition, for residential users, unlimited long distance may not be used for business use.

- **Unlimited Long Distance (Residential).** Intended for personal, residential voice calls within the U.S. Calling restrictions include but are not limited to business use, Internet services, telemarketing, auto-dialing, multi-party conferences, party or chat lines, adult entertainment lines, and voicemail/information services access. If usage is inconsistent with residential voice calling, Windstream may (1) charge 10 cents per minute for each call that violates this policy; (2) restrict use or convert plan to Windstream 10; and/or (3) void price guarantee and convert rates to then current monthly rates.

- **Voice Over Internet Protocol (VoIP)-Based Services.** In order to access or use any VoIP Services, you must sign the 911 Disclosure form, which warns of and has you acknowledge certain 911 limitations for VoIP Services.

- **Web Hosting.** See policy for Web Hosting at http://www.windstreambusiness.com/media/789/hosting_policy.pdf.

- **Windstream Service Agent.** Windstream partners with a third party vendor to provide service. As a result of this, you may be required to accept certain terms and conditions of the service as required by the third party. Windstream reserves the right to alter the service in any way including but not limited to changing the third party provider of the service or discontinuing this service at any time. The use of service requires you to be an active Windstream residential or small business High-Speed Internet customer. Service is free to all Windstream High-Speed Internet subscribers. Service is available for use only via laptop or PC and requires software download.

- **Wireless Data Backup** is for backup purposes only. Maximum bandwidth is 2MG regardless of the amount of bandwidth a customer has; Customer may not remove the wireless card from the service address. Real time quality of service is not available. Availability and speeds are not guaranteed and are affected by wireless strength.

**October 21, 2013**

### TERMS AND CONDITIONS FOR SERVICES AND/OR
### EQUIPMENT PROVIDED BY WINDSTREAM

**PLEASE READ THESE TERMS AND CONDITIONS CAREFULLY. IT IS ESPECIALLY IMPORTANT FOR YOU TO READ SECTION 10 (DISPUTE RESOLUTION) CAREFULLY, AS SECTION 10 PROVIDES FOR RESOLUTION OF DISPUTES THROUGH FINAL AND BINDING ARBITRATION BEFORE A NEUTRAL ARBITRATOR INSTEAD OF IN A COURT BY A JUDGE OR JURY OR THROUGH A CLASS ACTION. YOU WILL CONTINUE TO HAVE CERTAIN RIGHTS TO OBTAIN RELIEF FROM FEDERAL OR STATE AGENCIES.**

1. <u>Definitions</u>
   "**You**" or "**Customer**" means the person or entity that subscribes to Services or purchases or leases Equipment and anyone who accesses the Services and Equipment provided to you.
   "**We**", "**us**", "**our**", "**Company**" and "**Windstream**" refer to the Windstream legal entities providing Services to you and as identified on your bill.
   "**Service(s)**" refer to any services you have agreed to obtain from us.
   "**Equipment**" means any equipment or accessories you purchase or lease from us or those provided by us for use in any manner in connection with your Services. For ease of reference, Services and Equipment provided by Windstream shall be referred to in this document collectively as "Services.".
   "**Promotional Terms**" mean terms that apply to special offers from time to time. Promotional terms will be specified in your first bill message. Promotional terms may include a term commitment and an early termination fee in the event the service is not installed or maintained, or in the event you disconnect service prior to the end of the term.
   "**Service Order**" means the form (whether paper or electronic, including on-line order forms), if any, in which you apply for or make changes to Services and may include the length of time you will subscribe to a Service, rate plans, access charges, fees, taxes and surcharges, choice of long distance carrier, and the Equipment you have selected.

2. <u>Agreement and Acceptance.</u> This Agreement incorporates by reference and you agree to be bound by the following, in this order of priority **AND INCLUDING ANY CHANGES (SEE SECTION 23 BELOW):** 1) any applicable tariffs filed with the Federal Communications Commission ("FCC") or the relevant state public service commission; 2) The FCC or state web-posted price lists or terms and conditions (either, "price lists") posted at http://ww.windstream.com/documents/detariffedservices.pdf; 3) the product (bundle)-specific terms and conditions, including any Promotional Terms (see Section 27 herein and Your Bill Messages) and any additional agreements associated with such products; 4) the Service Order, if any; 5) any relevant click-through agreement for the Services you received; 6) these Terms and Conditions ("Terms"); 7) the Acceptable Use Policy posted at http://www2.windstream.net/customersupport/usersguide/accept/accept.html; and 8) the Privacy Policy posted at http://www.windstream.com/privacy.aspx.

   You accept this Agreement when you do any of the following: (a) give us your written or electronic signature, (b) tell us orally or electronically that you accept (i.e., by clicking the "I Accept" button for on-line purchases or account changes), or (c) use any Services. If you have never used the Services before and do not wish to be bound by this Agreement, do not begin using them and notify us immediately. By accepting this Agreement, you acknowledge that you are 18 years of age or older, are competent to enter into a contract with us, and are authorized to obtain Services or make changes to an existing account. You may obtain a copy of these Terms and any product-specific Terms and Conditions by visiting www.windstream.com or by calling a service representative at 877-807-9463. This Agreement supersedes any and all statements or promises made to you by any of our employees or agents. If you are a business customer with an existing contract, those contract terms will control.

3. <u>Charges for Services and Taxes, Fees and Surcharges.</u> You are responsible for paying all charges applicable to Services provided to you including, but not limited to, monthly recurring charges ("MRCs"), access charges, features, changes and moves to Services, Service repair visits and no-show charges, installation charges, IP address charges, billing charges, credit card surcharges, toll, long distance, and directory assistance, and any other usage-based charges at our current rates when used. In addition to the monthly recurring and usage-based charges, taxes, fees, surcharges, assessments and other charges apply to all Services and Equipment, including how those may change in the future. In certain service areas paper bills are available for a monthly charge.

   To determine whether certain taxes, fees and surcharges are applicable to Services provided to you, we are required by federal law to obtain your street address, which must be within our service area. You represent and warrant that the address you provide us to obtain Service is correct, and you acknowledge that we are relying on this information to determine which taxes, fees or surcharges are applicable to your Service. You agree to notify us if your address

changes. In the event you do not provide us with a valid address or address change, you may be responsible for additional taxes, fees or surcharges and penalties associated with failure to pay taxes based on the proper address, and we may terminate your Services.

As a convenience to you, Company may include charges for third party services on your monthly bill. You should always review your bill carefully and contact the Company if you are unsure about a charge on your bill. Company also offers the ability to block third party charges from your monthly bill. This service is optional and free of charge, and if you are interested in adding a third party block to your account, call a Company representative at the number found at the top right hand corner of your statement to determine if your account is eligible. The block does not apply to Services provided by Windstream or its affiliates to which you subscribe.

4. **Billing and Payment; Rate Increases.** We will bill you the recurring and installation rates you were quoted for Services or those associated with the Services you use or ordered, with increases on notice. All recurring charges are billed one month in advance. Billing at a location will begin upon the earlier of (i) the Installation Date (which may be the date administrative access to certain software-based Services is granted to Customer); or (ii) 30 days after delivery of the applicable facility and/or equipment to the Customer premises (if the delay in connection of the facility and/or equipment is due to Customer or its agent); however, Company may choose to bill in full monthly increments with no proration for partial service periods when service either starts or ends in the middle of a billing cycle.

We reserve the right to back-bill you for Services actually used but not previously billed.

Payment in full is due no later than the due date indicated on your bill and we may apply a late fee and interest and other charges (including, but not limited to, collection fees) up to the maximum amount permitted by law. Returned checks, payment by phone, paper bills and other fees due to your choice of payment method or billing receipt may also be subject to fees. You agree to pay costs and fees, including but not limited to attorney fees, we incur to collect an unpaid balance from you.

Company may require you to authorize payment for Services by credit card or by debiting a bank account, and no additional notice or consent is required before we invoice the credit card or debit the bank account for all amounts due to us for any reason.

5. **Credits, Deposits and Advanced Payments.** Our agreement to provide you Services is subject to credit approval and, as such, you authorize us to ask credit-reporting agencies for credit information about you. We may, in our discretion, require you to submit a deposit as security for payment of charges or an advanced payment before we establish any Services on your behalf. In the future, an additional deposit may be required if either the amount or number of Services is increased or your credit rating changes. Simple interest will be paid on the cash deposit for the period it is held by us and will be refunded if satisfactory credit has been established or upon termination of service (if no balance is due). We reserve the right to apply the deposit to any amount due and unpaid but the payment of a deposit in no way relieves you of paying your bills in a timely manner. Regarding advanced payments, any advanced payment will appear as a credit to your first month's bill. In the future, an additional advanced payment, that will be applied to your bill, may be required if you increase your Services with us. If you cancel Services before installation or we cannot install your Services for some reason, we may refund the advanced payment. We will not refund any advanced payment made after installation of Services.

6. **Termination by You**
   **Pre-Installation.** If you are a business customer and you terminate your order prior to the installation of Services, you will be required to pay a pre-installation cancellation charge equal to the greater of (i) three (3) months of MRCs ; or (ii) our costs to other providers. You agree that this charge is a reasonable measure of the administrative costs and other fees incurred by us to prepare for installation.

   **After Installation.** If you cancel your Services or a portion thereof after installation, you remain liable for payment of all outstanding charges for all Services you used and Equipment you purchased from us prior to termination and you will be charged for the full last month of Service with no proration or credit if you terminate Services prior to the last day of your billing cycle.

   **Fixed-Term Agreements.** When you purchased your Service(s), you may have been required to commit to a term or a minimum purchase. EITHER YOU OR WE MAY ELECT NOT TO RENEW YOUR SERVICE BY PROVIDING NOTICE TO THE OTHER NO LATER THAN THIRTY (30) DAYS PRIOR TO EXPIRATION OF THE FIXED TERM.

IF NEITHER YOU NOR WE DELIVER A TIMELY NOTICE NOT TO RENEW, THE SERVICES WILL RENEW ON A MONTH-TO-MONTH BASIS. IF YOU TERMINATE SERVICES AFTER INSTALLATION DURING THE INITIAL OR RENEWAL TERM FOR ANY REASON OTHER THAN FOR CAUSE, OR WE TERMINATE FOR CAUSE PURSUANT TO SECTION 7 BELOW, YOU WILL BE REQUIRED TO PAY TO US AS LIQUIDATED DAMAGES AN AMOUNT EQUAL TO 100% OF THE MONTHLY RECURRING CHARGES ("MRCS") MULTIPLIED BY THE NUMBER OF MONTHS REMAINING IN THE THEN CURRENT TERM. OR IF YOU TERMINATE OR DISCONNECT LESS THAN THE ENTIRETY OF YOUR SERVICES SUCH THAT YOUR ACTUAL USAGE AT A LOCATION FALLS BELOW ANY MINIMUM MONTHLY CHARGE ("MMC") OR MINIMUM MONTHLY FEE ("MMF") FOR THAT LOCATION, YOU AGREE TO PAY AN AMOUNT EQUAL TO THE MMC OR MMF FOR EVERY MONTH REMAINING IN THE THEN CURRENT TERM ("LIQUIDATED DAMAGES").

YOU AGREE THAT IN THE EVENT OF TERMINATION BY YOU, THE ACTUAL DAMAGE TO WINDSTREAM IS DIFFICULT TO ASCERTAIN AND THAT THE EARLY TERMINATION FEE REPRESENTS LIQUIDATED DAMAGES AND NOT A PENALTY AND IS A REASONABLE ESTIMATE OF THE ACTUAL REDUCTION IN THE VALUE OF THIS AGREEMENT THAT WE WILL SUSTAIN.

**Month-to-Month Agreements.** If no length of time is identified on the Service Order or you were not otherwise required to commit to a term, then the term is month-to-month and you or we may terminate at any time by providing notice at least thirty (30) days prior to the effective date of termination. You remain liable for payment of all outstanding charges for all Services you used and Equipment you purchased from us prior to termination and you will be charged for the full last month of Service with no proration or credit if you terminate Service prior to the last day of your billing cycle.

**Bundled Services.** Some plans may offer a discount if you sign up for bundled services and may require a term commitment. If you sign up for bundled services, you agree to maintain the bundled services for the applicable term. If you receive bundled services and you subsequently unbundle, terminate, or disconnect any of these Services, or we disconnect any of the Services, we may adjust the rates for the remaining Service(s) to the then current price.

**Change in Location.** A change in your service address or the location to which any Service is provided to you may constitute, at our sole discretion, termination of the Services or result in an increase in the prices you must pay for the Services.

**Change to Another Carrier.** We may deem a request by you to port your numbers as a request by you to terminate your Agreement. If you choose to port less than all of your numbers, or you leave any Services connected, we will continue to bill you for the numbers and/or Services still connected.

7. **Termination by Us.** Provisioning of the Service is subject to the availability of the requisite equipment and facilities. We may limit, interrupt, terminate or refuse to provide a Service if: (a) you do not honor any provision of this Agreement; (b) you use a Service in a manner that adversely affects other customers or harasses them, our employees, or others; (c) you use Service to engage in fraud or unlawful conduct or are suspected of doing so; (d) you modify your phone or any software residing thereon from the original manufacturer specifications, including for the purpose of accessing non-Windstream services; (e) you use Service in a manner that is excessive or unreasonable when compared to the predominant usage patterns of other customers on a similar service plan in your geographic area (and we may also implement charges or change you to the appropriate rate plan consistent with such use); (f) resell any Service; (g) for any other reason set forth in the relevant tariffs and price lists or terms and conditions; (h) you do not pay any amount to us or billed by us on behalf of others, including disputed amounts that Windstream determines are valid charges on your bills; (i) facilities or property associated with providing the Services have been condemned or use has been prohibited by the government in any manner; (j) you fail to acquire and maintain the rights of way or property access necessary for installation or maintenance of Services; (k) you are insolvent, have made an assignment for the benefit of credits or you have filed or had filed against you a petition for bankruptcy; or (l) we determine in our sole discretion that facilities are not technically or economically feasible. We may restore such interrupted or terminated Service, in our sole discretion, following your correction of the violation and payment of any amounts due, including any restoration charge we assess for restoring your Service.

8. **Personal Identifiers.** We assign telephone numbers, e-mail addresses, IP addresses, and other personal identifiers in connection with the Services. You have no proprietary right to any such identifiers, and we reserve the right to change them upon notice to you. In the event that we allow you to transfer a personal identifier to another party to obtain any Services we provide you, we reserve the right, prior to honoring the request for transfer, to charge a fee for

the transfer and to collect any money owed for Services.

9. **Disputed Bills.** You must review bills in a timely manner. To dispute a bill, you must comply with the dispute resolution provisions in Section 10 and submit your dispute, in writing, within 60 days after the date on the bill. You must pay any undisputed portion while your dispute is investigated. You accept all charges on your bill not disputed within 60 days and must pay those charges.

10. **Dispute Resolution.** By utilizing Windstream's Services and agreeing to these Terms, you agree to the following dispute resolution procedures. *You and Windstream agree to waive any right to a trial by jury in a court of general jurisdiction and any right to participate in a class action or consolidated action regarding a dispute as defined below. Specifically, you and Windstream agree to waive any right to pursue a dispute by joining a disputed claim with the disputed claim of any other person or entity or to assert a disputed claim in a representative capacity on behalf of anyone else in any lawsuit, arbitration or other proceeding.*

If you have a dispute with Windstream, you should notify Windstream's Customer Care department at the number listed on your invoice. If the Customer Care department is unable to resolve your dispute, you must submit your dispute to us in writing at the following address: Windstream Communications, Inc., 1720 Galleria Boulevard, Charlotte, NC 28270, Attn: Executive Customer Relations. You must describe your dispute and provide enough detail to allow us to understand it. You must provide any supporting documentation with your written dispute. Click here http://www.windstream.com/legal.aspx for a form that you may, but are not required, to use to submit your written dispute to us. If we have a dispute with you, we will send you a written notice to your billing address to attempt to resolve the dispute. You and Windstream agree that a dispute is any claim or controversy related in any way to Windstream's Services, including charges for Services, Equipment, Service Order(s) or our agreements pursuant to these Terms or any other agreements, whether the dispute arises in tort, contract, by statute or any other legal theory and whether the dispute arises under this or any prior agreement with us or arises after your Services with Windstream are terminated.

If you and Windstream are unable to resolve the dispute after 60 days from the date of receipt of the written dispute, you agree that either you or Windstream shall resolve the dispute in only one of two possible ways: (1) by seeking relief in small claims court, if appropriate under the applicable court's rules, in the city or county of the billing address reflected on your bill; or (2) by arbitration. **This Section does not prohibit you from submitting any issue you have with Windstream to any federal, state or local governmental agency or public service commission which may be able to seek relief from Windstream on your behalf.** If the dispute is regarding the charges for Services, you agree that if you do not seek relief in small claims court or by arbitration following the 60 day dispute period, then you will immediately begin paying the disputed amount that Windstream determines is valid, plus any charges that were not paid during the 60 day dispute period, or Windstream may terminate the Services.

Regarding arbitration, you and Windstream specifically agree to finally resolve all disputes not filed in small claims court by arbitration that will be final and binding on both you and Windstream, subject to any exceptions required by applicable law. *The following provisions shall apply to arbitration:*

a. **Notice:** If you want to arbitrate a dispute with Windstream after expiration of the 60 day dispute period noted above, you must file a claim with the American Arbitration Association ("AAA"). Click here http://www.windstream.com/legal.aspx for a form that you may, but are not required, to use. The claim must include a description of the dispute, a brief outline of previous efforts to resolve the dispute, all supporting documentation and a proposed resolution. A copy of the claim and proof of payment of the filing fee, such as a copy of the check or money order, should be sent to Windstream at: 4001 Rodney Parham, Little Rock, Arkansas 72212, Mailstop B1F03-71A, Attn: Legal Department ("Arbitration Notice Address"). Windstream will reimburse you for the filing fee if your claim does not exceed $75,000. If Windstream wants to arbitrate a dispute with you after expiration of the 60 day dispute period noted above, Windstream will send a copy of its claim to your billing address.

b. **Applicable Law:** The interpretation and enforceability of the arbitration provisions, and whether a dispute is subject to arbitration, is subject to the Federal Arbitration Act ("FAA") only and not state law.

c. **Applicable Rules:** Windstream and you agree that the arbitration will be conducted by the AAA. The rules governing the arbitration proceeding will be the current Commercial Arbitration Rules and the

Supplementary Procedures for Consumer Related Disputes ("AAA Rules") from the American Arbitration Association. The AAA rules are at www.adr.org or can be obtained by calling 1.800.778.7879.

**d. Method of Arbitration:** If your claim is for $10,000 or less, Windstream agrees that you may choose whether the arbitration will be conducted solely on the written documents submitted, by telephone or in person in the city or county of the billing address reflected on your bill. If your claim exceeds $10,000, the right to a hearing will be determined by the AAA rules. The written documents can be the notice to arbitrate that either of us send to the other regarding arbitration and referenced above.

**e. Arbitration Costs and Attorney Fees:** If you properly file a claim with AAA pursuant to these arbitration provisions, and the amount of your dispute does not exceed $10,000, Windstream agrees to pay for all AAA filing, administrative and arbitrator fees ("Arbitration Costs") and your reasonable attorney's fees (with reasonable hourly rates and expenses to be determined by the location of the arbitration) ("Attorney Fees") incurred by you regardless of the decision of the arbitrator, unless your claim is found to be frivolous or improper (as set forth in the Federal Rules of Civil Procedure Rule 11) by the arbitrator. A portion of the payment of Arbitration Costs may be in the form of reimbursement, as you may be required to place a deposit when your notice of arbitration is filed. If the claim is found to be frivolous or improper, the AAA Rules will apply regarding payment of Arbitration Costs. If your dispute exceeds $10,000 but not $75,000, Windstream agrees to pay all the Arbitration Costs and 50% of your Attorney Fees. For disputes of $75,000 or more, the AAA rules regarding Arbitration Costs will apply. However, Windstream agrees to pay 50% of the Arbitration Costs, and each party will pay its own Attorney Fees incurred for disputes of $75,000 or more. Notwithstanding the foregoing, if your claim is found to be frivolous or improper (as set forth in the Federal Rules of Civil Procedure Rule 11) by the arbitrator, Windstream will have no obligation to pay any of your Attorney Fees. If Windstream disputes the reasonableness of any Attorney Fees, you agree that the presiding arbitrator shall determine what is a reasonable fee and his/her decision regarding Attorney Fees will be binding on both you and Windstream. In no event shall Windstream be entitled to an award of its Attorney Fees.

**f. Awards:** If the arbitrator's award is in your favor and is greater than the value of Windstream's last settlement offer made to you prior to selection of the arbitrator, Windstream will pay you the amount of the arbitrator's award or $3,000, whichever amount is greater. Windstream also will pay your attorney's reasonable fees, including expenses, or $2,500, whichever amount is greater.

**g. Injunctive relief:** If you seek declaratory or injunctive relief in the arbitration, the arbitrator may award such relief only to the extent necessary to provide relief warranted by your individual claim.

**h. Consolidation:** The arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding.

**i. Confidentiality:** Any arbitration shall remain confidential. During the arbitration, the amount of any settlement offer made by Windstream or you shall not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which you or Windstream is entitled. Neither you nor Windstream may disclose the existence, content or result of any arbitration or award, except as may be required by law, or to confirm and enforce an award.

**j. Exceptions:** Nothing in this Section shall prevent Windstream from issuing notices, including take-down notices for alleged trademark or copyright infringement pursuant to the Digital Millennium Copyright Act, or termination of Service pursuant to Windstream's Acceptable Use Policy for your abuse of your internet access Services. Nothing in this Section shall prohibit Windstream from filing a lawsuit in a court of general jurisdiction to collect outstanding balances for unpaid Services or Equipment, or any other type of charge owed on your account, or for the theft of any Services or Equipment by you. This Section is intended to resolve outstanding disputes between us and not to collect a debt owed by you to Windstream.

**k. Limitation of Liability:** This Section is subject to the Limitation of Liability Section in these Terms and Conditions.

I.  **Limitations Period:** Any dispute must be brought by you or Windstream within two years after the date the basis for the claim or dispute first arises.

Notwithstanding any provision in these Terms and Conditions to the contrary, you and Windstream agree that if Windstream makes any future change to this arbitration provision (other than a change to the notice addresses), you may reject any such change by sending Windstream written notice within 30 days of the change to the Arbitration Notice Address provided above. By rejecting any such change, you are agreeing that you will arbitrate any dispute between us in accordance with the language of this provision.

If the provisions concerning the waiver of the class or consolidated actions, or the provisions regarding mandatory arbitration, are deemed unenforceable or void as a matter of law, you and Windstream agree that all claims will be brought in a court of general jurisdiction and not resolved through arbitration. **YOU AND WINDSTREAM WAIVE, THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT FOR THE SERVICES PROVIDED BY US.**

11. **Services Provided by Third Parties.** The Services will be provided either by us or by our third party vendors or contractors. We reserve the right to change or modify the source of any Services provided to you without notice.

12. **Company Provided and Owned Equipment.** Any Equipment installed by us on your premises that is not the subject of a sale or lease to Customer (such as the CSU/DSU interface cards, Channel Bank and router, if applicable) shall remain at all times our property. It shall remain in good condition, less normal wear and tear. If we do not have access to your premises within 30 days after Services are terminated, you shall reimburse us for the full purchase price of the equipment as well as any attorney's fees and costs. You are responsible for all security measures over the Services, including but not limited to access to authorization codes or encryption you deem necessary or required. Once Equipment is delivered to you, you bear the risk of loss.

13. **Disconnection of Current Provider; Special Construction; Third Party Charges.** You are solely responsible for disconnecting Services with your current service provider and we are not responsible for any charges assessed against you by such provider. You shall pay all charges if we or a third party provider is required to extend the demarcation point or undertake special construction or non-routine installation for you. Unless we specifically agree in writing to undertake equipment installation and maintenance work, you are responsible for all charges assessed by your phone system vendor and other third parties in connection with the Services and we shall have no responsibility for maintenance or repair of same.

14. **Access to Third Party Services.** You agree that the telephone line on which your Services are activated may not be used to access any third-party services equivalent to Services we provide or can make available, even if you declined to purchase such Services from us. Your telephone line contains programming designed to enable access to our Services only. You may not use any manual or electronic means to circumvent any restrictions placed on your telephone line to modify without authorization any programming supplied by us.

15. **Access and Installation, Repair and Maintenance.** You agree that you are responsible for acquiring and maintaining the right of way necessary to allow installation and maintenance of Services. Failure to acquire and maintain necessary right of way may result in delay of installation or termination of Services by Windstream. Upon notice, we may make tests and inspections to determine you are complying with the requirements of these terms or for routine and emergency maintenance of the equipment and facilities. We may take action to protect our facilities and equipment. We may substitute, change or rearrange any Equipment or facility at any time and we may limit or allocate use of existing facilities when necessary due to lack of facilities or due to a cause beyond our reasonable control.

16. **Privacy and Customer Proprietary Network Information.** You authorize us to monitor and record communications to us regarding your account or the Services for purposes of quality assurance. For on-line orders, we may implement reasonable procedures including, but not limited to, validating information provided by you or restricting the amount of Services purchases online. We reserve the right to cancel or reject on-line orders at any time for security or privacy reasons.

To provide Services to you, we maintain certain customer proprietary network information ("CPNI"). CPNI includes information that relates to the quantity, technical configuration, type destination, location and amount of use of any

telecommunications service we provide to you, and which we obtain because of the carrier-customer relationship between us. CPNI also includes information contained in your bill. We may use and share your CPNI without your permission for the following purposes:

- To protect the rights or property of us or other customers or carriers from fraudulent, abusive, or unlawful use of or subscription to the Services you get from us;
- To initiate, render, bill and collect for your Services;
- To provide information telemarketing, referral, or administrative services to you when you call us if you give us permission to do so;
- To provide call location information regarding the user of a wireless mobile service to certain other parties in an emergency situation;
- To provide information requested by law enforcement or a third party pursuant to a subpoena or other method of requesting information. We will not give you notice of any subpoena or court or administrative orders related to your account, IP address, contact information or use of Services unless required to do so by law.

If you do not want us to provide your information to other Windstream entities, please notify us by calling Residential Support at 866-347-1991 or Business Support at 800-843-9214.

When you view your account information or shop for Services on-line, you agree that we may display your CPNI on-line after proper verification by you to fill orders or allow you to make account changes.

17. **Theft and Fraud.** You agree to keep all passwords, Member ID's, IP addresses, and computer names confidential. If your Services are lost or stolen or fraudulently used, then you are responsible for all usage incurred before we receive notice from you of such loss or theft. If we choose to pursue investigation or prosecution of the loss or theft, you agree to cooperate in the investigation of fraud or theft and to provide us with such information and documentation as we may request (including affidavits and police reports).

18. **LIMITATION OF LIABILITY.** FOR PURPOSES OF THIS SECTION, DISCLAIMER OF WARRANTIES AND EMERGENCY/CRITICAL LINES SECTIONS, "OUR" OR "WE" INCLUDES WINDSTREAM'S OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES, AGENTS, SUBCONTRACTORS, VENDORS AND ANY ENTITY ON WHOSE BEHALF THE COMPANY RESELLS SERVICES. UNDER NO CIRCUMSTANCES WILL WE BE LIABLE FOR ANY ACCIDENT OR INJURY CAUSED BY SERVICES OR ANY DAMAGE OR LOSS RESULTING FROM THE INSTALLATION, MAINTENANCE OR REMOVAL OF THE SERVICES, ANY INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES (SUCH AS LOST PROFITS, LOST BUSINESS OPPORTUNITIES, BUSINESS INTERRUPTION, LOSS OF BUSINESS DATA), ANY PUNITIVE OR EXEMPLARY DAMAGES, THE COST OF ALTERNATIVE SERVICE OR FOR ANY SERVICE INTERRUPTIONS, DELAY OR FAILURE TO PERFORM UNDER THIS AGREEMENT DUE TO CAUSES BEYOND OUR REASONABLE CONTROL, INCLUDING BUT NOT LIMITED TO, STRIKES, LOCKOUTS, OTHER LABOR UNREST, NATURAL DISASTERS, ACTS OF GOD, CABLE CUTS OR COMMON CARRIER DELAYS. YOU AGREE THAT THE PRICING OF SERVICES REFLECTS THE INTENT OF BOTH YOU AND US TO LIMIT OUR LIABILITY AS PROVIDED HEREIN.

19. **DATA SERVICES.** YOU ACKNOWLEDGE THAT THE INTERNET IS A VOLATILE ENVIRONMENT AND WE ARE NOT LIABLE FOR CONFIDENTIAL INFORMATION STORED ON OR TRAVERSING OUR NETWORK. YOU MUST TAKE ALL APPROPRIATE PRECAUTIONS TO SECURE CONFIDENTIAL INFORMATION INCLUDING ENCRYPTING IF YOU DEEM NECESSARY.

20. **DISCLAIMER OF WARRANTIES.** SERVICES ARE PROVIDED ON AN "AS IS" AND "AS-AVAILABLE" BASIS WITHOUT WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF TITLE OR NON-INFRINGEMENT OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WARRANTY ARISING BY COURSE OF TRADE, COURSE OF DEALING OR COURSE OF PERFORMANCE, ANY WARRANTY THAT THE SERVICES WILL MEET CUSTOMER'S REQUIREMENTS OR ANY WARRANTY REGARDING THE QUALITY, CONTENT, ACCURACY OR VALIDITY OF THE INFORMATION OR DATA RESIDING ON OR PASSING THROUGH OR OVER THE NETWORK. ALL SUCH WARRANTIES ARE HEREBY DISCLAIMED. WITHOUT LIMITING THE FOREGOING, BROADBAND SPEEDS, TRANSMISSION QUALITY, NETWORK SECURITY OR RELIABILITY, AND ACCURACY OF ANY DIRECTORY LISTINGS ARE NOT GUARANTEED. NO ORAL OR WRITTEN ADVICE OR INFORMATION BY COMPANY'S EMPLOYEES, AGENTS OR CONTRACTORS SHALL CREATE A WARRANTY, AND CUSTOMER MAY NOT RELY ON ANY SUCH INFORMATION. WINDSTREAM DOES NOT

GUARANTEE YOUR SERVICE CAN OR WILL BE INSTALLED BY A PARTICULAR DATE. ANY INSTALLATION DATE PROVIDED IS ONLY AN ESTIMATE.

21. **Indemnification.** You agree to indemnify and hold Windstream and its subsidiaries, affiliates, officers, agents, co-branders, licensors or other partners and employees harmless from any claim or demand, including reasonable attorneys' fees, made by any third party due to or arising out of content you submit, post, transmit or otherwise make available through the Service, your use of the Service, your connection to the Service, your violation of this Agreement, including, without limitation the Acceptable Use Policy, or your violation of any rights of another.

You acknowledge that you are responsible for all use of the Service using your account, including use by subaccounts, and that this Agreement, including, without limitation, the Acceptable Use Policy and Privacy Policies, as amended from time to time, apply to any and all usage of your account, including use by subaccounts. You agree to abide by these terms and you agree to defend, hold harmless and indemnify Windstream from and against any and all claims stemming from usage of this account and any subaccounts,whether or not such usage is expressly authorized by you.

22. **Emergency/Critical Lines. CUSTOMER ACKNOWLEDGES THAT CERTAIN SERVICES MAY NOT PROVIDE ACCESS TO 911 OR TRANSMIT THE LOCATION OR EXTENSION IF CUSTOMER ATTEMPTS TO ACCESS 911 IN AN EMERGENCY.** Examples include voice over Internet protocol (VoIP), Centrex, and private branch exchange. Additionally, because T1s and VoIP can cease operating during a power outage, you should have a basic business or copper line for elevator, alarm, E911 and other critical functions. By proceeding with use of Services, you assume all responsibility and risk of harm, loss, or damage in the event that 911 access fails, is not possible, or does not provide the address, correct address, extension or other information to emergency authorities.

23. **Changes to these Terms and Conditions.** We may change these Terms, including any change in any charge or fee, or the imposition of a new charge or fee, at any time if we give you notice of the change. If we make a change to these Terms and Conditions that is material and you do not wish to accept such material change, you may terminate the affected Service by giving us 30 days notice, in which case you will not be subject to an early cancellation fee. You will, however, still be responsible for all charges for Services provided before you terminated your Agreement. A material change is ONLY a change that (a) terminates or substantially reduces the availability of a Service for you or (b) results in the increase of any charge by more than 10% of the monthly access charge for that Service. Material changes in your Service DO NOT include the increase in, or imposition of: (1) any charge required to be collected by any governmental authority, such as taxes or surcharges, or (2) any charge not prohibited by any governmental authority to recoup our expense incurred to comply with a governmental requirement.

As noted in Section 10, if Windstream makes future changes to the arbitration provision in that Section (other than a change to the notice addresses), you may reject this change by sending Windstream written notice within 30 days of the change to the Arbitration Notice Address. By rejecting the change, you agree that you will arbitrate any dispute between us in accordance with the language in Section 10 existing prior to the change.

24. **Applicable Law.** Your Agreement and our provision of Services to you are subject to (a) the laws of the state identified in the billing address that you have provided us and (b) any applicable federal laws including, but not limited to, the Federal Arbitration Act, 9 U.S.C. § 1 et seq. In the event of an inconsistency between any governmental requirement and these Terms regarding the provision of a Service that is subject to the governmental requirement, the provisions of the governmental requirement will apply to the extent necessary to avoid the inconsistency.

25. **Assignment.** We may assign this Agreement to another entity without any advance consent from or notice to you. You may not assign this Agreement without our consent.

26. **No Waiver, Severability.** If we do not enforce any right or remedy available under this Agreement, that failure is not a waiver. If any part of this Agreement is held invalid or unenforceable, the remainder of this Agreement will remain in force.

27. **Product Bundle - Specific Terms and Conditions (alphabetically)**
Product Descriptions generally can be found at www.windstream.com. Some Services have certain system requirements (i.e., Online Backup, Security Suite and TechHelp). Please see the relevant product description for details.

- **Broadband Protection Plus.** Includes the wiring coverage of Protection Plus (see below) and professional installation of Broadband, NIC (network interface card) if needed and Broadband-specific software provided by us for one computer at initial installation and only includes specific types of equipment. For installation and NIC replacement, the system must be Windows 2000 SP-4 or higher. With other operating systems, such as Mac and Linux, we will only cover replacement Customer Premise Equipment (CPE) and wiring/cabling but will not cover installation or software or NIC. The Broadband modem (if provided by us) will be replaced if damages by an electrical surge or natural act (i.e., lightning, floods, etc). This Product does NOT include: a) home networks (even if Equipment is purchased from us); b) LAN software; c) bandwidth/throughput guarantees; d) damage to PCs from viruses; e) non-standard wiring; f) PC Hardware (other than NIC); g) Cisco 827H and 827HI modems; h)operating systems and software maintenance; or i) integrated NIC cards and internal NIC laptop cards.

- **Cable TV.** Channels available to customer as part of any select packages of programming through Windstream Cable TV are subject to change and customer is not guaranteed any particular channel or number of channels. All prices, packages and programming are subject to availability based on location and Windstream's agreements with content providers and credit approval. A Cable TV service activation fee may apply. Taxes and fees, including applicable franchise and FCC regulatory fees may apply. Some promotions may require minimum programming. Certain promotions have an optional or mandatory term commitment period, and if the customer cancels services prior to the optional or mandatory term commitment period, certain termination or cancellation fees may apply. In some packages hardware and programming are sold separately. Other restrictions may apply.

- **Centrex.** Within 30 days of subscribing, you and Windstream will agree on the specific feature, functions and minimum lines and groups to be provisioned. We will base charges on the agreed minimum lines. We will have the right to bill you at hourly rates for all programming, installation or other labor associated with any adjustments to features and functions at initial installation and when changes are made later.

- **Conference Calling.** All per minute conferencing has a minimum per call. Flat Rate Audio and Web Conferencing is limited to 5,000 minutes per month, is only available to you if you have 10 lines or less, is limited to 5 participants on a call simultaneously and you must use Reservationless-Plus®. Flat Rate Web Conferencing requires user licensing at varying rates.

- **Credit Card Acceptance.** Credit card processing services are NOT provided by us and are instead provided by a third party vendor, with which you may be required to enter an agreement. We do not in any way provide credit card processing services, and we are not liable for, nor do we make any representation or warranty regarding the vendor's services. You are solely responsible for any applicable Payment Card Industry security and other standards applicable to accepting credit cards.

- **DISH Network Services.** All prices, packages and programming are subject to change without notice including, without limitation, any term commitment to which you have agreed. All DISH Network programming and any other services that are provided by DISH Network are subject to the terms and conditions of the Promotional Agreement and Residential Customer Agreement, which are available online at www.dishnetwork.com or upon request. Some promotions may require minimum programming. Certain promotions have an optional or mandatory term commitment period, and if you cancel your Services prior to the optional or mandatory term commitment period, certain termination or cancellation fees may apply. Hardware and programming are sold separately.

- **Domain Renewals.** New registrations with Windstream are free for 1 year and then renewals are billed to the customer in 1 year, 3 year or 5 year increments.

- **Fax to Email.** You must have an email address to Send/Receive faxes via this Service but email is not included with the Service. If you exceed your page limit per month, a minimum per page charge will apply. Overages are billed at $0.10/per page.

- **Google.** IF YOU SUBSCRIBE TO GOOGLE THROUGH US YOU WILL BE REQUIRED TO COMPLETE A CLICK-THROUGH AGREEMENT FOR THE GOOGLE LICENSE. We may cancel Google Services at any time on 30 days' notice and, at our option, may either terminate such Google Services altogether or move you to a similar platform. In the event that we or you terminate the Google Services or downgrade or cancel Google Services, you are solely

responsible for downloading all your information to your computer within 30 days.

- **High-Speed Internet.** High Speed Internet service is subject to the the Broadband Network Statement. Customers must agree to all terms of service prior to installing and using service. Speeds are distance-sensitive and availability by address varies. We strive to provision the line up to the maximum speed required to support the qualified and subscribed Service but actual speed will vary based on factors such as the condition of wiring inside a specific location; computer configuration; network or Internet congestion; and the server speed of the websites accessed. We cannot guarantee speeds or uninterrupted, error-free service.

- **Hulu Plus Services.** All Hulu Plus Services and any other services provided by Hulu are subject to the Hulu Terms of Use, which are available online at: www.hulu.com. Certain promotions have an optional or mandatory term commitment period, and if you cancel your Services prior to the optional or mandatory term commitment period, certain termination or cancellation fees may apply. If the Hulu Plus membership is not cancelled at the end of the promotional period, you authorize Hulu Plus to charge you each month for the membership fees, plus taxes, until you cancel the membership.

- **Identity Protection.** Windstream partners with a third party vendor to provide service. As a result of this, you may be required to accept certain terms and conditions of the service as required by the third party. Windstream reserves the right to alter the service in any way including, but not limited to changing the third party provider of the service or discontinuing this service at any time.

- **Internet Access.** Internet Access service is subject to the Broadband Network Statement Service will be provisioned for a maximum download speed of 1 Mbps. Due to the nature of this service, it is an "AS IS" service and may be intermittent, specifically during peak usage times of the day. This Service is not suitable for streaming video, gaming, or large downloads or uploads. Credits or adjustments for slow and/or varying speed, or not being able to access the Internet, will not be issued. Windstream cannot guarantee speeds or uninterrupted, error-free service.

- **Lifetime Price Guarantee.** Certain Services are subject to a Lifetime Price Guarantee ("Guarantee"), as advertised by us; however, in addition to the Agreement set forth herein, the following conditions apply to this Guarantee:

  - The Guarantee only applies to select Services that are part of a bundle, and not a stand-alone service. You must subscribe to at least one new bundle service that includes select High Speed Internet, or other select Internet services, select Phone services, select Cable TV programming, or select DISH programming.
  - Any package that includes DISH is subject to our continuing relationship with DISH. If such relationship ends for any reason, Guarantee bundles that include DISH may be terminated at our discretion. Additionally, channels available to you as part of DISH programming are subject to change without notice. You are not guaranteed any particular channel or number of channels.
  - A DISH activation fee may apply.
  - If DISH service is terminated by you before the end of any commitment, a cancellation fee based on the number of months remaining in the commitment will apply.
  - Channels available to customer as part of any select packages of programming through Windstream Cable TV are subject to change without notice and customer is not guaranteed any particular channel or number of channels. A Cable TV service activation fee may apply.
  - The Guarantee is void if you move, make any changes to your Services, disconnect, if you are disconnected by us, or if any portion of your account balance becomes past due.
  - If you order additional services and equipment including, but not limited to HD or DVR receivers, additional charges apply.
  - The Guarantee covers only the advertised price and does not include current or future taxes, fees or other charges.

- **Long Distance (Business).** Domestic calls are billed in six-second increments with a eighteen-second minimum. A sixty-second minute is broken down into ten six-second blocks and any calls with talk-times of eighteen seconds or less will be billed for eighteen seconds. Usage may be monitored for compliance/abnormal usage and you may be required to demonstrate compliance with these restrictions where monitoring indicates non-compliance. If usage is inconsistent with these restrictions and typical voice usage, Windstream may: (1) charge an additional amount per minute for each call that violates this policy; (2) restrict use or convert you to another plan; and/or (3) void any

applicable price guarantee. Additional charges apply for directory assistance, calling cards, collect calls, operator services, international calling and/or toll-free calling services. International dialing and access to 900/976 telephone numbers are blocked unless otherwise specified by the customer.

- **Managed Network Security CPE.** Requires a minimum commitment and subscription to Windstream Data services. Security gateway equipment must be returned upon service termination.

- **Online Backup.** Windstream partners with a third party vendor to provide service. As a result of this, you may be required to accept certain terms and conditions of the service as required by the third party. The purchase and use of service requires you to be an active Windstream residential or small business High-Speed Internet customer. Service is intended for the backup of laptops or PCs and does not support stand-alone or network servers. Minimum system requirements: Windows XP SP3or higher, Windows Vista SP1 or higher and Internet Explorer 6.0 or later. This service is activated through the Windstream Service Agent. Windstream reserves the right to alter the service in any way including but not limited to changing the third party provider of the service or discontinuing this service at any time.

- **PC Protect Plan.** Windstream partners with a third party vendor to provide service. As a result of this, you may be required to accept certain terms and conditions of the service as required by the third party. Windstream reserves the right to alter the service in any way including but not limited to changing the third party provider of the service or discontinuing this service at any time. The purchase and use of service requires you to be an active Windstream residential or small business High-Speed Internet customer. A full service agreement will be presented to you when you register your laptop or PC for coverage. For devices to be supported, they must contain supported Windows Operations System (currently Windows XP or newer) and a processor that is a Pentium 4 or newer or equivalent.

- **Personal Computer Offers.** Windstream resells personal computers that are manufactured and warranted by a third party. All support and warranties are provided by the manufacturer.

- **Phones at Home Protection Plan.** This plan provides for repair or replacement of residential phones. You must sign up and agree to additional terms applicable specifically to this Plan via the Windstream Phones at Home Protection Plan Registration Form in order to obtain Phones at Home Protection from us.

- **Price Lock.** Price Lock applies to select bundle products. This plan is in addition to the monthly recurring rate for your bundled services, any services and equipment you may purchase, and current and future taxes, fees and other charges. The Price Lock is void and current monthly rates will apply if any portion of the bundled service or feature is disconnected or changed or if any portion of your account balance becomes past due. Price Lock may be void if you move, even if the move is within Windstream service locations.

- **Professional Bundle Website Services.** Windstream requires the customer to agree to a EULA.

- **Professional Installation (Business).** Provided for only one computer per business or home and you must sign a waiver/disclaimer prior to our technicians working at your premises. This service includes: a) setting up the initial DSL connection; b) installing the NIC, if necessary; c) installing the necessary filter on the telephone line; d) DNS entries, configuring DHCP/Static IP address, gateway, etc.; and e) performing various network connectivity tests to ensure each network element has proper connectivity; It does NOT include: t) software installation other than what is included with the router; u) PC Installation (the computer must be installed before we can do a DSL installation); v) station cabling or CAT 5 patch cables; w) new or additional jacks for the DSL service; x) removing any applications unless the application must be removed to make the TCP/IP connection to the Internet work; y) CPE charges; or z) resolving LAN issues including, but not limited to, shared network drives, driver issues or other hardware issues.

- **Professional Installation (Residential).** Provided for the connection of up to three computers per home to the internet when computers are being connected via Windstream provided equipment. This service includes: a) setting up the initial High-Speed Internet connection; b) installing the NIC, if necessary; c) installing the necessary filter on the telephone line; d) performing the initial wireless setup of up to four peripheral devices, including the Windstream wireless gateway (customer may be required to provide user guides for peripheral devices); e) DNS entries, configuring DHCP/Static IP address, gateway, etc.; f) performing various network connectivity tests to ensure each network element has proper connectivity; g) installation and setup of one PC if purchased through Windstream; h) installation of one jack if needed for the High-Speed Internet service. It does NOT include: t) software installation other than what is included with the modem or provided by Windstream; u) PC installation for computers not

purchased through Windstream; v) station cabling or CAT 5 patch cables; w) removing any applications unless the application must be removed to make the TCP/IP connection to the Internet work; x) CPE charges; or y) resolving LAN issues including, but not limited to, shared network drives, driver issues or other hardware issues. We reserve the right to not provide this service if the requirements are beyond the standard scope of work.

- **Protection Plus.** This Service is a wire maintenance plan that includes repair or replacement of existing jacks/outlets (not including the addition or move of existing jacks) that meet our installation standards. This Service provides coverage for one access line only. Wiring and jacks damaged as a result of faulty, non-Windstream installation, the negligence or willful acts of you or your agent, vandalism, casualties such as fire or water damages, lightning, floods or earthquakes are excluded. This Service does not cover Key, Centrex and PBX systems.

- **Secure Broadband** requires a minimum term commitment and includes Internet and one static IP address for Managed Network Security. Additional static IP addresses may be available for an additional charge.

- **Security Suite.** Windstream partners with a third party vendor to provide service. As a result of this, you may be required to accept certain terms and conditions of the service as required by the third party. Windstream reserves the right to alter the service in any way including but not limited to changing the third party provider of the service or discontinuing this service at any time. The purchase and use of service requires you to be an active Windstream residential or small business High-Speed Internet customer. System requirements include: Microsoft® Windows 2000 (32-bit) with Service Pack 4 (SP4) or higher , Windows XP (32-bit) with Service Pack 1 (SP1) or higher, Windows Vista (32- or 64-bit) and Windows Vista Service Pack 1 (SP1) or higher, 800 X 600 or higher resolution, 256 MB RAM, 75 MB of available free drive space, Internet connection, Microsoft® Internet Explorer 6.0 or later, and (optional) Mozilla Firefox 1.5 or later. This service is activated through the Windstream Service Agent.

- **Small Business Bundles with Peace of Mind Guarantee.** The Windstream Small Business Bundle includes a business access line or a business VoIP line, long-distance calling, and a feature package of Caller ID, Call Forward, Repeat Dial, 3-Way Calling, Speed Call 30, Call Return, Call Waiting, and Caller ID on Call Waiting and may or may not include High-Speed Internet, High-Speed Internet with Static IP, Premium Tech Support, Online Backup, PC Protect, SaaS Endpoint Security and Broadband Protection Plus. Voice Mail and Rotary Hunt are included with certain bundles. The price for the bundle shall be set forth in Customer's first bill, and such price shall be specifically incorporated as a term of this Agreement.

This Lowest Price Guarantee offer is subject to availability and is a limited time offer for new customers or existing customers with business line only. If Customer switches to a lower price point for their bundle during the term of this Agreement, this Agreement will restart for another term on the effective date of the new pricing. If Customer terminates service prior to the end of the Agreement, customer may be responsible for an early termination charge equal to 50% of the monthly recurring revenue multiplied by the number of remaining months.

The Peace of Mind Guarantee offer allows a Customer to avoid an early termination charge in the event the Customer terminates service prior to the end of the Agreement if the termination is due to either Customer closing the service location or Customer moving outside of Company's service area. In order to avoid an early termination charge, Customer must provide thirty (30) days' written notice of its intent to terminate service to Company. Only Customers that have a two-year Agreement are covered by the Peace of Mind Guarantee.

- **Price Guarantees for Small Business Bundle Customers.** Covers the advertised price only rate (payable on a monthly basis). Does not include current or future taxes, fees or other charges. Guarantee is void and tariff or price list rates as applicable will apply if any bundled service or feature is disconnected or changed at any time. Guarantee may be void if Customer moves, even if move is within Company service locations. Offer is non-transferable. Customer's failure to remit the total due for the Small Business Bundle may result in disconnection of Customer's bundle. Customer can revert to basic local service only by payment of past due amounts for basic local service. The Peace of Mind Guarantee does not apply if Customer is disconnected involuntarily from its Small Business Bundle for any violation of the Terms and Conditions contained herein and wants to reconnect. The Lowest Price Guarantee does not apply if Customer voluntarily disconnects from its Business Bundle and wants to re-establish the service.

- **Tech Help.** Windstream partners with a third party vendor to provide service. As a result of this, you may be required to accept certain terms and conditions of the service as required by the third party. Windstream reserves the right to alter the service in any way including but not limited to changing the third party provider of the service or discontinuing

this service at any time. The purchase and use of service requires you to be an active Windstream residential or small business High-Speed Internet customer. This Service requires a minimum term commitment unless bundled with other value added services in a Windstream Security Package. Service is provided via agents remoting into customers' computer and therefore requires that computer must be capable of connecting to the Internet in order to utilize service. Minimum System requirements including Windows XP or Vista, Intel Pentium or Pentium II Processor with 500 MHz or faster for Windows XP, 256 MB or higher . Macintosh, UNIX, LINUX or older Windows operating systems are not supported. It includes: a) PC Security and Protection (viruses, spyware, etc.); b) PC Optimization; c) setting up new PCs and transferring files and data from the old machines; d) setting up and encrypting wireless networks; e) handling Windows issues; f) connecting and setting up printers and other peripherals such as scanners, printers and PDAs/Smartphones; and g) software installation, tutorials and tips. Does NOT include the following, among other items that cannot be solved remotely: u) site visits, if needed; v) failed/broken hard drives; w) adding more RAM; x) cracked motherboards; y) bad USB ports or connectors; or z) replacing broken hardware. This service is activated through the Windstream Service Agent.

- **Travel Safety Plus** .Windstream partners with a third party vendor to provide service. As a result of this, you may be required to accept certain terms and conditions of the service as required by the third party. Windstream reserves the right to alter the service in any way including but not limited to changing the third party provider of the service or discontinuing this service at any time. Windstream assume no responsibility for loss or damage resulting from services provided by the vendor or its subcontractors. Windstream residential home phone services, long distance or High-Speed Internet is required in order to subscribe to Travel Safety Plus.

- **Unlimited Long Distance (Business).** Intended for direct-dialed, one-plus voice use only and cannot be used for auto-dialing (including automatic outbound dialing systems or call distribution systems), broadcast fax, long distance internet or intranet access, fax machines, softphones or data devices, transcript services, telemarketing, multi-party conferencing calling (excluding 3-way calls), party lines, chat lines, adult entertainment lines, calls to 900 and 976 numbers, or call center and certain switching applications. In addition, for residential users, unlimited long distance may not be used for business use.

- **Unlimited Long Distance (Residential).** Intended for personal, residential voice calls within the U.S. Calling restrictions include but are not limited to business use, Internet services, telemarketing, auto-dialing, multi-party conferences, party or chat lines, adult entertainment lines, and voicemail/information services access. If usage is inconsistent with residential voice calling, Windstream may (1) charge 10 cents per minute for each call that violates this policy; (2) restrict use or convert plan to Windstream 10; and/or (3) void price guarantee and convert rates to then current monthly rates.

- **Voice Over Internet Protocol (VoIP)-Based Services.** In order to access or use any VoIP Services, you must sign the 911 Disclosure form, which warns of and has you acknowledge certain 911 limitations for VoIP Services.

- **Web Hosting.** See policy for Web Hosting at http://www.windstreambusiness.com/media/789/hosting_policy.pdf.

- **Windstream Service Agent.** Windstream partners with a third party vendor to provide service. As a result of this, you may be required to accept certain terms and conditions of the service as required by the third party. Windstream reserves the right to alter the service in any way including but not limited to changing the third party provider of the service or discontinuing this service at any time. The use of service requires you to be an active Windstream residential or small business High-Speed Internet customer. Service is free to all Windstream High-Speed Internet subscribers. Service is available for use only via laptop or PC and requires software download.

- **Wireless Data Backup** is for backup purposes only. Maximum bandwidth is 2MG regardless of the amount of bandwidth a customer has; Customer may not remove the wireless card from the service address. Real time quality of service is not available. Availability and speeds are not guaranteed and are affected by wireless strength.

**October 21, 2013**

# EXHIBIT 6

**From:** Adam V. Sadlowski
**Sent:** Wednesday, January 2, 2019 10:59 AM
**To:** 'Sean Flynn' <sflynn@grsm.com>
**Cc:** Cori R. Besse <CBesse@sb-lawyers.com>; Gregory Brunton <gbrunton@grsm.com>; Tyler Tarney <ttarney@grsm.com>; Carrie Thiem <cthiem@grsm.com>; Leslie Handy <lhandy@grsm.com>
**Subject:** RE: Ramsey v. RPM - Documents produced by Windstream

Sean,

Thanks for sending the Windstream documents. In response to your questions:

1. We do not object to RPM sharing the Windstream documents with Dish.

2. I already provided you with the same Windstream Terms and Conditions (dated Oct. 21, 2013). Specifically, on March 28, 2017, I sent you an email (see attached) with the same Oct. 21, 2013 Windstream Terms and Conditions containing the arbitration provision. As outlined in my March 28 email, the Windstream arbitration provision specifically excludes debt collection as illustrated by the *Loney* case, where the court in that case refused to enforce the same Windstream arbitration provision against one of Windstream's other debt collectors. In addition, RPM has waived any right to compel arbitration as the deadline for RPM to file a motion to compel has long passed. Under the Court's April 20, 2017 Minute Order (attached), RPM had until May 17, 2017 to inform the Court whether it intended to compel arbitration in the *Ramsey* case. On May 17, 2017, your office emailed the parties' joint status letter (attached) to Judge Dlott and RPM informed the Court: "After attempting to obtain additional information, and after further investigation of the ability to pursue Arbitration in this matter, Defendant Receivables Performance Management is unable to proceed with a motion to compel arbitration." RPM has waived any purported right to arbitration by actively participating in litigation for more than two years after the *Ramsey* lawsuit was filed. *Johnson Associates Corp. v. HL Operating Corp.*, 680 F.3d 713, 717-21 (6th Cir. 2012) (finding defendant waived right to arbitrate where it sought to compel arbitration eight months after the case was filed and where it participated in litigation by filing an answer, filing a counterclaim, engaging in settlement talks, actively scheduling case calendar, and requesting discovery) (attached). Given these factors, there is no basis for Plaintiff to dismiss the case and proceed with arbitration,

**REDACTED-SUBJECT TO**



**FED. R. EVID. 408**

1

Also, can you confirm that Jan. 28 will work for the 30(b)(6) deposition. We plan on issuing the amended notice if we do not have confirmation by the end of the week.

Adam V. Sadlowski
THE LAW FIRM OF
SADLOWSKI & BESSE L.L.C.
11427 Reed Hartman Highway, Suite 217
Blue Ash, Ohio 45241
P: (513) 618-6595
F: (513) 618-6442
E: asadlowski@sb-lawyers.com
www.sb-lawyers.com
www.blueashlawfirm.com

# EXHIBIT 7

# Johnson Assocs. Corp. v. HL Operating Corp.

United States Court of Appeals for the Sixth Circuit

May 23, 2012, Decided; May 23, 2012, Filed

File Name: 12a0148p.06

No. 10-6468

**Reporter**

680 F.3d 713 *; 2012 U.S. App. LEXIS 10339 **; 2012 FED App. 0148P (6th Cir.) ***; 2012 WL 1861675

JOHNSON ASSOCIATES CORPORATION; T. CHANTAL INTERNATIONAL LIMITED, Plaintiffs-Appellees, v. HL OPERATING CORP., dba Hartmann, Defendant-Appellant.

**Prior History:** [**1] Appeal from the United States District Court for the Middle District of Tennessee at Nashville. No. 3:09-cv-1206—John T. Nixon, District Judge.

Johnson Assocs. Corp. v. HL Operating Corp., 2010 U.S. Dist. LEXIS 126751 (M.D. Tenn., Nov. 30, 2010)

**Counsel:** ON BRIEF: Samuel L. Felker, Kathryn Hannen Walker, BASS, BERRY & SIMS PLC, Nashville, Tennessee, for Appellant.

Stephen H. Price, Erika R. Barnes, STITES & HARBISON PLLC, Nashville, Tennessee, for Appellees.

**Judges:** Before: NORRIS, CLAY, and GRIFFIN, Circuit Judges.

**Opinion by:** GRIFFIN

## Opinion

[*715] [***1] GRIFFIN, Circuit Judge. Defendant-appellant HL Operating Corporation ("Hartmann") appeals from the district court's order denying its motion to compel arbitration on the basis that it waived its right to enforce an arbitration clause against plaintiffs-appellees Johnson Associates Corporation ("Johnson") and T. Chantal International Limited ("T. Chantal") in their suit for breach of contract and unjust enrichment. We affirm.

[***2] I.

This case involves a dispute over Hartmann's contract with Johnson and T. Chantal to manufacture Hartmann's luggage lines. Plaintiffs filed suit against Hartmann on December 22, 2009, seeking damages for breach of contract based on a "Sourcing Agreement" between the parties and claiming that Hartmann was unjustly enriched. Hartmann filed an answer and asserted [**2] a counterclaim for breach of contract. A case management conference was held. Thereafter, the parties engaged in a judicial settlement conference, held settlement discussions, and exchanged multiple offers from approximately the middle of April 2010 through the middle of June 2010 with the assistance of a magistrate judge. These efforts were unsuccessful. On July 1, 2010, the magistrate judge assisting with the settlement proceedings returned the case file to the magistrate judge otherwise handling the case because "it now appears that there is very little chance of resolution at this stage in the proceedings."

That same day, Hartmann filed a motion to continue the trial and to modify the case management order, which at the time required the parties to complete written discovery and fact witness depositions by August 15, 2010. The district court denied Hartmann's motion. Hartmann then served plaintiffs with interrogatories, requests for production of documents, and a request for admissions on July 2, 2010, and July 16, 2010; and plaintiffs served Hartmann with their discovery requests on July 13, 2010. On July 21, 2010, Hartmann noticed eight depositions; those depositions, however, [**3] were later postponed. The parties then filed a joint motion to modify the case management order to make the responses to the discovery requests due on August 26, 2010, and the court entered an order to that effect on August 12, 2010.

On August 23, 2010, just three days before the newly agreed-upon discovery deadline, Hartmann notified plaintiffs that it intended to exercise its right to arbitrate the dispute as provided by paragraph 13(a) of the Sourcing Agreement. Hartmann requested a response by August 24, 2010, and notified plaintiffs that in the

event they did not agree to arbitrate, Hartmann would file a motion to compel arbitration. Hartmann also stated that "[i]t is our position that no discovery should be had until the Court rules on such a [***3] motion. Consequently, we will grant you an indefinite extension to respond to any of our outstanding discovery . . . . We ask that you do the same for Hartmann." When plaintiffs failed to respond, Hartmann filed a motion to compel arbitration on August 25, 2010.

[*716] On August 26, 2010, plaintiffs served their discovery responses on Hartmann in accordance with the deadline. They produced 1,151 pages of responsive documents and provided a 4.11 [**4] gigabyte hard drive containing responsive information. Plaintiffs then continued to seek discovery from Hartmann while the motion to compel arbitration was pending. On September 1, 2010, plaintiffs' counsel wrote to Hartmann's counsel: "Regardless of its motion to dismiss or stay the litigation pending arbitration, which Plaintiffs oppose, Hartmann is still required to comply with outstanding court orders regarding discovery, . . . . Specifically, Plaintiffs intend to continue to take depositions in this matter." As a result, when Hartmann served written discovery responses and documents on September 15, 2010, it stipulated that "it [wa]s doing so under objection and Hartmann does not agree that its response to these requests constitutes any waiver of its right to arbitrate this dispute."

The district court held a hearing on Hartmann's motion to dismiss or compel arbitration in mid-November. In an opinion dated November 30, 2010, the court held that Hartmann had waived its right to compel arbitration because Hartmann "moved for and was granted an extension of time within which to file an Answer"; "asserted ten affirmative defenses and a counterclaim"; "engaged in a judicial settlement [**5] conference and informal efforts to resolve the case"; "both unilaterally and jointly with Plaintiffs moved for adjustments of the Case Management Order"; "served . . . discovery requests"; and prejudiced Plaintiffs because "[w]hile litigating in this court for most of a year, Plaintiffs have participated in scheduling, requested discovery materials and prepared discovery responses" that "[they assert] . . . will not be fully transferrable to an arbitration process." Hartmann timely appeals.

[***4] II.

"We review a district court's denial of a motion to compel arbitration de novo." Hurley v. Deutsche Bank

Trust Co. Ams., 610 F.3d 334, 338 (6th Cir. 2010) (citing Albert M. Higley Co. v. N/S Corp., 445 F.3d 861, 863 (6th Cir. 2006)).

III.

Hartmann makes two arguments on appeal. First, Hartmann contends that it could not have waived its right to arbitration because the Sourcing Agreement contains an explicit no-waiver provision: "No waiver by either party of any provision of this Agreement or of any breach or default shall constitute a continuing waiver of such provision or of any other provisions of this Agreement." Because Hartmann raised this issue in its reply to its motion to compel arbitration [**6] below, and the district court failed to address it, Hartmann claims that the district court's ruling must be vacated and the matter remanded for further consideration. Plaintiffs, on the other hand, assert that Hartmann did not properly raise the issue in its reply below, and that even if it did, the fact that the district court failed to address the argument does not mean that the court committed any error in making its determination that Hartmann waived its right to arbitration. We consider each of these arguments in turn.

Plaintiffs argue that Hartmann made only a "vague" reference in passing in its reply brief, without explanation or legal citation, that it could not waive the specific arbitration provision as a result of the general no-waiver provision in the Sourcing Agreement. This vague reference, they contend, was insufficient to raise the issue before the district court and thus did not preserve it for appeal. We disagree. Because the issue of waiver was first [*717] raised in plaintiffs' response, Hartmann's reply was the first and only opportunity it had to address the issue. Moreover, although Hartmann's argument lacked legal citation, it was not vague or made merely in passing. [**7] Hartmann argued that:

> In addition to the facts that Plaintiffs have not and will not suffer any prejudice and that Hartmann has not taken any actions "completely inconsistent" with arbitration, Hartmann cannot be found to have waived [***5] its right because the parties expressly agreed that neither party could waive any provision of the Contract between them. Section 13(e) of the agreement between the parties states plainly that "[n]o waiver by either party of any provision of this Agreement or any breach or default shall constitute continuing waiver of such provision or of any other provisions of this Agreement." Docket No. 1-1 at § 13(e). As such, not only did

Plaintiffs expressly agree to arbitrate this dispute, but they also agreed that the actions they now claim constitute waiver would not in fact act as a waiver of the arbitration provision.

This was sufficient to preserve the issue for our review.

However, even though the no-waiver clause argument is preserved, Hartmann wrongly concludes that the district court's failure to address the issue requires remand. "[T]he presence of [a] 'no waiver' clause does not alter the ordinary analysis undertaken to determine if a party has waived its [**8] right to arbitration." *S & R Co. of Kingston v. Latona Trucking, Inc.*, 159 F.3d 80, 86 (2d Cir. 1998), *cert. denied*, 528 U.S. 1058, 120 S. Ct. 629, 145 L. Ed. 2d 506 (1999). This makes sense because "to allow the 'no waiver' clause to preclude a finding of waiver would permit parties to waste scarce judicial time and effort and hamper judges' authority to control the course of the proceedings" and allow parties to "test[] the water before making the swim" by delaying assertion of their right to arbitration until the litigation is nearly complete. *Id.* (citation and internal quotation marks omitted); *accord Gray Holdco, Inc. v. Cassady*, 654 F.3d 444, 452-53 (3d Cir. 2011); *Republic Ins. Co. v. PAICO Receivables, LLC*, 383 F.3d 341, 348-49 (5th Cir. 2004). Given that the alleged no-waiver provision in the Sourcing Agreement was not potentially determinative, Hartmann's argument that the district court's failure to address the issue requires remand is without merit.

Second, Hartmann argues that the district court erred in concluding that Hartmann waived its right to arbitration based on its participation in the litigation. Although it has long been settled that a party can waive its contractual right to arbitration, *see Am. Locomotive Co. v. Gyro Process Co.*, 185 F.2d 316, 318 (6th Cir. 1950), [**9] "because of the strong presumption in favor of arbitration, waiver of the right to arbitration is not to be lightly inferred." *Glazer v. Lehman Bros., Inc.*, 394 F.3d 444, 450 (6th Cir. 2005). We have explained that "a party may waive an agreement to arbitrate [***6] by engaging in two courses of conduct: (1) taking actions that are completely inconsistent with any reliance on an arbitration agreement; and (2) 'delaying its assertion to such an extent that the opposing party incurs actual prejudice.'" *Hurley*, 610 F.3d at 338 (quoting *O.J. Distrib., Inc. v. Hornell Brewing Co.*, 340 F.3d 345, 356 (6th Cir. 2003)); *see Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat*, 289 F.3d 434, 438 (6th Cir. 2002).

In this case, the parties' arguments focus on our unpublished decision in *Manasher v. NECC Telecom.*, 310 Fed. Appx. 804 (6th Cir. 2009). There, we held that the defendant "waived whatever right to arbitrate it may have had by failing to [*718] plead arbitration as an affirmative defense and by actively participating in litigation for almost a year without asserting that it had a right to arbitration" because that "conduct was 'completely inconsistent with [any] reliance [on the right to arbitration]' [**10] and caused the plaintiffs to suffer prejudice through unnecessary delay and expense." *Id.* at 806 (quoting *Gen. Star Nat'l Ins.*, 289 F.3d at 438). Hartmann contends that our determination in *Manasher* that a defendant's failure to raise an arbitration clause in its answer is inconsistent with its reliance on the right to arbitrate is suspect because a defendant is not required by Federal Rule of Civil Procedure 8(c) to plead arbitration as an affirmative defense. Hartmann also asserts that *Manasher* is distinguishable from the instant case because that case included motions to certify the class and to amend the complaint, and none of the litigation activities in this case were as extensive or laborious. We find Hartmann's arguments unavailing.

Regardless of whether a defendant is required to raise arbitration as a defense under Rule 8(c), a defendant's failure to raise arbitration as an affirmative defense shows his intent to litigate rather than arbitrate. The filing of an answer is, after all, the main opportunity for a defendant to give notice of potentially dispositive issues to the plaintiff, and the intent to invoke an arbitration provision is just such an issue. Indeed, as a practical [**11] matter, an enforceable contractual right to compel arbitration operates as a quasi-jurisdictional bar to a plaintiff's claims, providing grounds for dismissal of the suit. It is therefore unsurprising that defendants routinely raise the right to arbitration [***7] in their answer, whether it is technically required by Rule 8 or not. *See Tenneco Resins, Inc. v. Davy Int'l, AG*, 770 F.2d 416, 420 (5th Cir. 1985) ("Although [defendant] did not move for a stay pending arbitration until approximately eight months into the litigation, in its answer to the original complaint, [defendant] did seek to have the action dismissed because the dispute was covered by a valid and enforceable arbitration clause thereby putting [plaintiff] on notice as to its desire to arbitrate the matter."); *Hilti, Inc. v. Oldach*, 392 F.2d 368, 371 (1st Cir. 1968) (noting that "defendant's answer, in its special defense, served notice on plaintiff of the arbitration defense"); *see also Gen. Guar. Ins. Co. v. New Orleans Gen. Agency, Inc.*, 427 F.2d 924, 929 n.5 (5th Cir. 1970) ("Once the defendant, by answer, has given notice of insisting on arbitration the burden is heavy on the party seeking to prove waiver.").

Hartmann [**12] is, of course, correct that the litigation in *Manasher* was more significant than the litigation in this case. In *Manasher*, the suit proceeded for over a year before the issue of arbitration was raised, and, during that time, there was a motion to certify the class and a motion to amend the complaint. Here, in contrast, the case had progressed only eight months before Hartmann raised its right to arbitration, and the parties' prior motions addressed only settlement, scheduling deadlines, and discovery requests. But the fact that this case involved less litigation than in *Manasher* is not dispositive. And, in our view, Hartmann's actions were also completely inconsistent with any reliance on its right to arbitrate because Hartmann failed to raise arbitration in its answer, *see Manasher*, 310 F. App'x at 806; asserted a counterclaim for breach of contract, *see, e.g., Crossville Med. Oncology, P.C. v. Glenwood Sys., LLC*, 310 F. App'x 858, 859 (6th Cir. 2009) (noting that the defendant "participated in litigation when it filed an answer and counterclaims"); and actively scheduled and requested discovery, including depositions, [*719] rather than moving to compel arbitration following the end of [**13] formal settlement discussions, *cf. Dickinson v. Heinold Sec., Inc.*, 661 F.2d 638, 641 (7th Cir. 1981) (noting that the defendant "promptly moved" for arbitration following failure of settlement).

[***8] Hartmann's citations to decisions from other jurisdictions do not convince us otherwise. *J. & S. Constr. Co., Inc. v. Travelers Indem. Co.*, 520 F.2d 809 (1st Cir. 1975), is not helpful to Hartmann because in that case the court based its conclusion that the defendant did not waive its right to arbitration on the lack of prejudice to the plaintiff. *Id.* at 809-10 ("This ruling is supported by the record, there having been no showing of prejudice."). *Tenneco Resins, Inc.* and *Hilti, Inc.* are similarly off target because in those cases, unlike here, the right to arbitration was raised in each of the defendants' respective answers. *See* 770 F.2d at 420; 392 F.2d at 371. And *Carcich v. Rederi A/B Nordie*, 389 F.2d 692 (2d Cir. 1968), is likewise inapplicable because in that case arbitration was raised "at an early date and continuously asserted," while in this case, it was not raised until eight months into the litigation. *Id.* at 695. The only case Hartmann relies on that is arguably close is *Am. Dairy Queen Corp. v. Tantillo*, 536 F. Supp. 718 (M.D. La. 1982), [**14] and we find that court's "substantial invocation of the litigation process" analysis unpersuasive in light of our "completely inconsistent" actions test. *See id.* at 722.

We are also unpersuaded by Hartmann's assertion that it did not act completely inconsistently with any reliance

on its right to arbitration because failing to assert arbitration as an affirmative defense, participating in only a "minimal" amount of litigation while mostly attempting to settle the case, and filing an answer and counterclaim are individually insufficient to support such a finding. Although Hartmann cites some authority in support of these assertions, *see Walker v. J.C. Bradford & Co.*, 938 F.2d 575, 578 (5th Cir. 1991) ("Attempts at settlement . . . are not inconsistent with an inclination to arbitrate and do not preclude the exercise of a right to arbitration."); *Fisher v. A.G. Becker Paribas, Inc.*, 791 F.2d 691, 698 (9th Cir. 1986) ("[T]he bare fact that [a party] failed to raise an affirmative defense is inadequate by itself to support a claim of waiver of arbitration."); *Crossville Med.*, 310 F. App'x at 859 (holding that the mere filing of answer and counterclaims were not inconsistent with defendant's [**15] right to arbitrate), the problem with Hartmann's argument is that, regardless of whether each of these circumstances is insufficient to show that Hartmann acted completely [***9] inconsistently with its right to arbitration, they may well be sufficient when considered together.[1] We hold that in this case they are.

This leaves the second part of the waiver inquiry: prejudice. "Prejudice can be substantive, such as when a party loses a motion on the merits and then attempts, in effect, to relitigate the issue by invoking arbitration, or it can be found when a party too long postpones his invocation of its contractual right to arbitration, and thereby causes his adversary to incur unnecessary delay or expense." *Kramer v. Hammond*, 943 F.2d 176, 179 [*720] (2d Cir. 1991); [**16] *see, e.g., Manasher*, 310 F. App'x at 806. Prejudice can also be found where a party has gained a strategic advantage by obtaining something in discovery that would be unavailable in arbitration. *Stifel, Nicolaus & Co. Inc. v. Freeman*, 924 F.2d 157, 159 (8th Cir. 1991). Here, the district court concluded that plaintiffs were prejudiced by unnecessary delay and expense because "the right to arbitrate was not asserted for eight months, during which motions were filed, requests for discovery materials were made and responses were prepared, and a judicial settlement conference was held." It

---

[1] Hartmann has also taken at least one of these statements out of context. In *Fisher*, the Ninth Circuit's full statement was: "*Absent a showing of prejudice* by the Fishers, the bare fact that Becker failed to raise an affirmative defense is inadequate by itself to support a claim of waiver of arbitration. *Rush v. Oppenheimer & Co.*, 779 F.2d 885, 889 (2d Cir. 1985)." 791 F.2d at 698 (emphasis added). Thus, the case does not actually support Hartmann's contention.

emphasized that "[a] considerable amount of time and resources has been spent in pursuing this matter in court, and Plaintiffs assert that the fruits of their efforts will not be fully transferrable to an arbitration process abroad that may delay resolution of this case even further." We substantially agree with the district court.

Hartmann argues that the district court erred by relying on the "time and resources" spent in litigation to conclude that plaintiffs were prejudiced by Hartmann's delayed assertion of its right to arbitration. As support for this argument, Hartmann cites our statement that "delay [**17] alone, regardless of its length is not enough [to establish prejudice]," *Ziegler v. Aukerman*, 512 F.3d 777, 786 (6th Cir. 2008) (citation and internal quotation marks omitted), and the Fifth Circuit's statement that "pretrial expense and delay-unfortunately inherent in litigation-without more, do not constitute prejudice [***10] sufficient to support a finding of waiver." *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 26 (2d Cir. 1995) However, this is not a case involving delay alone, or even delay and the inherent pretrial expense referred to in *Leadertex*. This is a case where, in addition to an eight-month delay and expenses involved with numerous scheduling motions and court-supervised settlement discussions, plaintiffs also engaged in discovery. The combination of all of these factors caused plaintiffs to suffer "actual prejudice." *Hurley*, 610 F.3d at 338.

Hartmann resists this conclusion, pointing to the Fifth Circuit's statement in *Tenneco Resins* that "when only a minimal amount of discovery has been conducted, which may also be useful for the purpose of arbitration, the court should not ordinarily infer waiver based upon prejudice to the [opposing party]." 770 F.2d at 421. [**18] But that statement does not describe this case. Here, plaintiffs produced 1,151 pages of responsive documents and a 4.11 gigabyte hard drive full of responsive information. *Cf. Patten Grading & Paving, Inc. v. Skanska USA Bldg., Inc.*, 380 F.3d 200, 207 (4th Cir. 2004) (finding no prejudice where the written discovery was "limited"); *Leadertex*, 67 F.3d at 26 (finding no prejudice where the only documents produced were unnecessary copies of twenty-three dye orders). Moreover, plaintiffs represented to the district court that they engaged in more discovery than would be permitted in arbitration; and, contrary to Hartmann's contention, the district court implicitly credited that representation.

Hartmann also intimates that it cannot be responsible for plaintiffs' discovery expenses because the metadata on the hard drive provided by plaintiffs shows that the information was saved on August 24, 2010, one day after Hartmann notified plaintiffs of its intent to arbitrate. But this does not benefit Hartmann either. If anything, the fact that the responsive information was saved to the disk only one day after Hartmann notified plaintiffs of its intent to arbitrate confirms that plaintiffs were [**19] prejudiced; after all, it is exceedingly unlikely that plaintiffs would have gathered all of that responsive material, or even a substantial portion of it, in the hours between [*721] when it received notice of Hartmann's intent to arbitrate on August 23, 2010, and its saving of the material to [***11] the disk on August 24, 2010. Because Hartmann's actions were completely inconsistent with any reliance on its right to arbitration, and because Hartmann's belated assertion of that right caused plaintiffs actual prejudice in the form of unnecessary delay and expense, we hold that Hartmann waived its right to arbitration.

IV.

For these reasons, we affirm the judgment of the district court.

---

End of Document

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Phillip Ramsey, | : | Case No. 1:16-cv-1059 |
| | : | |
| Plaintiff, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | |
| Receivables Performance Management, | : | Order Denying Defendants' Motions to |
| LLC, *et al.*, | : | Dismiss and Granting Plaintiff's Motion |
| | : | for Costs and Attorney's Fees |
| Defendants. | : | |

This matter is before the Court on Defendant Receivables Performance Management,

LLC's Motion to Dismiss (Doc. 20), Defendant Howard George's Motion to Dismiss (Doc. 37),

and Plaintiff's Motion for Attorney Fees and Costs (Doc. 38). Each motion is opposed. (Doc.

26, 39, 40.) For the reasons that follow, the Motions to Dismiss will be DENIED, and the

Motion for Costs and Attorney's Fees will be GRANTED.

## I.    BACKGROUND

### A.    Facts[1]

Plaintiff Phillip Ramsey is an Ohio resident who was a customer of Windstream

Communications, a provider of telephone, internet, and televisions services, through which he

subscribed to DISH satellite television. (Doc. 18 at PageID 129, ¶ 9.) In 2014, Ramsey's father,

who suffers from dementia and is under Plaintiff's court-ordered guardianship, purchased on-

demand movies without Plaintiff's authorization. (*Id.* at ¶ 10.) Plaintiff disputed the charges for

these purchases with Windstream by speaking with customer service representatives on multiple

---

[1] The Court has drawn the background facts from Plaintiff's First Amended Complaint (Doc. 18)
unless otherwise indicated.

occasions, the resolution of which was Windstream promising to agree to remove the unauthorized charges from Plaintiff's account. (*Id.*)

In spite of this, Windstream began collection efforts against Plaintiff by making repeated automated calls to his cell phone and sending him collection letters. (*Id.* at PageID 130, ¶ 11.) In response, Plaintiff spoke with Windstream on the telephone to dispute the debt and instructed Windstream to immediately cease all calls. (*Id.* at ¶ 13.) On November 16, 2014, Plaintiff also sent a letter to Windstream formally disputing the debt and instructing Windstream "and any affiliated collection agencies" to cease communications with him regarding his Windstream account. (*Id.* at ¶ 14.) Plaintiff also cancelled his service with Windstream. (*Id.* at PageID 131, ¶ 16.) Yet Windstream's collection efforts continued. (*Id.*) The final invoices Plaintiff received from Windstream after canceling service reflect a $0.00 balance and that Windstream, therefore, agreed to waive the disputed charges. (*Id.*)

In early 2015, Defendant Receivables Performance Management, LLC ("RPM"), a Washington limited liability company, began collection efforts against Plaintiff by making calls to Plaintiff's cell phone using an automatic telephone dialing system and/or an artificial or prerecorded voice. (*Id.* at ¶ 18.) RPM also sent collection letters to Plaintiff. (*Id.* at PageID 131–32, ¶ 18.) In response, Plaintiff spoke via telephone with RPM representatives and instructed RPM to immediately stop its collection calls. (*Id.* at PageID 132, ¶ 19.) RPM continued its collection efforts to the tune of an estimated one hundred calls to Plaintiff's cell phone. (*Id.* at ¶ 20.)

### B. Procedural History

Plaintiff filed suit on November 8, 2016 (Doc. 1), and RPM filed an answer on February 8, 2017 (Doc. 7). The Court issued its Preliminary Pretrial Order on May 30, 2017, and

discovery commenced. (Doc. 13). On June 22, 2017, Plaintiff filed a Motion for Leave to Amend the Complaint to add a named Defendant, Howard George, the founder and CEO of RPM (Doc. 16), which was unopposed by Defendant. (Doc. 17). The Court granted that Motion on July 14, 2017. (July 14, 2017 Docket Entry.)

In his First Amended Complaint, Plaintiff asserts two causes of action against both Defendants: (1) violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227; and (2) violation of the Ohio Consumer Sales Practices Act ("OCSPA"), Ohio Rev. Code §§ 1345.02–.03.

On August 11, 2017, RPM filed a Motion to Dismiss.[2] (Doc. 20.) On October 26, 2017, the Court ordered RPM and Plaintiff to file supplemental briefs addressing four questions related to RPM's Motion to Dismiss. (Doc. 30.) Notably, RPM only addressed three of the Court's questions in its Memorandum, failing to address its fourth question altogether.[3] (Doc. 34.) Plaintiff filed its responsive Memorandum on November 16, 2017. (Doc. 36.) The following day, on November 17, 2017, George, represented by the same attorney as RPM, filed a Motion to Dismiss (Doc. 37). Much of the argument presented by George is verbatim what was presented by RPM in its first-filed Motion to Dismiss. On November 20, 2017, Plaintiff filed a Motion for Costs and Attorney's Fees (Doc. 38). All motions are now ripe.

---

[2] At the time of filing, George had not yet been served.

[3] In addition, RPM's response exceeded the Court's page limit as it was single-spaced, which violates Southern District of Ohio Local Rule 5.1(a). The Court also notes that Defendant George's Response in Opposition to Plaintiff's Motion for Costs and Attorney's Fees (Doc. 40) incorrectly uses footnote citations rather than in-text citations as required by Judge Dlott's Standing Order on Civil Procedures Rule I.E.1.d. Defendants are advised that future filings that do not comply with the Southern District of Ohio Local Rules and/or Judge Dlott's Standing Order on Civil Procedures will be stricken from the record.

## II. LEGAL STANDARD

### A. Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." To withstand a motion to dismiss pursuant to Rule 12(b)(6), a complaint must comply with the pleading requirements of Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). When considering a motion to dismiss pursuant to Rule 12(b)(6), the Court must construe the complaint in a light most favorable to the plaintiff and accept the factual allegations as true. *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). The Court "need not, however, accept conclusory allegations or conclusions of law dressed up as facts." *Erie Cty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 867 (6th Cir. 2012).

In ruling on a motion to dismiss, the court may consider written instruments that are exhibits to a pleading, as those are considered part of the pleading for all purposes. *Campbell v. Nationstar Mortg.*, 611 F. App'x 288, 292 (6th Cir. 2015) (citing Fed. R. Civ. P. 10(c)). A court may also consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.* (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

### B. Rule 12(b)(7)

A party may also move to dismiss under Rule 12(b)(7) for "failure to join a party under Rule 19." Fed. R. Civ. P. 12(b)(7). The Court applies a three-part inquiry to determine whether

4

a case must be dismissed for failure to join an indispensable party under Rule 19.[4] *Reyna*

*Capital Corp. v. Millennium Leasing and Fin. Servs., Inc.*, 494 F. Supp. 2d 709, 713 (S.D. Ohio

2006) (citing *Glancy v. Taubman Centers, Inc.*, 373 F.3d 656 (6th Cir. 2004)).  First, the Court

---

[4] Rule 19, governing joinder, states:

**(a) Persons Required to Be Joined if Feasible.**
    **(1)** *Required Party.* A person who is subject to service of process and
    whose joinder will not deprive the court of subject-matter jurisdiction
    must be joined as a party if:
        **(A)** in that person's absence, the court cannot accord complete
        relief among existing parties; or
        **(B)** that person claims an interest relating to the subject of the
        action and is so situated that disposing of the action in the person's
        absence may:
            **(i)** as a practical matter impair or impede the person's
            ability to protect the interest; or
            **(ii)** leave an existing party subject to a substantial risk of
            incurring double, multiple, or otherwise inconsistent
            obligations because of the interest.
    **(2)** *Joinder by Court Order.* If a person has not been joined as required,
    the court must order that the person be made a party. A person who
    refuses to join as a plaintiff may be made either a defendant or, in a proper
    case, an involuntary plaintiff.
    **(3)** *Venue.* If a joined party objects to venue and the joinder would make
    venue improper, the court must dismiss that party.

**(b) When Joinder Is Not Feasible.** If a person who is required to be joined if
feasible cannot be joined, the court must determine whether, in equity and good
conscience, the action should proceed among the existing parties or should be
dismissed. The factors for the court to consider include:
    **(1)** the extent to which a judgment rendered in the person's absence might
    prejudice that person or the existing parties;
    **(2)** the extent to which any prejudice could be lessened or avoided by:
        **(A)** protective provisions in the judgment;
        **(B)** shaping the relief; or
        **(C)** other measures;
    **(3)** whether a judgment rendered in the person's absence would be
    adequate; and
    **(4)** whether the plaintiff would have an adequate remedy if the action were
    dismissed for nonjoinder.

5

must determine whether the person or entity is a necessary party under Rule 19(a). *Id.; see Temple v. Synthes Corp.*, 498 U.S. 5, 8 (1990) (establishing that Rule 19(b) inquiry is required only if the party satisfies the threshold requirements of Rule 19(a)). Second, if the person or entity is a necessary party, the Court must determine if joinder of that person or entity will deprive the Court of subject matter jurisdiction. *Id.* Third, if joinder is not feasible because it will eliminate the Court's ability to hear the case, the Court must analyze Rule 19(b) factors to determine whether it should "in equity and good conscience" dismiss the case because the absentee person or entity is indispensable. *Id.*

## III. MOTIONS TO DISMISS

The Court will first consider the Defendants' Motions to Dismiss the Complaint, and will then consider Plaintiff's Motion for Costs and Attorney's Fees. RPM and George move to dismiss the Complaint on the grounds that Plaintiff engaged in improper claim-splitting and failed to join Windstream, which they deem an indispensable party. In addition to these two arguments, George argues a third ground for dismissal: that Plaintiff failed to state a viable claim against him. The Court will address these arguments in turn, but is not persuaded that either Defendant is entitled to dismissal of the First Amended Complaint.

### A. Claim-Splitting Doctrine is Inapplicable

Both Defendants argue that the Plaintiff engaged in improper claim-splitting by bringing this action on the heels of *Ramsey v. International Computer Systems, Inc. d/b/a First Collection Services*, 16-cv-745-TSB, (the *"First Collection* action"),[5] a previously-filed and now-resolved

---

[5] The Court may take judicial notice of the docket in *First Collection* pursuant to Federal Rule of Evidence 201(b). *Buck v. Thomas M. Cooley Law Sch.*, 597 F.3d 812, 816 (6th Cir. 2010) ("Although typically courts are limited to the pleadings when faced with a motion under Rule 12(b)(6), a court may take judicial notice of other court proceedings without converting the

action which arises from the same nucleus of facts. The *First Collection* action is similar to the underlying case, but it is distinct in that it involves *different* companies' collection efforts against Plaintiff.

In *First Collection*, Plaintiff Phillip Ramsey brought suit against Defendant International Computer Systems, Inc. d/b/a First Collection Services ("First Collection") and Southwest Credit Systems, L.P. ("Southwest") for alleged violations of the Fair Credit Reporting Act by Southwest and violations of the TCPA and Fair Debt Collection Practices Act by both companies. (No. 16-cv-745, Doc. 1.) The *First Collection* case revolves around the collection efforts by Windstream, First Collection, and Southwest related to the debt incurred by Ramsey when he cancelled his Windstream account. (*Id.* at PageID 4–5.) Ramsey alleged that through letter and over the phone, he instructed Windstream and First Collection that Windstream and affiliated collection agencies should cease all communications with him in regard to his Windstream account. (*Id.*) Ramsey cancelled his Windstream service, but Windstream and its debt collectors' efforts continued. (*Id.* at PageID 5–6.) First Collection sent a letter to Ramsey acknowledging receipt of his letter, including correspondence from Windstream showing his debt was written off, but stated that the charge was legitimate and outstanding. (PageID 6.) Southwest also began collection efforts on behalf of Windstream by sending collection letters and contacting Ramsey on his telephone. (*Id.* at PageID 7.) Southwest continued these efforts even after Ramsey sent a letter requesting that the company stop contacting him regarding the debt. (*Id.*) Southwest also

---

motion into one for summary judgment.") (citing *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 576 (6th Cir. 2008)).

reported the incorrect status of Plaintiff's Windstream account to major credit bureaus. (*Id.* at PageID 8.) The case is now resolved.[6]

Under the claim-splitting doctrine, a district court may dismiss or stay a later-filed action pursuant to its authority to administer its docket where it (1) involves the same parties or their privies; and (2) arises out of the same transaction or series of transactions as the first suit. *Zephyr Aviation III, L.L.C. v. Keytech Ltd.,* No. 8:07-cv-227-T-27TGW, 2008 WL 759095, *1 n.4 (M.D. Fla. Mar. 20, 2008) (adopting report and recommendation, staying case and denying without prejudice defendants' motion to dismiss) (citing *Curtis v. Citibank, N.A.,* 226 F.3d 133, 138 (2nd Cir. 2000)); *Cadle Co. v. Whataburger of Alice, Inc.,* 174 F.3d 599 (5th Cir. 1999)). "[T]he 'claim splitting doctrine' applies where a second suit has been filed before the first suit has reached a final judgment." *Id.* at *6 (citing *Hartsel Springs Ranch of Colo., Inc. v. Bluegreen Corp.,* 296 F.3d 982 (10th Cir. 2002) (finding the district court erred in dismissing action under claim-splitting doctrine and finding the relevant inquiry to be whether the two suits involved one wrong committed by one defendant and whether the equity of the situation supported dismissal of the second case.). As Plaintiff points out and Defendants ignore, this doctrine is typically applied where the first-filed and second-filed actions may still be consolidated. *See, e.g., Zephyr,* 2008 WL 759095 (first-filed action stayed and still pending at time the Court was faced with a motion to dismiss the second action). The first-filed action is no longer pending. The fact that this action cannot be consolidated with the first-filed action, which

---

[6] A review of the docket reveals that on November 3, 2016, Plaintiff filed a Notice of Acceptance of Defendant Southwest Credit Systems, L.P.'s Rule 68 Offer of Judgment and a Clerk's Judgment was entered the following day against Southwest Credit Systems, L.P. (Case No. 16-cv-745, Docs. 14, 15.) An Amended Complaint was filed against Defendant International Computer Systems, and on March 31, 2017, the Court issued a Conditional Order of Dismissal after being advised that the matter had been settled. (*Id.,* Mar. 31, 2017 Docket Entry.)

is no longer pending, is problematic and undermines the goal of judicial efficiency.

Furthermore, Defendants did not cite any applicable Sixth Circuit case law applying the doctrine

in analogous circumstances as this case.[7] Accordingly, the Court declines to exercise its

discretion to apply this doctrine here.

Even if the Court was persuaded that the claim-splitting doctrine should result in

dismissal of Plaintiff's claims, which it is not, the elements are not met. The *First Collection*

action involved separate and distinct collection efforts by two *different* entities than the

Defendants in this case. This action is based on 245 unauthorized telephone calls RPM allegedly

made to Plaintiff's cell phone using RPM's telephone dialing system, representatives,

employees, processes, and procedures, at dates and times specific to RPM. The calls were made

by RPM and do not involve or relate to First Collection or Southwest. There is no evidence that

the Defendants in this action are in privity with First Collection or Southwest by virtue of their

---

[7] Rather, "[t]o the extent that there is some need to prevent claim-splitting, that purpose is already served by ordinary principles of *claim preclusion*. Plaintiffs generally must bring all claims arising out of a common set of facts in a single lawsuit, and federal district courts have discretion to enforce that requirement as necessary 'to avoid duplicative litigation.'" *Elgin v. Dep't of Treasury*, 567 U.S. 1, 34 (2012) (emphasis added). Defendants argue that claim-splitting is a type of claim preclusion, and therefore, they are arguing claim preclusion applies. The two doctrines have different elements. For the sake of completeness, the Court also finds that claim preclusion is inappropriate and Defendants have not established that the elements are met. *See Heike v. Central Mich. Univ. Bd. Of Trustees*, 573 F. App'x 476, 480 (6th Cir. 2014) (Claim preclusion applies when: (1) there is a final decision on the merits in the first action by a court of competent jurisdiction; (2) the second action involves the same parties, or their privies, as the first; (3) the second action raises an issue actually litigated or which should have been litigated in the first action; and (4) there is an identity of claims between the first and second actions.). Though given the opportunity to do so, RPM failed to address whether there has been a final decision on the merits by virtue of the resolution of the *First Collection* action to satisfy the first prong of claim preclusion. As Plaintiff points out, such a decision would require Plaintiff prevailing on its TCPA claims, and there is no evidence of a decision on the merits in the *First Collection* action. The second prong, privity, is also lacking, as discussed *infra*. Finally, the fourth element of claim preclusion is not met, as the *First Collection* action involved separate and distinct collection efforts by *different* entities than RPM and Defendant George.

9

connection to collecting on the same underlying debt. In any event, whether the entities are in privity would be a fact question that is inappropriate for the Court to weigh in on at this stage.

For these reasons, the Court rejects the argument that the claim-splitting doctrine bars Plaintiff's claims.

### B. Windstream Is Not an Indispensable Party

Defendants argue that this case should be dismissed for failure to join Windstream. The Court disagrees. Under Rule 19(a), a party is required to be joined if the Court cannot accord complete relief among the existing parties, or the party has an interest relating to the subject of the action and is so situated that disposing of the action in the party's absence may impede that party's ability to protect its interest or leave that party subject to a risk of incurring double, multiple, or inconsistent obligations. Fed. R. Civ. P. 19(a)(1)(A)–(B). Only if Windstream is a necessary party, does the Court examine Rule 19(b) as a potential ground for dismissal of the action for failure to join a necessary party. *See Temple*, 498 U.S. at 8.

Windstream is not a necessary party under Rule 19(a). Defendants argue that the claims in this case revolve around Plaintiff's allegations that Plaintiff sent a letter to Windstream disputing his debt and expressly instructing Windstream and any affiliated collection agency to cease communications with him regarding his account. These allegations do not render Windstream a necessary party. Plaintiff does not assert any claims against or seek damages from Windstream based on the automated calls made by RPM. Plaintiff's claims relate to RPM's conduct in using an automated telephone dialing system to call Plaintiff's cellular phone and George's authorization of those collection tactics. Windstream can easily be subpoenaed in this case if discovery from it is needed. Furthermore, the Court is not persuaded that Windstream has

10

an interest in the action such that it will be unable to protect its interests or leave it at risk of incurring double, multiple, or inconsistent obligations.

Even if Windstream was a necessary party, neither Defendant has adequately briefed the issue of why dismissal would be justified under Rule 19(b).[8] Accordingly, dismissal for failure to join Windstream is not warranted.

### C. Viability of Claims Against George

Courts have held that an individual acting on behalf of a corporation may be held personally liable for TCPA violations where they "had direct, personal participation in or personally authorized the conduct found to have violated the statute." *Van Sweden Jewelers, Inc. v. 101 VT, Inc.*, No. 1:10-cv-253, 2012 WL 4074620, at *8 (W.D. Mich. June 21, 2012) (citing *Texas v. Am. Blastfax*, 164 F. Supp. 2d 892, 898 (W.D. Tex. 2001)); *see also Sandusky Wellness Center, LLC v. Wagner Wellness, Inc.*, No 3:12-cv-2257, 2014 WL 1333472, at *3 (N.D. Ohio Mar. 28, 2014) (finding individual could be personally liable for violations of the TCPA where there was evidence of his personal involvement). George argues that claims against him must be dismissed for failure to state a claim. The Court disagrees. Plaintiff alleges that George was RPM's highest-ranking officer and responsible for all RPM business operations and that he was in charge of implementing TCPA procedures at RPM. (Doc. 18 at PageID 128, ¶ 3, PageID 138, ¶ 39.) At this early stage, the facts pled are sufficient to allege that George personally authorized

---

[8] Notably, the Court asked RPM to do so in its Supplemental filing. RPM completely disregarded and did not address the Court's questions about its Rule 19 analysis in its Supplemental Memorandum. George, who filed his Motion to Dismiss later and is represented by the same attorney as RPM, also did not adequately address Rule 19(b) in his subsequent filings.

11

the conduct alleged to have violated the TCPA and to therefore withstand a motion to dismiss.[9] As such, George's Motion to Dismiss is denied.

## IV.  MOTION FOR COSTS AND ATTORNEY'S FEES

Having found that the Defendants' Motions to Dismiss are without merit, the Court now turns to Plaintiff's Motion for Costs and Attorney's Fees. (Doc. 38.) Plaintiff's counsel, Adam Sadlowski, moves under Federal Rule of Civil Procedure 4 for the costs of service of summons upon Defendant George and for recovery of reasonable attorney's fees incurred in preparing a motion to collect those costs. He argues that George deliberately evaded service and lacked good cause to avoid the unnecessary expense of serving the summons. This case has been rife with needless contention, and evasion of service is among the many disputes that have backlogged the docket of this case and cost the Court unnecessary judicial resources. As set forth below, Plaintiff's motion is well-taken and will be granted.

Under Rule 4(d), "Waiving Service:"

(1) *Requesting a Waiver.* An individual, corporation, or association that is subject to service under Rule 4(e), (f), or (h) has a duty to avoid unnecessary expenses of serving the summons. The plaintiff may notify such a defendant that an action has been commenced and request that the defendant waive service of a summons. The notice and request must:
  (A) be in writing and be addressed:
      (i) to the individual defendant; or
      (ii) for a defendant subject to service under Rule 4(h), to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process;
  (B) name the court where the complaint was filed;
  (C) be accompanied by a copy of the complaint, 2 copies of the waiver form appended to this Rule 4, and a prepaid means for returning the form;
  (D) inform the defendant, using the form appended to this Rule 4, of the consequences of waiving and not waiving service;

---

[9] The Court notes that Plaintiff attached discovery responses in support of its argument that the claims pled against George are viable. The Court does not rely upon those responses in determining whether the Complaint allegations are sufficient to state a claim.

(E) state the date when the request is sent;
(F) give the defendant a reasonable time of at least 30 days after the request was sent--or at least 60 days if sent to the defendant outside any judicial district of the United States--to return the waiver; and
(G) be sent by first-class mail or other reliable means.

(2) *Failure to Waive.* If a defendant located within the United States fails, without good cause, to sign and return a waiver requested by a plaintiff located within the United States, the court must impose on the defendant:
(A) the expenses later incurred in making service; and
(B) the reasonable expenses, including attorney's fees, of any motion required to collect those service expenses.

Fed. R. Civ. P. 4.

On June 22, 2017, Plaintiff moved for leave to amend the Complaint to assert allegations against Defendant George, which the Court granted on July 14, 2017. (Doc. 16, July 14, 2017 Docket Entry.) On July 14, 2017, Sadlowski promptly sent defense counsel, Flynn, an email with a courtesy copy of the First Amended Complaint, Notice of Lawsuit, and Request to Waive Service of Summons. (Sadlowski Decl., Doc. 38-2 at PageID 553.) Unable to solicit a response from Flynn as to whether George intended to waive service despite his status as counsel for both George and RPM, on July 24, 2017, Sadlowski mailed Flynn the following documents via certified U.S. mail: a First Amended Complaint, Notice of Lawsuit, two copies of the Waiver of Service of Summons, and a postage pre-paid, self-addressed envelope for return of the Waiver to Plaintiff's counsel. (*Id.*) On August 16, 2017, Sadlowski contacted Flynn to ask whether George intended to waive service. (*Id.*) Flynn did not respond. (*Id.*) On August 24, 2017, Plaintiff filed his request for Issuance of Summons with the Court, retained a process server in Washington, and filed the executed summons with the Court on October 9, 2017. (*Id.*; *see* Oct. 9, 2017 Minute Entry.) The Court notes that in the meantime, Flynn had many *other* communications with Sadlowski and the Court, including communications over multiple

13

discovery disputes and filing a Motion to Dismiss. (*See, e.g.,* Doc. 20, Motion to Dismiss filed

August 10, 2017; August 18, 2017 Minute Entry re: Discovery Dispute; August 31, 2017 Minute

Entry re: Discovery Dispute.)

George argues that Plaintiff is not entitled to the costs of service of summons and

reasonable attorney's fees because he did not strictly comply with Rule 4(d). He argues the

written notice and request for waiver must be written to the *Defendant*, and Sadlowski addressed

this to *Defendant's counsel*. George also claims that he only received eight days to return the

waiver. The Court rejects both of these arguments. Communications between Sadlowski and

Flynn provided to the Court in support of Plaintiff's Motion make clear that Flynn was—and

is—representing George in this matter. Moreover, as Sadlowski points out, he has an ethical

duty not to communicate directly to an individual known to be represented by counsel.

Furthermore, communications provided to the Court also demonstrate that George was given at

least thirty days to return the waiver.

Under Fed. R. Civ. P. 4(d), a defendant may only refuse to return a waiver of summons of

service for good cause. Good cause has not been shown here. Rather, defense counsel has

demonstrated a pattern of dilatory tactics that have needlessly delayed this case from moving

forward. Accordingly, the Court finds that under Rule 4(d)(2), Plaintiff is entitled to the fees and

costs of service and reasonable attorney's fees for preparing and defending a motion to obtain

such fees and costs.

Sadlowski requests $1,770.00 for attorney's fees and $157.49 for costs of service of

summons, which the Court finds reasonable. He is an attorney with 12 years of experience.

(Doc. 38-2 at PageID 556–57.) His billing rate is $295/hour, and he spent 3.5 billable hours

14

preparing his Motion and 2.5 billable hours preparing a reply.[10] (Doc. 38-2 at PageID 552–53, Doc. 42-1 at PageID 645–46.) The Court finds Sadlowski's billing rate to be fair and reasonable. The cost of service of process in Washington was $157.49 is also reasonable given that a process servicer had to be hired to serve George in the state of Washington. (Doc. 38-2 at PageID 553.) Accordingly, the Court finds that Plaintiff is entitled under Rule 4 to recover from George the costs of attorney's fees and service.

## V. CONCLUSION

For the reasons set forth herein, RPM's Motion to Dismiss (Doc. 20) and George's Motion to Dismiss (Doc. 37) are DENIED. Plaintiff's Motion for Costs and Attorney's Fees (Doc. 38) is GRANTED, and Plaintiff is entitled to recover $157.49 in costs and $1,770.00 in fees from Defendant George.

**IT IS SO ORDERED.**

___s/Susan J. Dlott_____
Judge Susan J. Dlott
United States District Court

---

[10] Courts in this district often refer to the 1983 Rubin Committee rates as a basis for comparison. *Hunter v. Hamilton Cty. Bd. Of Elections*, No. 1:10-cv-820, 2013 WL 5467751, at *17 (S.D. Ohio Sept. 30, 2013). Judges in the Southern District of Ohio often refer to the 1983 Rubin Committee rates and apply a 4% annual cost-of-living allowance to measure the reasonableness of fees requested. *Id.* That committee arrived at the following categories and hourly rates for 1983: Paralegals—$37.91/hour; Law Clerks—$23.96/hour; Young Associates (2 years of experience or less)—$61.77/hour; Intermediate Associates (2 to 4 years of experience)—$71.62/hour; Senior Associates (4 to 5 years of experience)—$82.81/hour; Young Partners (6 to 10 years of experience)—$96.39/hour; Intermediate Partners (11 to 20 years of experience)—$113.43/hour; and Senior Partners (21 or more years of experience)—$128.34/hour. *Id.* at n.9. By the Court's calculation, an Intermediate Partner Rate in 2018 would be $458.91. Sadlowski's requested rate of $295 is therefore well below the Rubin Rate.

Sean P. Flynn
SFLYNN@GRSM.COM
Direct Dial: (949) 255-6958



GORDON&REES
SCULLY MANSUKHANI

2211 Michelson Drive, Suite 400
Irvine, California 92612
Phone: (949) 255-6950
WWW.GRSM.COM

January 23, 2019

<u>Via Email Only</u>

Honorable Magistrate Judge Karen L. Litkovitz
Potter Stewart U.S. Courthouse, Room 716
100 East Fifth Street
Cincinnati, OH 45202
litkovitz_chambers@ohsd.uscourts.gov

Re:   ***Phillip Ramsey v. Receivables Performance Management, LLC and Howard George***
      Case No.:   1:16-cv-01059-SJD

Dear Magistrate Litkovitz:

   This firm represents Defendants Receivables Performance Management, LLC and Howard George ("Defendants"). Pursuant to Your Honor's January 23, 2019 Order[1], we hereby submit our brief regarding the recently discovered Arbitration Agreement affecting this case.

   On January 8, 2019, the Supreme Court issued its opinion in *Schein v. Archer & White* 2019 U.S. LEXIS 566. Therein, the Court clearly an unambiguously stated that the matter of Arbitration is a matter of contract and courts must enforce those contracts as written, irrespective of any opposing party's claim that the arbitration claim lacks merit. *Id.* at, **7-8.

   Here, on December 26, 2018, after years of informally attempting to obtain the operative service contract between Plaintiff and Windstream, Windstream produced the operative agreement in response to a Defendants Document Subpoena. While the document is arguably necessary to establish Plaintiff's Ohio Consumer Sales Practices Act claim and thus a document which should have (but was not) disclosed on Plaintiff's Initial Disclosures, Defendants specifically requested Plaintiff produced the agreement in Request for Production of Documents number 9, but Plaintiff refused and never even requested a copy from Windstream. Needless to say, the reason for Plaintiff's refusal to cooperate in Discovery and produce the requested service agreement, *inter alia*, is patently obvious, because therein Plaintiff agreed that:

   [A]ny claim or controversy related in any way to Windstream's Services, including charges for Services, Equipment, Service Order(s) or our agreements pursuant to these Terms or any other agreements, whether the dispute arises in tort, contract, by statute or any other legal theory and whether the dispute arises under this or any prior agreement with us or arises after your Services with Windstream are terminated[, would be submitted to binding arbitration.]

---

[1] In the interests of following the spirit of Your Honor's Order and keeping our submission "brief", we are not attaching copies of any of the referenced documents, although Defendants are willing to provide copies if the Court would find them useful for Thursday's Conference.

ALABAMA ♦ ARIZONA ♦ CALIFORNIA ♦ COLORADO ♦ CONNECTICUT ♦ FLORIDA ♦ GEORGIA ♦ ILLINOIS ♦ MARYLAND ♦
MASSACHUSETTS ♦ MISSOURI ♦ NEVADA ♦ NEW JERSEY ♦ NEW YORK ♦ NORTH CAROLINA ♦ OREGON ♦ PENNSYLVANIA
♦ SOUTH CAROLINA ♦ SOUTH DAKOTA ♦ TEXAS ♦ VIRGINIA ♦ WASHINGTON ♦ WASHINGTON, DC

RPM is legally entitled to enforce this Arbitration Agreement because as Windstream's agent, where a debt incurred under a contract containing an arbitration provision is assigned to another for debt collection, the debt collector stands in the shoes of the assignor and may enforce the arbitration provision. *Tickanen v. Harris, Ltd.*, 461 F. Supp. 2d 863, 870 (E.D. Wis. 2006); *Paragon Micro, Inc. v. Bundy*, 22 F. Supp. 3d 880, 889 (N.D. Ill. 2014); and *Zurich Am. Ins. Co. v. Watts Indus.*, 417 F.3d 682, 687 (7th Cir. 2005) (*citing Fyrnetics (H.K.) Ltd. v. Quantum Grp., Inc.*, 293 F.3d 1023, 1029 (7th Cir. 2002)). But for Plaintiff's concealment and refusal to produce his service agreement, this issue would have been resolved months, if not years ago.

On December 27, 2018 (the day after the Arbitration Agreement was produced by Windstream), Defendants provided a copy of the documents to Plaintiff's Counsel along with a request that this case proceed in Arbitration. Plaintiff's Counsel responded that RPM had Waived any right to pursue Arbitration. For the following reasons, Plaintiff's statement is untrue.

Plaintiff's Counsel has pointed to a March 28, 2017 e-mail he sent regarding a copy of a service agreement used in *Loney v. State Collection Service*, that contained an arbitration clause. First, it is important to note that the moving party in *Loney* was the pro per plaintiff, who in other related decisions from the district court in North Carolina describe that plaintiff as a what would be termed a vexatious litigant. The defendant in that case, unlike the Defendants here, did not claim to be a party to the service agreement. Thus, whatever authoritative weight the *Loney* case may provide to Plaintiff in this case, is certainly circumspect.

In any event, Plaintiff Counsel's email makes clear it was Plaintiff's position the service agreement from the *Loney* case did not apply to this case. Indeed, Plaintiff's Counsel admits in the email that he found the *Loney* case prior to filing the present case and states that prior to filing this case he thoroughly investigated the arbitration issue and found no evidence of any arbitration clause. Plaintiff's contention now that this document found and reviewed prior to filing this lawsuit which he contended did not apply to him, is now somehow evidence that Defendants Waived any right to compel Arbitration is befuddling. Thus, there are no facts that support waiver such as in the *Loney* case, or the only other case Plaintiff has thus far relied on *Johnson Associates Corp. v. HL Operating Corp.*, 680 F.3d 713, 717-21 (6th Cir. 2012).

In *Johnson Associates*, the parties asserted claims based on a contract, a contract that both parties had at the outset of the litigation and that contained the subject arbitration provision. Thus, both parties were actually aware of the arbitration clause and proceed in litigation instead. As set forth above, neither party in this case actually knew there was an arbitration clause until December 27, 2018.

Plaintiff's Counsel also argued the May 17, 2017 Joint Status Report, Waived any right to compel Arbitration. The Joint Statement, however, clearly states that Defendants had not been able to locate the operative service contract at that time. Even during Plaintiff's deposition a year and a half later on October 28, 2018, he said he had not seen any agreement between himself and Windstream that contained an Arbitration Agreement. Two months later, Defendants obtained that Arbitration Agreement provided it to Plaintiff and made a demand that the case proceed in Arbitration, which Plaintiff has thus far rejected.

January 23, 2019
Page 3

Finally, generally speaking, if the party opposing arbitration claims Waiver by the moving party, there must be some prejudice as a result of the alleged Waiver, if not then waiver does not apply. Unlike in *Johnson Associates, supra*, Defendants did assert Arbitration as an Affirmative Defense. Unlike *Johnson Associates, supra*, Defendants did not assert a counterclaim. Unlike *Johnson Associates, supra*, the contractual agreement to arbitrate was not a part of the claims alleged. Therefore, Plaintiff's claim of Waiver is wholly inconsistent with his own conduct in this case, and Defendants have promptly raised the issue.

Thank you in advance for your consideration of our clients' position, and we look forward to discussing this issue with Your Honor.

Respectfully Submitted,

*/s/ Sean Flynn*

SEAN P. FLYNN, ESQ.
*Attorney for Defendants*

cc: Plaintiff's Counsel