UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION (CINCINNATI)

| | | |
|---|---|---|
| PHILLIP RAMSEY, | : | CASE NO. 1:16-cv-1059 |
| Plaintiff, | : | Judge Susan J. Dlott |
| v. | : | Magistrate Judge Karen L. Litkovitz |
| RECEIVABLES PERFORMANCE MANAGEMENT, LLC, *et al.*, | : | **PLAINTIFF'S STATEMENT OF PROPOSED UNDISPUTED FACTS** |
| | : | |
| Defendants. | : | |
| | : | |

_____

Provided below is Plaintiff's Statement of Proposed Undisputed Facts.[1] Note that most of the undisputed facts in this case come from the mouths of Defendant Receivables Performance Management, LLC's own witnesses (Owner and Chief Executive Officer, Howard George, Chief Financial Officer and corporate witness, Christopher Vittoz, and General Counsel, Mark Case).

Pursuant to S.D. Ohio Rule 7.2(e) and Judge Dlott's Standing Order I.E.3., Plaintiff has filed with the Court the complete transcripts of the depositions cited in this Statement (See Doc. #70, 71, 72, 73, and 76), but has <u>not</u> attached to Plaintiff's Motion the relied upon excerpts of the previously filed deposition transcripts.[2]

---

[1] Plaintiff's Statement of Proposed Undisputed Facts is attached as Exhibit B to Motion of Plaintiff for Partial Summary Judgment on Claims Against Defendant Receivables Performance Management, LLC (hereafter, "Plaintiff's Motion").

[2] Judge Dlott Standing Order I.E.3. ("Where a deposition or other document is already in the record, the excerpts relied upon in support of the motion should not be filed as attachments in support of the motion.").

**EXHIBIT B**

## PHILLIP RAMSEY AND WINDTREAM COMMUNICATIONS, LLC

1. Plaintiff Phillip Ramsey ("Plaintiff"), is, and was as all  relevant times and up to the present day, an adult citizen and resident of the state of Ohio, residing at 7919 Colette Lane, Cincinnati, Ohio 45224. Affidavit of Phillip Ramsey in Support of Motion of Plaintiff for Partial Summary Judgment on Claims Against Defendant Receivables Performance Management, LLC ("Ramsey Aff."), ¶2;[3] October 24, 2018 Deposition of Phillip L. Ramsey ("Ramsey Depo."), Doc. #73 at PageID #956.[4]

2. Plaintiff was during all relevant time periods the sole owner, subscriber, user, and possessor of a cellular telephone with an assigned number of 513-403-2590. Ramsey Aff., ¶3, Ex. C-1; Ramsey Depo., Doc. #73 at PageID #956. All negotiations and telephone communications by Plaintiff with Windstream Communications, LLC ("Windstream") occurred in the state of Ohio using Plaintiff's cellular telephone with an assigned number 513-403-2590. Ramsey Aff., ¶2.

3. Windstream is registered with the state of Ohio as a Foreign For-Profit Limited Liability Company and regularly conducts business in the state of Ohio. State of Ohio Certificate of Registration for Windstream Communications, LLC (attached as Exhibit S to Plaintiff's Motion);[5] Ramsey Aff., ¶¶2, 6-17, 19-20, Exs. C-3 to C-6, and C-11.

---

[3] The Affidavit of Plaintiff Phillip Ramsey and its accompanying exhibits (C-1 through C-11) are attached as Exhibit C to Plaintiff's Motion.

[4] The October 24, 2018 Deposition of Phillip L. Ramsey was filed with the Court on March 1, 2019.  Doc. #73, PageID #954 to 1006.

[5] Available at:  https://bizimage.sos.state.oh.us/api/image/pdf/201516625686 (last visited March 8, 2019).

4. In addition to his residence in Cincinnati, Ohio, Plaintiff also owned a small plot of land located at 54 Beech Drive, Burnside, Kentucky 42519 (hereafter, "54 Beech Drive") which had a small trailer on it where Plaintiff allowed his father to reside. Ramsey Aff., ¶4; Ramsey Depo., Doc. #73 at PageID #981.

5. Plaintiff's father suffers from dementia and was for a period of time under Plaintiff's court ordered guardianship as a result of his mental illness. Ramsey Aff., ¶5, Ex. C-2; Ramsey Depo., Doc. #73 at PageID #1000.

6. In early June 2014, Plaintiff ordered from Windstream certain satellite television, telephone, and internet services to be provided by Windstream at the 54 Beech Drive location. Ramsey Aff., ¶6, Ex. C-3; Ramsey Depo., Doc. #73 at PageID #981. As part of these services with Windstream, Plaintiff purchased DISH satellite television through Windstream. Id. The telephone number for this service was 606-561-8850. Id. Windstream provided Plaintiff with a Windstream account number 162418057 (hereafter, the "1st Windstream Account") for these services. Id. The billing address for the 1st Windstream Account was Plaintiff's home address at 7919 Colette Lane, Cincinnati, Ohio 45224. Id.

7. As a result of his mental illness, in June and July 2014, Plaintiff's father purchased nearly 200 on-demand movies without Plaintiff's authorization or knowledge. Ramsey Aff., ¶7, Exs. C-3 and C-4; Ramsey Depo., Doc. #73 at PageID #967. Based on Windstream's invoices, the charges for these on-demand movies totaled $1,174.19. Id.

8. After receiving the invoices from Windstream showing these unauthorized on-demand purchases, in July and August 2014, Plaintiff called Windstream's customer service on multiple occasions and spoke with Windstream representatives to dispute the charges and

have these unauthorized charges removed from his account. <u>Ramsey Aff.</u>, ¶8; <u>Ramsey Depo.</u>, Doc. #73 at PageID #958. After several conversations with Windstream representatives via telephone, Windstream representatives on multiple occasions agreed to remove these unauthorized charges from the 1st Windstream Account. <u>Id</u>.

9. Notwithstanding the Windstream's promises and agreements, beginning in August 2014, Windstream's own debt collection department began collection efforts against Plaintiff relating to the $1,174.19 amount which Windstream had agreed to remove from his account. <u>Ramsey Aff.</u>, ¶9; <u>Ramsey Depo.</u>, Doc. #73 at PageID #982. These collection efforts included Windstream making repeated calls to Plaintiff's cellular telephone and sending him collection letters. <u>Id</u>.

10. On August 22, 2014, Windstream sent a collection letter to Plaintiff stating that the disputed amounts were owed and that Windstream was going to send his account to collections if he did not make payment for the unauthorized charges. <u>Ramsey Aff.</u>, ¶10, Ex. C-5.

11. On August 28, 2014, Plaintiff spoke with a Windstream representative and instructed Windstream to "stop calling" him; Plaintiff also explained that the on-demand changes were the result of his father's mental illness, and asked the charges to be removed from his Windstream account. <u>Ramsey Aff.</u>, ¶11; <u>Ramsey Depo.</u>, Doc. #73 at PageID #971. Plaintiff kept contemporaneous notes of his August 28, 2014 call with Windstream. <u>Ramsey Aff.</u>, ¶¶10-11, Ex. C-5; <u>Ramsey Depo.</u>, Doc. #73 at PageID #971-972.

12. As shown in Plaintiff's October 28, 2014 Windstream invoice, on September 19, 2014, Windstream credited $1,174.19 to Plaintiff's 1st Windstream Account and effectively

removed the unauthorized on-demand purchases from Plaintiff's account. Ramsey Aff., ¶12, Ex. C-6.

13. Despite these agreements and conversations with Windstream and the credits being applied to Plaintiff's Windstream account, Windstream continued with its debt collection efforts through repeated calls and letters to Plaintiff. Ramsey Aff., ¶13, Ex. C-7; Ramsey Depo., Doc. #73 at PageID #982. As a result of these continued collection efforts and his father's poor health, on or around October 20, 2014, Plaintiff called Windstream to cancel all of his Windstream services and again instructed Windstream to "stop calling me." Id. Around October 21, 2014, Windstream closed the 1st Windstream Account. Id.

14. Despite Plaintiff's frustrations with Windstream, he still wanted his father to have access to services at the 54 Beech Drive location. Ramsey Aff., ¶13; Ramsey Depo., Doc. #73 at PageID #981-982. Consequently, on or around October 29, 2014, Plaintiff called Windstream to request reactivation of the services at the 54 Beech Drive location. Id. Windstream opened a new account for Plaintiff for the reactivated services and Windstream provided Plaintiff with a new Windstream account number 162472801 for the reactivated services (hereafter, the "2nd Windstream Account"). Id., Ex. C-8.

15. Plaintiff continued to receive collection calls from Windstream regarding the 1st Windstream Account relating to the $1,174.19 charges Windstream had previously removed from his account and during these calls Plaintiff repeatedly instructed Windstream to "cease" all communications and to "stop calling me." Ramsey Aff., ¶15; Ramsey Depo., Doc. #73 at PageID #958, 982, 985-988, 992, 994-995, 1004.

16. Immediately after reactivating the services, Plaintiff's father was admitted to the hospital as a result of his ongoing medical issues. Ramsey Aff., ¶15.

17. As a result of the continued collection calls from Windstream and the fact his father was in the hospital and therefore did not need access to the services, Plaintiff called Windstream on October 31, 2014 and cancelled the 2nd Windstream Account. Ramsey Aff., ¶16, Ex. C-8; Ramsey Depo., Doc. #73 at PageID #981, 992, 1004. During this call on October 31, 2014, Plaintiff cancelled all services with Windstream and again instructed Windstream and its debt collectors to "stop all calls" and "never contact me again." Id. Following his October 31, 2014 instruction to Windstream to cancel all services, and to "stop all calls" and "never contact me again," Plaintiff never requested, activated, or received any further services from Windstream. Ramsey Aff., ¶16; Ramsey Depo., Doc. #73 at PageID #1004.

18. Notwithstanding Plaintiff's repeated oral instructions to "stop all calls" and "never contact me again," Windstream continued its debt collection efforts against Plaintiff, which soon included using a third-party debt collector (First Collections Services). Ramsey Aff., ¶15, 17; Ramsey Depo., Doc. #73 at PageID #958, 982, 985-988, 992, 994-995, 1004.

19. In response to these continued collection efforts by Windstream, Plaintiff sent a letter dated November 16, 2014 to Windstream disputing the purported on-demand charges which Windstream previously agreed to remove and the letter also expressly instructed Windstream "and any affiliated collection agencies to cease all communications with me in regards to the Windstream account associated with Phillip Ramsey" and "once you receive a letter of dispute it is your obligation to cease all communication with Phillip Ramsey . . . ." Ramsey Aff., ¶18, Ex. C-9; Ramsey Depo., Doc. #73 at PageID #974-976. Plaintiff sent the

6

November 16, 2014 letter to Windstream via U.S. Postal Service Priority 2-Day Mail and it was delivered to Windstream on November 19, 2014. Id.

20. After sending the November 16, 2014 letter, Windstream's debt collector efforts continued against Plaintiff in the form of calls and letters to Plaintiff. Ramsey Aff., ¶19, Ex. C-10; Ramsey Depo., Doc. #73 at PageID #982. In a collection letter dated November 24, 2014 sent to Plaintiff, Windstream acknowledged the cancellation of his Windstream accounts. Ramsey Aff., ¶19, Ex. C-10.

21. The final invoice that Plaintiff received from Windstream shows that Windstream agreed to waive the unauthorized charges and Plaintiff owed a balance of $0.00 after he cancelled his services with Windstream. Ramsey Aff., ¶20, Ex. C-11. All payments Plaintiff ever made or sent to Windstream were made in or sent from the state of Ohio. Id.

22. After cancelling his accounts with Windstream, Plaintiff never provided Windstream with his cellular telephone number and Plaintiff never provided Windstream with his consent for Windstream or any third-party associated with Windstream to contact him by any means. Ramsey Aff., ¶21; Ramsey Depo., Doc. #73 at PageID #1004.

23. Plaintiff never provided Defendant Receivables Performance Management LLC ("RPM") with his cellular telephone number. Ramsey Aff., ¶22; Ramsey Depo., Doc. #73 at PageID #1004.

24. Plaintiff never provided RPM with his consent for RPM to contact him by any means. Ramsey Aff., ¶23; Ramsey Depo., Doc. #73 at PageID #1004.

## DEFENDANT RECEIVABLES PERFORMANCE MANAGEMENT, LLC

25. Defendant Receivables Performance Management, LLC ("RPM"), is debt collection agency located in Lynnwood, Washington that specializes in collecting debt on behalf of creditor clients in the telecommunications industry. October 9, 2018 Deposition of Howard L. George, II ("George Depo."), Doc. #72 at PageID #938.[6]

26. RPM had a contract with Windstream during the relevant time period to collect on delinquent Windstream account debts. George Depo., Doc. #72 at PageID #939-940; January 28, 2019 Rule 30(b)(6) Deposition of Christopher A. Vittoz ("Vittoz Rule 30(b)(6) Depo."), Doc. #76 at PageID #1029.[7]

## THE PICK DATABASE USED BY RPM

27. As part of operations, RPM maintained and used an internal electronic database called the "Pick" database. George Depo., Doc. #72 at PageID #943; October 8, 2018 Deposition of Christopher A. Vittoz ("Vittoz I Depo."), Doc. #70 at PageID #906-908;[8] Vittoz Rule 30(b)(6) Depo., Doc. #76 at PageID #1030.

28. The Pick database contains information on debtor' accounts, including telephone numbers, addresses, and debt information supplied by RPM's clients and obtained by RPM. Id.

---

[6] The October 9, 2018 Deposition of Howard L. George, II was filed with the Court on March 1, 2019. Doc. #72, PageID #935 to 953.

[7] The January 28, 2019 Rule 30(b)(6) Deposition of Christopher A. Vittoz was filed with the Court on March 6, 2019. Doc. #76, PageID #1019 to 1052.

[8] The October 8, 2018 Deposition of Christopher A. Vittoz was filed with the Court on March 1, 2019. Doc. #70, PageID #901 to 924.

29. When RPM obtains an account from Windstream, account information was programmed into the Pick database. Vittoz Rule 30(b)(6) Depo., Doc. #76 at PageID #1025, 1030-1031, 1042-1051. The Pick database also tracked all of RPM's debt collection activities, including tracking all calls placed by RPM to consumers using the Noble Predictive Dialer. Id.

30. For each client account placed with RPM, the Pick database is able to generate a Pick report for that account which outlines all collection activities undertaken by RPM on that account. Vittoz Rule 30(b)(6) Depo., Doc. #76 at PageID #1042-1051.

## THE NOBLE PREDICTIVE DIALER USED BY RPM

31. To call suspected consumers (including Plaintiff), RPM used a telephone dialing system manufactured by a company named Noble Systems. Vittoz I Depo., Doc. #70 at PageID #913. The Noble telephone system used by RPM in relevant time period of 2014 to 2015 is called the "Noble Predictive Dialer" and is also known as "Maestro." Vittoz Rule 30(b)(6) Depo., Doc. #76 at PageID #1036, 1042.

32. The Noble Predictive Dialer was configured to interface with RPM's Pick database. Vittoz Rule 30(b)(6) Depo., Doc. #76 at PageID #1025, 1044.

33. The Pick database contains information on debtor' accounts, including telephone numbers, address, and debt information supplied by RPM's clients. Vittoz Rule 30(b)(6) Depo., Doc. #76 at PageID #1025.

34. When RPM obtains an account from Windstream, RPM programmed account information into the Pick database, which then would automatically import the telephone numbers into

the Noble Predictive Dialer to create dial lists. <u>Vittoz I Depo.</u>, Doc. #70 at PageID #908; <u>Vittoz Rule 30(b)(6) Depo.</u>, Doc. #76 at PageID #1025.

35. An RPM representative would program the Noble Predictive Dialer with instructions as to when to call a particular number. <u>Vittoz I Depo.</u>, Doc. #70 at PageID #921-922; <u>Vittoz Rule 30(b)(6) Depo.</u>, Doc. #76 at PageID #1025-1026, 1038. Generally, RPM would create a call dial list the evening before or the morning of a dial list campaign. <u>Vittoz I Depo.</u>, Doc. #70 at PageID #921-922; <u>Vittoz Rule 30(b)(6) Depo.</u>, Doc. #76 at PageID #1025, 1025. Once activated (an RPM representative pressed "start"), the Noble Predictive Dialer then automatically dials the numbers sequentially in the order the numbers appear on the dialing list without any human intervention. <u>Vittoz I Depo.</u>, Doc. #70 at PageID #921-922; <u>Vittoz Rule 30(b)(6) Depo.</u>, Doc. #76 at PageID #1025, 1038. The sequence of the list is determined by the pre-programmed time to call each number, and dialer automatically dials the numbers sequentially from the stored list of telephone numbers. <u>Id</u>.

36. When the Noble Predictive Dialer automatically dials a number, it simply routes the number to the outbound collection floor for an available RPM debt collector. <u>Vittoz I Depo.</u>, Doc. #70 at PageID #921-922; <u>Vittoz Rule 30(b)(6) Depo.</u>, Doc. #76 at PageID #1025-1026, 1038. If the consumer does not answer or no RPM debt collector is available, then the call is automatically disconnected. <u>Vittoz Rule 30(b)(6) Depo.</u>, Doc. #76 at PageID #1038.

37. To summarize, the Noble Predictive Dialer used by RPM during the relevant time period of this lawsuit (2014 and 2015) automatically "list dialed" consumers by (1) making calls from a stored list of pre-programmed telephone numbers, (2) making calls sequentially according to a pre-programmed time for the calling campaign, (3) transferring the calls to an RPM

collector to speak with the debtor, and (4) disconnecting the call if the consumer did not answer—all without human intervention. Vittoz I Depo., Doc. #70 at PageID #921-922; Vittoz Rule 30(b)(6) Depo., Doc. #76 at PageID #1025-1026, 1038, 1042-1051.

38. If a consumer's account with RPM was marked as having prior express consent to be contacted, then RPM used the foregoing automated "list dialing" function of the Noble Predictive Dialer to call a consumer. Vittoz Rule 30(b)(6) Depo., Doc. #76 at PageID #1026, 1032, 1044, 1047.

39. RPM had Plaintiff's prior express consent marked as affirmative for his Windstream accounts. Vittoz Rule 30(b)(6) Depo., Doc. #76 at PageID #1032, 1044, 1047; RPM Pick Report for Plaintiff's 1st Windstream Report ("1st Pick Report"); RPM Pick Report for Plaintiff's 2nd Windstream Report ("2nd Pick Report").[9]

40. RPM has failed to produce any evidence to show RPM used the Noble Predictive Dialer in any manner other than list dialing to contact Plaintiff. Id.

41. RPM prepared Pick reports for both Plaintiff's 1st Windstream Account and 2nd Windstream Account which contains all collection activities taken by RPM against Plaintiff, including listing all calls made by RPM using the Noble Predictive Dialer to call Plaintiff's cellular telephone. Vittoz Rule 30(b)(6) Depo., Doc. #76 at PageID #1042-1051; 1st Pick Report; 2nd Pick Report.

---

[9] The 1st Pick Report and 2nd Pick Report are attached as Exhibit Q and R, respectively, to Plaintiff's Motion. The 1st Pick Report and 2nd Pick Report are authenticated at Vittoz Rule 30(b)(6) Depo., Doc. #76 at PageID #1044, 1049.

## RPM'S COLLECTION EFFORTS AGAINST PLAINTIFF

42. On February 19, 2015, Windstream placed Plaintiff's 2nd Windstream Account with RPM for debt collection purposes. Vittoz Rule 30(b)(6) Depo., Doc. #76 at PageID #1047; 2nd Pick Report.

43. Between February 20, 2015 and March 30, 2015, RPM used its Noble Predictive Dialer to call Plaintiff's cellular telephone (513-403-2590) a total of 97 times. Vittoz Rule 30(b)(6) Depo., Doc. #76 at PageID #1048; 2nd Pick Report.

44. On March 30, 2015, Windstream placed Plaintiff's 1st Windstream Account with RPM for debt collection purposes. Vittoz Rule 30(b)(6) Depo., Doc. #76 at PageID #1045; 1st Pick Report.

45. Between March 31, 2015 and July 7, 2015, used its Noble Predictive Dialer to call Plaintiff's cellular telephone (513-403-2590) a total of 148 times. Vittoz Rule 30(b)(6) Depo., Doc. #76 at PageID #1047; 1st Pick Report.

46. Prior to Plaintiff's Windstream accounts ever being placed with RPM for collections, Plaintiff repeatedly orally instructed Windstream to stop all calls and communications with Plaintiff regarding all his Windstream accounts, including on October 31, 2014 when Plaintiff cancelled all services with Windstream. Ramsey Aff., ¶¶15-16, Ex. C-8; Ramsey Depo., Doc. #73 at PageID #958, 981, 982, 985-988, 992, 994-995, 1004.

47. Prior to Plaintiff's Windstream accounts ever being placed with RPM for collections, Plaintiff sent the November 16, 2014 letter from Cincinnati, Ohio to Windstream, which

Windstream received on November 19, 2014. <u>Ramsey Aff.</u>, ¶18, Ex. C-9; <u>Ramsey Depo.</u>, Doc. #73 at PageID #974-976.

48. RPM's general counsel (Mark Case) and corporate witness (Chris Vittoz) conceded the November 16, 2014 letter to Windstream was a valid revocation of consent under the TCPA, and RPM would have ceased all communications with Plaintiff had RPM known of the letter. <u>October 8, 2018 Deposition of Mark T. Case</u> ("<u>Case Depo.</u>"), Doc. #71 at PageID #929-930;[10] <u>Vittoz Rule 30(b)(6) Depo.</u>, Doc. #76 at PageID #1030-1031.

49. RPM's general counsel (Mark Case) also conceded RPM did not have a policy or procedure in place to determine if a consumer communicated with a Windstream prior to the consumer's debt being placed with RPM. <u>Case Depo.</u>, Doc. #71 at PageID #929-930. For example, if a consumer instructed Windstream to cease all communications with the consumer and this communication was sent by the consumer to Windstream before the debt was placed with RPM for collections, then RPM did not have a policy or procedure in place to ensure it obtained those communication or instructions from Windstream. <u>Id</u>. As a result of RPM's failure to have such a policy in place, RPM never obtained Plaintiff's oral and written instructions to Windstream to stop all calls and cease all communications. <u>Id</u>.; <u>Vittoz Rule 30(b)(6) Depo.</u>, Doc. #76 at PageID #1031-1033.

50. RPM never asked Windstream if Plaintiff had sent any instructions to Windstream regarding his Windstream accounts. <u>Vittoz Rule 30(b)(6) Depo.</u>, Doc. #76 at PageID #1030-1031, 1033.

---

[10] The October 8, 2018 Deposition of Mark T. Case was filed with the Court on March 1, 2019. Doc. #71, PageID #925 to 934.

51. Plaintiff never provided RPM with his cellular telephone number or with his "prior express consent" under the TCPA to be contacted on his cellular telephone by any means, including an ATDS under the TCPA. <u>Ramsey Aff.</u>, ¶¶21-23; <u>Ramsey Depo.</u>, Doc. #73 at PageID #1004. <u>Vittoz Rule 30(b)(6) Depo.</u>, Doc. #76 at PageID #1031-1033.

52. RPM has produced no evidence to show Plaintiff ever provided RPM with "prior express consent" to be called on his cellular telephone phone with an ATDS. (No testimony, evidence, or exhibits have been produced by RPM to refute this material fact). <u>Vittoz Rule 30(b)(6) Depo.</u>, Doc. #76 at PageID #1030-1033.

53. RPM used its Noble Predictive Dialer's to call Plaintiff's' cellular telephone a total of 245 during the period of February to July 2015. <u>1st Pick Report</u>; <u>2nd pick Report</u>; <u>Vittoz Rule 30(b)(6) Depo.</u>, Doc. #76 at PageID #1047-1048.

54. RPM concedes all calls to Plaintiff were made for purposes of debt collection and not made for any "emergency" purpose. <u>Vittoz Rule 30(b)(6) Depo.</u>, Doc. #76 at PageID #1049.