**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION – CINCINNATI**

| | | |
|---|---|---|
| PHILLIP RAMSEY, | : | Case No. 1:16-cv-1059 |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| RECEIVABLES PERFORMANCE | : | |
| MANAGEMENT, LLC, et al., | : | |
| | : | |
| Defendants. | : | |

---

### MEMORANDUM OPINION AND ORDER
---

This case is before the Court on cross motions for summary judgment. (Docs. 80, 82.) Plaintiff Phillip Ramsey alleges that Defendants Receivables Performance Management, LLC (RPM) and Howard George violated the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 *et seq.*, and the Ohio Consumer Sales Practices Act (OCSPA), Ohio Revised Code § 1345 *et seq.*, by using automated technology to call his cell phone without his consent 245 times. He has moved for partial summary judgment (Doc. 80). He seeks judgment on both of his claims against RPM. (He does not move for summary judgment on his claims against Defendant Howard George or the issue of whether Defendants willfully and knowingly violated the TCPA. Doc. 80 at 1.) Defendants also move for summary judgment on Ramsey's claims.

For the reasons below, the Court denies summary judgment for Defendants and grants in part and denies in part summary judgment for Ramsey.

## FACTS

In 2014, Phillip Ramsey was appointed guardian over his father, who was suffering from a form of dementia. His father moved into a trailer that Ramsey kept on his property. That summer, Ramsey subscribed to Windstream Communications, LLC, for DISH satellite television, telephone, and internet services. Through that service, Ramsey's father purchased nearly 200 on-demand movies without Ramsey's knowledge or consent. The charges for the movies added up to $1,174.19. In August of that year, Windstream sent a collection letter to Ramsey stating that he owed Windstream for the on-demand movies and that it was going to send his account to collections if he did not pay. (Doc. 89-2 at ¶ 10.)

Ramsey cancelled his Windstream service, but later requested reactivation of his services in late October 2014, resulting in a second Windstream account. (Doc. 89-2 at ¶ 14, Page ID 1781.) Windstream continued to make collection calls to Ramsey about the charges associated with the first account. During these calls, Ramsey repeatedly told Windstream to stop calling him. (*Id.* at ¶ 15.) On November 16, 2014, Ramsey sent a letter to Windstream requesting that Windstream and any affiliated collection agencies cease all communications with him. (*Id.* at ¶ 19; Doc. 80-3 at Page ID 1158, Ex. C-9.)

Enter Defendant Receivables Performance Management (RPM). RPM is a debt collection agency in Washington State that specializes in collecting debt on behalf of creditors that work in telecommunications. (Doc. 89-2 at ¶ 25.) On February 19, 2015, Windstream placed Ramsey's second account with RPM for debt collection and, on March 30, 2015, did the same for the first account. (Doc. 87-1 at ¶ 4, Page ID 1670; Doc.

89-2 at ¶¶ 42, 44, Page ID 1793-94.) Windstream never communicated Ramsey's November 2014 cease-contact letter to RPM. (Doc. 87-1 at ¶ 5.) Over the next several months, RPM used a Noble Systems, Inc., telephone system—also known as the Noble Predictive Dialer—to call Ramsey's cell phone to attempt to collect the debt. (Doc. 89-2 at ¶¶ 53, 54.) Between February 20, 2015, and July 7, 2015, RPM used the Noble Predictive Dialer to call Ramsey's cell phone 245 times. (Doc. 87-1 at ¶ 11; 89-2 at ¶¶ 31, 43, 45, 53.)

As part of its operations, RPM used an internal electronic database called the PICK system. (Doc. 89-2 at ¶ 27.) The PICK system stored information on debtors' accounts, including telephone numbers, addresses, and debt information. (Doc. 89-2 at ¶ 28.) The PICK system and the Noble dialing system worked together. The Noble system had an automated function through which it generated and uploaded telephone numbers from the PICK system "each night automatically." (Doc. 70 at 18, Page ID 908.) According to Christopher Vittoz, RPM's Chief Financial Officer, "[t]he Pick system would each night go through and select accounts based on parameters that were entered into Pick for dialing the next day." (Doc. 76 at 91, Page ID 1044.) The accounts the PICK system selected "could be picked up into one of those list IDs, one of those campaigns," and then to the Noble dialing system and available for calling the next day. (*Id.*) A "campaign" was just a word for "a list of phone numbers" to be dialed. (Doc. 72 at 45-46, Page ID 947.) Thus, campaigns—that is, lists of phone numbers—would be built in the PICK system and then transferred to the Noble system. (Doc. 76 at 55.)

Calls went out to debtors in one of two ways: preview mode or list dialing. (Doc.

76 at 15-16.)  To dial a number in preview mode, the number "would have had to be in both Pick and Noble for that agent to initiate that phone call." (Doc. 76 at 17.)  In preview mode, an agent would "press a key to actually dial the phone number on that account." (Doc. 76 at 16-17.)

The other way was list dialing.  (Doc. 76 at 15-16.)  The Noble system was "primarily involved" in list dialing.  (Doc. 76 at 14.)  The RPM employee who ran the lists from day-to-day was Dan Parrott.  Overnight, the telephone numbers would be moved from the PICK system to the Noble system.  (*Id.* at 14.)  The lists contained names, phone numbers, and other information.  (Doc. 76 at 65.)  List dialing was the alternative to preview mode: if calls weren't going out in preview mode, then "Dan [was] kicking off that list of numbers." (Doc. 76 at 16.)  He would initiate the list-dialing "[e]ssentially [by] clicking a button to press play to have a list start." (*Id.* at 15.)  When Parrot initiated the list to be dialed, "it was time to play that campaign." (*Id.*)  At that point, "calls would go out from the dialer." (*Id.*)

When the Noble Predictive Dialer dialed a number, "the phone numbers would be called in the order that they appeared in the list . . . . [I]f that list connected with a person, somebody picked up the phone, then that would be connected over to an agent." (Doc. 76 at 67-68, Page ID 1038.)  The Noble system connected consumers with agents by routing the call to the outbound collector floor, at which point the system would "hunt[] for an unoccupied outbound station.  The call then drops into the collector's bin, he or she answers the call and the Pick system displays the account information for that

debtor." (Doc. 70 at 72, Page ID 921.)

No one suggests that the calls went out to Ramsey in any way other than through the Noble Predictive Dialer in list-dialing mode. RPM used preview mode for consumer accounts that were not marked as having prior express consent. (Doc. 76 at 17-18.) But in Ramsey's case, RPM had designated his account as having his prior express consent. (Doc. 89-2 at ¶ 39; Doc. 76 at 89, Page ID 1044.) And the parties agree on two more things: first, if a consumer's account with RPM was designated as having prior express consent to be called, then RPM used the Noble Predictive Dialer's "list dialing" function. (Doc. 89-2 at ¶ 38.) Second, RPM indeed used the Noble Predictive Dialer to call Ramsey a total of 245 times between February and July 2015.

## ANALYSIS

When there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law, the court shall grant summary judgment. Fed. R. Civ. P. 56(a). A "mere scintilla" of evidence in support of the non-moving party's position is not enough to avoid summary judgment. *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005). Rather, to preclude summary judgment, there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

The parties agree that much of this case depends on whether the Noble Predictive Dialer falls under the definition of an "automatic telephone dialing system" (ATDS, or autodialer), as defined by 47 U.S.C. § 227(a)(1). Ramsey says it does. Defendants say it does not. But not every use of an ATDS is unlawful: the TCPA provides exceptions for

calls made for emergency purposes or made with the called party's prior express consent. 47 U.S.C. § 227(b)(1)(A). So the parties also dispute whether RPM had Ramsey's consent, and what effect, if any, Ramsey's revocation of consent from Windstream had on RPM's calls to Ramsey. Ramsey also brings a state law claim under the OCSPA, which prohibits unfair, deceptive, and unconscionable acts and practices in connection with a consumer transaction.

The Court will address each issue in turn.

I.      **RPM violated the TCPA.**

Ramsey claims that RPM repeatedly violated the TCPA by making 245 collection calls to his cell phone without his prior express consent. (Doc. 18 at ¶ 36.) He maintains that RPM made these calls using an ATDS. (Doc. 18 at ¶¶ 26, 34; Doc. 80 at 9.) So, according to Ramsey, these calls violated 47 U.S.C. § 227(b)(1)(A)(iii). (Doc. 18 at ¶ 36.)

RPM acknowledges that a critical issue before the Court is whether the telephone system they used to call Ramsey constitutes an ATDS. (Doc. 89-1 at 1; 82 at 6, 10; 88 at 1, 19.) It contends that the Noble Predictive Dialer is not an ATDS and that it had Ramsey's prior express consent to place the calls.

The law favors Ramsey's position, for the reasons below.

**A. The Sixth Circuit's interpretation of the ATDS definition.**

The TCPA makes it "unlawful . . . to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice." 47 U.S.C. § 227(b)(1)(A)(iii). Congress defined the term "automatic telephone dialing system" as

6

"equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). The act covers cell phones. 47 U.S.C. § 227(b)(1)(A)(iii). Thus, federal law prohibits the use of an autodialer to call somebody's cell phone, with some exceptions. *See ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687, 693 (D.C. Cir. 2018).

More difficult is determining whether a given piece of technology constitutes an autodialer. The meaning of the statutory definition of an autodialer, or ATDS, has divided many circuits. The circuits that have examined the statutory definition of an ATDS have "split in primarily two camps on how to interpret it." *Allan v. Pennsylvania Higher Educ. Assistance Agency*, 968 F.3d 567, 580 (6th Cir. 2020) (Nalbandian, J., dissenting). The debate generally revolves around whether the phrase "using a random or sequential number generator" modifies both of the verbs "to store" and "[to] produce," or just modifies the verb "[to] produce." *Compare Duran v. La Boom Disco, Inc.*, 955 F.3d 279, 287 (2d Cir. 2020), *and Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1053 (9th Cir. 2018), *with Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 460 (7th Cir. 2020), *and Glasser v. Hilton Grand Vacations Co.*, 948 F.3d 1301, 1306 (11th Cir. 2020), *and Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 119 (3d Cir. 2018). (Other constructions exist, such as Judge Nalbandian's proposed interpretation that "using a random or sequential number generator" modifies the entire phrase "telephone numbers to be called." *Allan*, 968 F.3d at 580.)

The Sixth Circuit recently weighed in on the statutory definition of an ATDS in *Allan v. Pennsylvania Higher Educ. Assistance Agency*. It joined the Second and Ninth

7

Circuits in holding that the phrase "using a random or sequential number generator" modifies the verb "[to] produce," but not "to store." *Allan*, 968 F.3d at 580. Under this reading, a stored-number device qualifies as an ATDS.

A majority of the *Allan* panel found that the term's definition was ambiguous and looked to other provisions of the autodialer ban to assist in interpreting the term. *Id.* at 574. In arriving at the meaning of an ATDS, the court looked to one of the TCPA's exceptions: the exception for calls "made with the prior express consent of the called party." § 227(b)(1)(A). The Sixth Circuit reasoned that consented-to calls "by their nature are calls made to known persons, i.e., persons whose numbers are stored on a list and were not randomly generated." *Allan*, 968 F.3d at 575. So, by implication, "the autodialer ban applies to stored-number systems." *Id.* Thus, *Allan* held that the phrase "using a random or sequential number generator" applied to the verb "[to] produce" but not to the verb "to store."

Accordingly, as it stands in the Sixth Circuit today, an ATDS is "equipment which has the capacity [] to store [telephone numbers to be called]; or produce telephone numbers to be called, using a random or sequential number generator; and [] to dial such numbers." *Id.* at 579–80 (interpreting 47 U.S.C. § 227(a)(1)). This means that a stored-number device qualifies as an ATDS, whether or not it uses a random or sequential number generator. *Id.* at 580. Consequently, "devices that dial from a stored list of numbers are subject to the autodialer ban." *Id.* at 569.

In response to other circuits' concern that this definition would capture "everyday use of smart phones," the majority panel constrained its interpretation of the statute to

8

apply only to "*automated*" telephone equipment: "the autodialer ban applies to *automatic* dialing systems or artificial or prerecorded voice messages only." *Id.* at 578. *See also ACA Int'l v. Federal Communications Com'n*, 885 F.3d 687, 692 (D.C. Cir. 2018) ("It cannot be the case that every uninvited communication from a smartphone infringes federal law, and that nearly every American is a TCPA-violator-in-waiting, if not a violator-in-fact."). So, in a nutshell, the Sixth Circuit's interpretation of an ATDS includes automatic dialing systems that store telephone numbers to be called and dial such numbers. *Allan*, 968 F.3d at 578.

After the court decided *Allan*, the parties filed supplemental briefs. Defendants argued that the Sixth Circuit made the same error in reasoning that the Federal Communications Commission (FCC) did in *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961, 7972-73 (2015) (*2015 Order*). The FCC had ruled that, to be an ATDS, a device *must* be able to generate and dial random or sequential numbers—but a device could also be an ATDS *even if* it lacked that capacity. The D.C. Circuit set these irreconcilable definitions aside. *ACA Int'l*, 885 F.3d at 702-03. The Sixth Circuit's interpretation, Defendants contend, reaches the same erroneous conclusion: it's an ATDS if it can generate numbers and it's an ATDS if it can't. (Doc. 116.) And, according to Defendants, the D.C. Circuit has jurisdiction over the FCC's rules and was earlier in time than *Allan*, so this Court should ignore what the Sixth Circuit says.

This Court cannot do that. As an initial matter, *ACA Int'l* did not interpret the statutory definition—it left that determination open. *See Ammons v. Ally Fin., Inc.*, 326 F.

9

Supp. 3d 578, 586 (M.D. Tenn. 2018) (quoting *Reyes v. BCA Fin. Servs., Inc.*, 312 F. Supp.3d

1308, 1322 (S.D. Fla. 2018)). Moreover, Defendants' argument is wrong on its face. The

Sixth Circuit did not simply repeat the FCC's mistake. The FCC's *2015 Order* provided

for two contradictory definitions of an ATDS. Contrary to Defendants' claims otherwise,

the Sixth Circuit's interpretation of the ATDS definition does not contradict itself. *Allan*

simply construed the number-generator phrase to modify one verb instead of both verbs.

That decision has settled the debate for this circuit and binds this district court as to the

term's meaning. And, as it applies here, *Allan* requires this Court to resolve two

questions: (1) Did the Noble Predictive Dialer store numbers? (2) Did it use an automated

process to dial numbers?

The short answers are yes and yes. The longer answers follow.

**B. The dialing system is an ATDS under *Allan* because it stored and automatically dialed phone numbers.**

Upon examination, the record reveals little that distinguishes the dialing system

in this case from the dialing system held to be an ATDS in *Allan*. The calling lists in *Allan*

were created afresh everyday through an automated process. *Allan*, 968 F.3d at 570. So

were the calling lists here. (Doc. 70 at 18, Page ID 908) (Q: "[W]ho would have been the

employee or representative uploading telephone numbers into the Noble dialing system

. . . ? A: That, as I mentioned, is an automated function. The system would generate those

files and upload them each night automatically.") The dialing system in *Allan* created

the calling lists based on a stored list of numbers. *Id.* A comparable process happened

here: the lists were constructed in the PICK system, which stored the consumer's names

and numbers, and were later transferred to the Noble system. (Doc. 89-2 at ¶ 28; Doc. 76 at 55, Page ID 1035.) So in both cases, the calling lists of phone numbers ended up stored on the dialing system itself. In *Allan*, a live person created the calling campaigns for the day, but it was the dialing system that actually placed the calls and connected call recipients when a call went through. *Id.* A similar thing took place here. A live person would initiate the calling campaign by pressing a button and then the "calls would go out from the dialer." (Doc. 76 at 15, Page ID 1025.) Only after a call connected to a person would a live agent take the call. (Doc. 70 at 72, Page ID 921; Doc. 76 at 67-68, Page ID 1038.) Finally, the *Allan* dialing system was a predictive dialer. *Id.* So is the Noble system here. (Doc. 89-2 at ¶ 31.)

Beyond the similarities between the *Allan* ATDS and the Noble Predictive Dialer here, the record conclusively shows that RPM's Noble system stored numbers and automatically dialed them. The deposition testimony establishes that it was not just the PICK system that stored the phone numbers—the Noble system did too. Recall that the calling campaigns were lists of phone numbers to be called. (Doc. 72 at 45-46, Page ID 947.) Vittoz testified that the calling campaigns were built in the PICK system and then transferred over to the Noble system. (Doc. 76 at 55, Page ID 1035.) When an RPM manager initiated a campaign, calls originated from the Noble dialer. (Doc. 76 at 15, Page ID 1025.) Clearly, then, the Noble system stored the numbers and dialed them. That makes it an ATDS. *Allan*, 968 F.3d at 579–80.

RPM argues that the human intervention that goes into its processes disqualifies its dialing system from being an ATDS. Not in this case. The human intervention here

11

was limited to starting and stopping a calling campaign. But the significant parts of the process were automated. The PICK system—not a human—selected the accounts for dialing. (Doc. 76 at 91, Page ID 1044.) Those accounts migrated to the Noble system automatically. (Doc. 70 at 18, Page ID 908; Doc. 76 at 55, Page ID 1035.) And, when calls were going out, the Noble system—not a human—dialed the numbers. (Doc. 76 at 15, Page ID 1025.) Once a call connected to a live consumer, the system looked for an unoccupied agent to speak with the consumer. (Doc. 70 at 72, Page ID 921; Doc. 76 at 67-68, Page ID 1038.) The only involvement a human had in the dialing of phone numbers was "[e]ssentially clicking a button to press play to have a list start." (Doc. 76 at 15, Page ID 1025.) This slight degree of human intervention is not enough to remove the dialer from the ambit of the statutory definition. *Marks*, 904 F.3d at 1052-53.

The record establishes that the calls were automatically made from a stored list and are thus subject to the ATDS ban. *See Allan*, 968 F.3d at 575. Since it is not disputed that the 245 calls to Ramsey went out from the Noble Predictive Dialer (Doc. 89-2 at ¶¶ 31, 38, 39, 43, 45, 53), RPM is liable unless it can show that it had Ramsey's prior express consent to be called.

### C. RPM did not have Ramsey's prior express consent.

The TCPA provides a consent exception to its regulation of autodialers. If a caller has the recipient's prior express consent to call her cellphone using an ATDS, then the caller does not violate the TCPA. 47 U.S.C. § 227(b)(1)(A)(iii). Defendants have the burden of proof to show that Ramsey had given his prior express consent to be called with an autodialer before Defendants actually called him. *E.g., Baisden v. Credit*

12

*Adjustments, Inc.*, 813 F.3d 338, 343 (6th Cir. 2016) (quoting FCC guidance providing that, "[s]hould a question arise as to whether express consent was provided, the burden will be on the creditor to show it obtained the necessary prior express consent"); *Zehala v. Am. Exp.*, No. 2:10-CV-848, 2012 WL 1657061, at *4 (S.D. Ohio May 9, 2012); *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 FCC Rcd. 559, 565 (2008) (*2008 Order*). "[A] creditor on whose behalf an autodialed . . . call is made to a wireless number bears the responsibility for any violation of the Commission's rules. Calls placed by a third party collector on behalf of that creditor are treated as if the creditor itself placed the call." *2008 Order*, 23 FCC Rcd. at 565.

The TCPA does not prohibit a caller from obtaining a consumer's prior express consent through an intermediary. *2015 Order*, 30 FCC Rcd. 7961 (2015), *set aside in other part by ACA Int'l*, 885 F.3d 687 (D.C. Cir. 2018). In questions of prior express consent, when the consent is claimed to have been conveyed through an intermediary, "the appropriate analysis turns on whether the called party granted permission or authorization, not on whether the creditor received the number directly." *Baisden v. Credit Adjustments, Inc.*, 813 F.3d 338, 345 (6th Cir. 2016) (quoting *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1123 (11th Cir. 2014)). Thus, the analysis hinges on whether Windstream or RPM had Ramsey's permission or authorization to call him. So the Court will start there.

Ramsey argues that he revoked his consent to be called, by means of the November 16, 2014 letter he sent to Windstream. In that letter, he instructed Windstream and "any affiliated collection agencies" to cease all communications with him. (Doc. 89-2 at ¶ 47,

13

Page ID 1795.)

Defendants do not take the position that Ramsey's revocation of consent was totally ineffective. On the contrary, they admit that his revocation was valid and, if they had known about it, they would have ceased their communication with him. (Doc. 89-2 at ¶ 48.) Instead, they raise two related counterarguments. First, they argue that in the ordinary course of business, Windstream sends them debtors' accounts through electronic data transfers. Since Ramsey's phone number was in the account that came from Windstream, the argument goes, Defendants had Ramsey's consent. Second, they make an argument under agency law. They admit that Ramsey made his cease-contact request to Windstream but argue that these communications were never communicated to RPM. Under these circumstances, Windstream was the principal and RPM was the agent. And, based on agency law, Defendants maintain that the agent's knowledge may be imputed to the principal, but not vice versa, citing *Schmitt v. FMA All.*, 398 F.3d 995, 997 (8th Cir. 2005); *Mullen v. Compton*, No. 2:11-CV-01159, 2013 WL 372470, at *4 (S.D. Ohio Jan. 30, 2013).

Ramsey replies that the cases Defendants cite apply to the Fair Debt Collections Practices Act (FDCPA), not the TCPA, and conflict with FCC orders that are more on point. He argues that, by relying on Windstream as a third-party intermediary to provide consent on Ramsey's behalf, RPM assumed the risk that Windstream did not actually have Ramsey's prior express consent, citing a 2014 FCC Declaratory Ruling, *Matter of GroupMe, Inc./skype Commc'ns S.A.R.L Petition for Expedited Declaratory Ruling Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 29 FCC Rcd. 3442, 3442 (2014)

14

("*GroupMe*").

These positions settle the question of whether, when Ramsey received the calls, he had granted Windstream or any of its affiliates "permission or authorization," *Baisden*, 813 F.3d at 345, to call him—the answer is clearly no. There is no debate that a party may revoke his consent through any reasonable means that clearly express a desire to receive no further messages from the caller. *ACA Int'l*, 885 F.3d at 692. RPM does not dispute the efficacy of Ramsey's revocation as it relates to Windstream. Nor does it point to any evidence that Ramsey affirmatively gave RPM his prior express consent. So the search for prior express consent turns up empty—Ramsey revoked consent from Windstream, meaning Windstream sent an account lacking prior express consent to RPM, but RPM operated otherwise.

What RPM disputes instead is the effect of Ramsey's revocation as it relates to its own operations. The question here is whether a third-party debt collection agency is liable for autodialed calls under the TCPA when the consumer has revoked his prior express consent to be called, even when that revocation has not been communicated to the debt collector or the debt collector otherwise fails to confirm the consumer has consented to calls. And, in situations like this one—in which the called party has revoked his consent to be called, but the third-party has relied on an intermediary's representation, or its own assumption, that consent still exists—the FCC has clearly indicated that the caller remains liable for TCPA violations. *See, e.g.*, *GroupMe*, 29 FCC Rcd. at 3447.

The Sixth Circuit has already adopted much of the FCC's reasoning regarding

15

prior express consent as conveyed through intermediaries. In *Baisden*, the plaintiffs had provided their cell phone numbers to a medical provider during the course of a business relationship. When the plaintiffs failed to pay their bills, their accounts—and phone numbers—ended up with a debt collector. The debt collector used automated technology to call their cell phones. The *Baisden* plaintiffs argued that prior express consent is deemed granted only if the consumer provides her phone number to the creditor directly. Not so, held the court. Rather,

> consumers may give "prior express consent" under the FCC's interpretations of the TCPA when they provide a cell phone number to one entity as part of a commercial transaction, which then provides the number to another related entity from which the consumer incurs a debt that is part and parcel of the reason they gave the number in the first place.

*Id.* at 346. Thus, in some circumstances, an intermediary may convey a consumer's consent to a third-party collector. *Id.*

But *Baisden* did not address a situation in which the consumer had revoked consent. The FCC, on the other hand, has. And it has emphasized that callers who rely on third-party representations regarding consent do so at their peril. In *GroupMe*, the FCC addressed prior express consent as it relates to social networks and text messages, but the Sixth Circuit has adopted the FCC's reasoning as it applies to collection agencies and phone calls too. *See Baisden*, 813 F.3d at 343 (applying *GroupMe* to collection calls). In that ruling, the FCC interpreted the TCPA "to permit a text sender . . . to send such autodialed text messages based on the consent obtained and conveyed by an intermediary, *with the caveat that if consent was not, in fact, obtained, the sender . . . remains liable*." *GroupMe*, 29 FCC Rcd. at 3446 (emphasis added). "[S]ocial networks that rely on

third-party representations regarding consent remain liable for TCPA violations when a consumer's consent was not obtained." *Id.* at 3442. A "caller remains liable for TCPA violations when it relies upon the assertion of an intermediary that the consumer has given such prior express consent." *Id.* at 3447. An intermediary may only convey consent that has actually been provided by the consumer—the intermediary cannot provide consent on the consumer's behalf. *Id.* Or, as the Sixth Circuit put it, "the context of the consent provided is critical." *Baisden*, 813 F.3d at 343.

The critical context here is the record's clear demonstration that Ramsey revoked consent from Windstream, but RPM operated under the assumption it had Ramsey's consent based merely on its receipt of his account from Windstream. Since Ramsey revoked his consent, the facts here place this case outside the scope of *Baisden*'s facts and within the scope of *GroupMe*'s guidance.

By *GroupMe*'s lights, RPM lacked Ramsey's prior express consent to place autodialed calls to his cell phone. Windstream could not consent on Ramsey's behalf. *GroupMe*, 29 FCC Rcd. at 3447. And it could only convey the consent Ramsey had given it. *Id.* But Ramsey clearly revoked that consent in November 2014, months before Windstream forwarded both of Ramsey's accounts to RPM. Whether or not Windstream ever had Ramsey's consent is irrelevant, because even if he had permitted Windstream to call him, his November 2014 letter constituted clear "instructions to the contrary." *Baisden*, 813 F.3d at 342 (quoting *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7 FCC Rcd. 8752, 8769 (1992)). That letter was a reasonable means of revoking consent to receive any further messages, as Defendants concede. (Doc.

89-2 at ¶ 48, Page ID 1795.) *ACA Int'l*, 885 F.3d at 692 (upholding the FCC's "reasonable means" approach of revoking consent). Thus, when Windstream forwarded Ramsey's account to RPM, it was not forwarding an account for which any party had Ramsey's prior express consent to call his phone. RPM's general counsel and corporate witness admitted as much. (Doc. 89-2 at ¶¶ 47-48.) Instead of verifying with Windstream or Ramsey that it had the consumer's prior express consent, RPM proceeded to make hundreds of autodialed calls in reliance upon the assumption it was in the clear. The FCC has provided that, in this scenario, the caller remains liable for any TCPA violations that may result. *See GroupMe*, 29 FCC Rcd. at 3447.

Such a conclusion is consistent with the plain text of the "prior express consent" exception. The clear import of the statutory exception is that the caller needs to obtain consent *before* it uses an ATDS to make a call and that such consent needs to be *express*, as in "clearly and unmistakably communicated," *Black's Law Dictionary* 726 (11th ed. 2019) (first definition of "express"), or "definite," *Black's Law Dictionary* 580 (6th ed. 1990) (second definition of "express" in most current edition when Congress passed the TCPA). That means not tacit. Tacit consent is what Defendants rely on here, at best. But the statute requires more. To find otherwise would be to depart from the plain words composing the exception. Another comparison to *Baisden* shows why. In *Baisden*, the called party had given, without revoking, prior express consent. Thus, those facts supported the application of the exception: even though the called parties may not have consented to be called by the debt collector, they had consented to be called about the debt in general and had not revoked that consent. Here, different facts compel a different

conclusion.  Ramsey had revoked whatever consent he gave to Windstream to receive autodialed calls about the debt.  So the fact that the number came from the creditor does not, in this instance, constitute proof of consent.  Reliance on an intermediary's representation—when in fact no consent exists—is nowhere within the range of textually permissible range of meanings for the phrase "prior express consent."  Much less a caller's own assumption without any attempt to confirm the consumer has in fact consented.  Because RPM relies on the presumption that it had consent to call Ramsey, when Ramsey had in fact revoked consent, RPM lacked Ramsey's prior express consent to receive calls from an ATDS.

RPM's agency argument fails too.  The principal/agent theory is the wrong frame around this dispute, which stems from a statutory provision, not common law.  RPM's knowledge of consent or non-consent is not the point—the TCPA requires actual consent.  So RPM's argument that it never received Ramsey's revocation of consent takes it nowhere.  When Windstream sent Ramsey's account to RPM, Windstream had no actual consent to forward to RPM.  And RPM had no basis for assuming that it began at a default starting point of having Ramsey's consent to be called.  So RPM's lack of knowledge that Ramsey had revoked his consent cannot stand in for Ramsey's prior express consent.

Defendants have one more argument in their quiver.  They argue that Ramsey only revoked consent for his first Windstream account, and to the extent the revocation had any effect, it should only have effect as to that account.  This argument is irrelevant.  Defendants concede that they placed only one call to Ramsey with respect to the second Windstream account.  That call took place in September 2015 and is not among the 245

19

calls placed between February 20, 2015, and July 7, 2015. (Doc. 89-2 at ¶ 53, Page ID 1798.) The Court will not assess whether Defendants' argument on this score has any merit, because even if it did, the phone call regarding the second Windstream account is outside the timeline of the targeted calls and not at issue here.

### D. Ramsey is entitled to statutory damages.

Under the TCPA, a plaintiff may bring "an action to recover for actual monetary loss from [a TCPA violation], or to receive $500 in damages for each such violation, whichever is greater." 47 U.S.C. § 227(b)(3)(B). The parties agree that RPM used its Noble Predictive Dialer to call Ramsey's cell phone 245 times between February and July 2015. (Doc. 89-2 at ¶ 53, Page ID 1798.) Since the Court has found that the Noble system is an ATDS under *Allan* and that RPM made the calls without Ramsey's consent, it will award Ramsey statutory damages of $500 per violation.

### II. Genuine questions of material fact preclude summary judgment on the Ohio Consumer Sales Practices Act claim.

Ramsey also brings a claim under the Ohio Consumer Sales Practices Act (OCSPA), Ohio Revised Code § 1345 *et seq.* Under the OCSPA, no "supplier" shall commit an unfair, deceptive, or unconscionable act or practice in connection with a consumer transaction. R.C. 1345.02(A), 1345.03(A). Ramsey claims that TCPA violations constitute such prohibited practices, citing *Charvat v. GVN Michigan, Inc.*, 561 F.3d 623, 629 fn. 4 (6th Cir. 2009), and for that reason he is entitled to statutory damages under the OCSPA for each of the 245 calls, plus reasonable attorney fees.

Defendants argue that, if the Court grants summary judgment in their favor on the

TCPA claim, then the Court should decline to exercise its supplemental jurisdiction over the OCSPA claim.  They also claim that since, according to them, the TCPA claim lacks merit, and the OCSPA claim is predicated on the TCPA claim, the OCSPA claim automatically fails.

The parties' limited briefing on the OCSPA claim does not develop the issue to the degree that the Court may find in either side's favor.  Start with Defendants.  They make the same arguments on offense as they do on defense, and both of them live or die on the success of the TCPA claim.  Since the Court has ruled in Ramsey's favor on the TCPA claim, Defendants' OCSPA arguments fail.  As for Ramsey, he relies entirely on one footnote in a case that pertained to a different legal question than whether TCPA violations also constitute OCSPA violations as a legal matter.  *See Charvat*, 561 F.3d at 629 fn. 4. That is not enough to remove this issue from the factfinder's consideration.  Ramsey does not explain why the facts here compel the conclusion that these TCPA violations constitute per se OCSPA violations.  So genuine and material questions of fact hang over the OCSPA claim.  The Court will deny both motions for summary judgment as they relate to that claim.

### III.  Genuine questions of material fact remain as to Howard George's involvement.

Defendants argue that Howard George is only involved in this case because he is RPM's CEO and that no allegations or evidence show he took any action relative to Ramsey.  Ramsey responds that genuine disputes of material fact remain as to whether George engaged in conduct warranting personal liability for RPM's TCPA violations.  He

claims George is RPM's founder, owner, and highest-ranking officer, and also the final authority over RPM's business operations and RPM's contract with Windstream. More specifically, he alleges that George was in charge of implementing TCPA procedures at RPM.

George characterizes Ramsey's argument as the red herring variety—but does not say why. Because Ramsey places genuine and material questions of fact into dispute, and Defendants make no effort to seriously refute those facts, the Court will deny Defendants' motion for summary judgement as it relates to co-defendant Howard George.

## CONCLUSION

Based on the reasons above, the Court **GRANTS IN PART** Ramsey's motion for summary judgment against RPM and awards Ramsey $122,500.00 for RPM's 245 TCPA violations. The Court **DENIES IN PART** Ramsey's motion as it relates to his OCSPA claim and **DENIES** Defendants' motion for summary judgment.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____

JUDGE MATTHEW W. McFARLAND